

**ACLU**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
District
of Columbia

915 15th St. NW, 2nd Floor
Washington, D.C. 20005
202-457-0800
acludc.org

The Honorable Mark Langer
Clerk, U.S. Court of Appeals
for the District of Columbia Circuit
E. Barrett Prettyman U.S. Courthouse and
William B. Bryant Annex
333 Constitution Ave. N.W.
Washington, D.C. 20001

September 8, 2023

> Re: *Asinor v. District of Columbia*, No. 22-7129, and *Cameron v. District of Columbia*, No. 22-7130 (oral argument in consolidated cases on September 21, 2023)—Rule 28(j) Letter

Dear Mr. Langer:

Plaintiffs-Appellants write to inform the Court of two recent decisions (attached) supporting their *Monell* arguments.

First, *Frederick Douglass Foundation, Inc. v. District of Columbia*, 2023 WL 5209556 (D.C. Cir. Aug. 15, 2023) held that pro-life demonstrators plausibly alleged several theories by which a District custom or policy led to unconstitutional selective enforcement of a statute against them. One successful theory there was custom, which Plaintiffs allege here. *See id.* at *15; Appellants' Br. 51. *Frederick Douglass* undercuts Defendants' argument here that successfully *pleading* a custom requires alleging "concentrated, fully packed, precisely delineated scenarios." Appellees' Br. 46 (citation omitted). Although this Court has applied that standard when reviewing municipal liability determinations reached *after trial*, it does not apply at the pleading stage, *see* Reply Br. 22, as *Frederick Douglass* confirms. Rather, what plaintiffs must do is "plausibly allege the violation was pursuant to an official custom," 2023 WL 5209556, at *14—a standard plaintiffs in that case met merely by "alleg[ing] facts *suggesting*" that the violation was "persistent and widespread." *Id.* at *15 (emphasis added). Plaintiffs have done likewise here. The 200-plus examples Plaintiffs cite of the challenged custom, *see* Reply Br. 21-22, plausibly "suggest[]," based on "common sense," 2023 WL 5209556, at *14-*15 (citation and internal quotation marks omitted), that the District's practice of retaining cell phones longer than reasonably necessary is "persistent and widespread."

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
**District
of Columbia**

915 15th St. NW, 2nd Floor
Washington, D.C. 20005
202-457-0800
acludc.org

Second, in *Brown v. Knapp*, 75 F.4th 638, 651-52 & n.5 (6th Cir. 2023), the Sixth Circuit rejected the argument that officers who detain arrestees longer than 48 hours without probable-cause hearings violate the Fourth Amendment only by acting "knowingly or intentionally" and not "negligen[tly]." This conclusion rebuts the District's assertion that Fourth Amendment claims invariably require intentional conduct—and that Plaintiffs therefore must allege a custom of intentional acts. *See* Appellees' Br. 48-49. In fact, "distinct Fourth Amendment claims" use "their own particularized standards" regarding officers' requisite mental state. *Brown*, 75 F.4th at 651 n.5. Here, as Plaintiffs explained, over-detaining property, like over-detaining people, violates the Fourth Amendment regardless of the intent of the officers involved. *See* Appellants' Br. 52-53; Reply Br. 26-27.

Respectfully submitted,

/s/ Michael Perloff
Michael Perloff
Scott Michelman
Arthur B. Spitzer
Laura K. Follansbee
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street N.W., Second Floor
Washington, D.C. 20005
202-601-4268
mperloff@acludc.org

*Counsel for Plaintiffs-Appellants
in Asinor v. District of Columbia,
No. 22-7129*, and *Cameron v. District of
Columbia*, No. 22-7130

Jonathan M. Smith
Carlos Andino
Kristin L. McGough
Washington Lawyers' Committee for
Civil Rights & Urban Affairs
700 14th Street, N.W., Suite 400

915 15th St. NW, 2nd Floor
Washington, D.C. 20005
202-457-0800
acludc.org

Washington, D.C. 20005
(202) 319-1000
jonathan_smith@washlaw.org

Jeffrey L. Light
Law Office of Jeffrey L. Light
1629 K Street, N.W., Suite 300
Washington, DC 20006
202-277-6213
jeffrey@lawofficeofjeffreylight.com

Tara L. Reinhart
Julia K. York
Joseph M. Sandman
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7630
tara.reinhart@probonolaw.com

*Counsel for Plaintiffs-Appellants
in Cameron v. District of Columbia,
No. 22-7130*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing letter complies with the word limit of Fed. R. App. P. 28(j) because the body of the letter is 349 words long.

/s/ Michael Perloff
Michael Perloff

# Attachment 1

2023 WL 5209556
Only the Westlaw citation is currently available.
United States Court of Appeals,
District of Columbia Circuit.

FREDERICK DOUGLASS
FOUNDATION, INC., et al., Appellants

v.

DISTRICT OF COLUMBIA, Appellee

No. 21-7108
|
Argued September 28, 2022
|
Decided August 15, 2023

**Synopsis**
**Background:** Anti-abortion organization and protestors brought suit against District of Columbia, claiming that enforcement of defacement ordinance against them, but not against others voicing distinct messages, violated the First Amendment prohibition of viewpoint discrimination, the Fifth Amendment's equal protection guarantee, expressive association rights, the Religious Freedom Restoration Act (RFRA), and the free exercise clause. Organization and protestors moved for a preliminary injunction barring District from enforcing ordinance against them at forthcoming rally. The United States District Court for District of Columbia, 531 F.Supp.3d 316, James E. Boasberg, Chief Judge, denied preliminary injunction. Organization and protestors filed amended complaint, alleging violations of the First and Fifth Amendments, conceding the defacement ordinance was facially constitutional, but arguing the District's one-sided enforcement of the ordinance was not. The District Court, Boasberg, Chief Judge, 2021 WL 3912119, granted District's motion to dismiss for failure to state claim. Organization and protestors appealed.

**Holdings:** The Court of Appeals, Rao, Circuit Judge, held that:

organization plausibly alleged that its members, who were arrested for printing "Black Pre-Born Lives Matter" on public sidewalk, were similarly situated to those protestors who were not arrested for painting public sidewalks with "Black Lives Matter" message for purposes of organization's § 1983 claim;

organization plausibly alleged that District of Columbia abridged its members' First Amendment rights by enforcing District's ordinance against them;

organization was not required to allege discriminatory intent in order to state § 1983 First Amendment selective enforcement claim against District;

organization did not plausibly plead that District's enforcement of its ordinance against organization's members, but not against protestors was rooted in purposeful discrimination, as required for its § 1983 selective enforcement claim under Fifth Amendment;

organization plausibly alleged predicate First Amendment selective enforcement violation was pursuant to official custom or policy so as to establish District's liability under *Monell*; and

District's ordinance prohibiting defacement of property was not unconstitutional "as applied" to organization's pro-life speech.

Affirmed in part, reversed in part, and remanded.

Wilkins, Circuit Judge, concurred in judgment and filed opinion.

Appeal from the United States District Court for the District of Columbia (No. 1:20-cv-03346)

**Attorneys and Law Firms**

Erin M. Hawley argued the cause for appellants. With her on the briefs were John J. Bursch, Kevin H. Theriot, and Jacob P. Warner.

Samuel J. Salario, Jr. was on the brief for amicus curiae Americans United for Life in support of appellants.

Jacob L. Phillips was on the brief for amicus curiae The Susan B. Anthony List in support of appellants.

Carl J. Schifferle, Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were Karl A. Racine, Attorney General, Caroline S. Van Zile, Solicitor General, and Ashwin P. Phatak, Principal Deputy Solicitor General.

Before: Wilkins, Rao and Childs, Circuit Judges.

**Opinion**

Opinion concurring in the judgment filed by Circuit Judge Wilkins.

Rao, Circuit Judge:

**\*1**    The First Amendment prohibits government discrimination on the basis of viewpoint. "To permit one side ... to have a monopoly in expressing its views ... is the antithesis of constitutional guarantees." *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Relations Comm'n*, 429 U.S. 167, 175–76, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). The protection for freedom of speech applies not only to legislation, but also to enforcement of the laws. This case concerns a constitutional challenge to the selective enforcement of the District of Columbia's defacement ordinance against some viewpoints but not others.

In the summer of 2020, thousands of protesters flooded the streets of the District to proclaim "Black Lives Matter." Over several weeks, the protesters covered streets, sidewalks, and storefronts with paint and chalk. The markings were ubiquitous and in open violation of the District's defacement ordinance, yet none of the protesters were arrested. During the same summer, District police officers arrested two pro-life advocates in a smaller protest for chalking "Black Pre-Born Lives Matter" on a public sidewalk.

The organizers of the smaller protest, the Frederick Douglass Foundation and Students for Life of America (collectively "the Foundation"), sued. The Foundation alleged violations of the First and Fifth Amendments, conceding the defacement ordinance was facially constitutional, but arguing the District's one-sided enforcement of the ordinance was not. The district court dismissed the complaint. Concluding the First Amendment and equal protection claims were essentially the same, the district court held the Foundation had failed to adequately allege discriminatory intent, which the court considered a necessary element of both claims.

We affirm the district court's dismissal of the Foundation's equal protection claim because the Foundation has not plausibly alleged invidious discrimination by District officials. Discriminatory motive, however, is not an element of a First Amendment free speech selective enforcement claim. The First Amendment prohibits discrimination on the basis of viewpoint irrespective of the government's motive. We hold the Foundation has plausibly alleged the District discriminated on the basis of viewpoint in the selective enforcement of its defacement ordinance. We therefore reverse the dismissal of the Foundation's First Amendment claim and remand for further proceedings.

**I.**

This case is about the District's alleged discriminatory enforcement of its defacement ordinance. The ordinance prohibits "willfully and wantonly ... writ[ing], mark[ing], draw[ing], or paint[ing]" on public or private property, without the consent of the owner or public official controlling the property.[1] D.C. Code § 22–3312.1. The parties agree the ordinance does not, on its face, violate the First Amendment. The provision is content- and viewpoint-neutral and serves the District's interest in preventing vandalism. Instead, the Foundation alleges the District discriminated on the basis of viewpoint by selectively enforcing the ordinance against those who chalked "Black Pre-Born Lives Matter," but not against those who painted, marked, and chalked "Black Lives Matter."

**\*2**    At the motion to dismiss stage, we "accept as true all of the allegations" in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We recount the facts as set forth by the Foundation, most of which are not contested by the District.

**A.**

George Floyd's death at the hands of a Minneapolis police officer in May 2020 sparked a wave of protests across the country. The District played host to some of the largest and most sustained of these Black Lives Matter protests, which addressed the excessive use of police force and other issues of racial justice. Most of the protests occurred in May and early June but some scattered events continued until late summer. District leadership, including Mayor Muriel Bowser, supported the message of the protests and commissioned a painting of "Black Lives Matter" to cover a street for more than a city block.[2]



The District all but abandoned enforcement of the defacement ordinance during the Black Lives Matter protests, creating a de facto categorical exemption for individuals who marked "Black Lives Matter" messages on public and private property. The complaint offers a number of examples. The day after Mayor Bowser's street mural was revealed, protestors added an equal sign and "Defund the Police," so the message read "Black Lives Matter = Defund the Police."



Police officers watched as the alteration took place and did nothing to stop it. Although the Black Lives Matter advocates did not seek a permit or otherwise receive consent, they were neither arrested nor charged under the defacement ordinance. In fact, the District left the addition in place for months, eventually removing it in mid-August.

Black Lives Matter protesters also covered construction scaffolding outside the Chamber of Commerce with graffiti, murals, and photographs. Again the protesters were neither stopped nor arrested for blatant violations of the defacement ordinance.[3] Over weeks and months, many individuals painted streets, sidewalks, and storefronts with graffiti and chalk espousing variations on the "Black Lives Matter" message. Not a single permit was sought, and not one person was punished for violating the defacement ordinance. For months, the District allowed many of the Black Lives Matter markings, paintings, and drawings to remain on public property.



Also in the summer of 2020, two pro-life organizations planned a protest. The Frederick Douglass Foundation is a non-profit education and policy group that advocates for free markets and limited government. Among other things, the Frederick Douglass Foundation "acts as a liaison between black, faith-based organizations" and elected officials, and seeks to protect "black babies still in the womb." Students for Life of America, the nation's largest pro-life youth organization, recruits and mobilizes students to help abolish abortion. These organizations planned a small rally—for less than 50 supporters—to proclaim "Black Pre-Born Lives Matter" and paint this message on the streets.

 **\*3** In the lead up to the pro-life rally, the Foundation applied for and received a permit to assemble. In a conversation about the permit, a police officer gave the Foundation verbal permission to paint its "Black Pre-Born Lives Matter" message on the street. The officer explained that he believed Mayor Bowser had effectively opened up the District's streets for political markings. The Foundation also sent a letter to Mayor Bowser asking to paint a mural and declaring it a constitutional right to do so. Mayor Bowser did not respond.

When the pro-life advocates arrived for their rally on August 1, six police cars and many police officers were waiting. The officers said the advocates could assemble in accordance with the Foundation's permit, but if they painted or chalked their message on the sidewalk, they would be arrested for violating the defacement ordinance. Two students began to chalk "Black Pre-Born Lives Matter" on the sidewalk anyway. Despite the message being written in small, faint letters with washable chalk, the two students were arrested. The entire event was caught on video.



This was not the only incident. The Foundation planned to hold another rally on March 27, 2021, to proclaim "Black Pre-Born Lives Matter" and write their message on the public street. The Foundation sought a permit and was allowed by the District to assemble with a bullhorn and a music stand. The District again denied the Foundation's request to paint or mark on the street or sidewalk.

**B.**

Having failed to secure a permit from the District, the Foundation—joined by three individual members—sought to enjoin the District from enforcing the defacement ordinance during their rally on March 27. *Frederick Douglass Found. v. District of Columbia*, 531 F. Supp. 3d 316, 322 (D.D.C. 2021). The Foundation claimed the vigorous enforcement of the ordinance against individuals expressing "Black Pre-Born Lives Matter" and the lack of enforcement against individuals expressing "Black Lives Matter" violated the Free Speech, Free Exercise, and Free Association Clauses of the First Amendment, the equal protection guarantee of the Fifth Amendment, and the Religious Freedom Restoration Act ("RFRA"). *Id.* at 328–45. The Foundation argued Mayor Bowser and District officials discriminated against their pro-life message, as evidenced by Mayor Bowser's commissioning of the Black Lives Matter mural and her strong public support of Planned Parenthood and its pro-choice agenda. The Foundation claimed the District seemed eager to arrest its members, pointing to the rapid, coordinated, and overwhelming response to the small gathering in August 2020. Because its protest was similarly situated to the Black Lives Matter protest, the Foundation argued that viewpoint discrimination was the only explanation for the District's disparate treatment.

The district court declined to enjoin enforcement of the defacement ordinance at the March 27 protest, concluding the Foundation was not likely to succeed on the merits of its constitutional and statutory claims. *Id.* at 345. In response, the Foundation amended its complaint. The Foundation reiterated its claims that the District had violated its members' rights under the First and Fifth Amendments, and under RFRA, by allowing individuals to mark "Black Lives Matter" on public streets and sidewalks, but arresting those who marked "Black Pre-Born Lives Matter." The Foundation sought a declaratory judgment, preliminary and permanent injunctive relief, and damages under 42 U.S.C. § 1983.

**\*4** The district court granted the District's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The court expressed uncertainty about how to treat the free speech and equal protection claims in particular, but ultimately concluded they were "essentially the same." *Frederick Douglass Found. v. District of Columbia*, 2021 WL 3912119, at \*4 (D.D.C. Sept. 1, 2021). Moreover, both constitutional claims failed because the Foundation had not plausibly alleged the District had a discriminatory purpose. In the alternative, the district court held the Foundation had not sufficiently alleged the District had a policy of selective enforcement, as required to establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

On appeal, the Foundation leaves aside its free exercise, free association, and RFRA claims, but maintains the district court erred by dismissing the free speech and equal protection claims.

**II.**

We review de novo the district court's dismissal for failure to state a claim. *Jackson v. Modly*, 949 F.3d 763, 767 (D.C. Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (cleaned up). The court must be able to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At this stage, "we construe the complaint liberally," granting the Foundation "the benefit of all inferences that can be derived from the facts alleged." *Zukerman v. USPS*, 961 F.3d 431, 436 (D.C. Cir. 2020) (cleaned up).

The Foundation alleges the District of Columbia is liable under 42 U.S.C. § 1983 for viewpoint discrimination in the selective enforcement of its defacement ordinance. Section 1983 provides, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of ... the District of Columbia, subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable." A municipality or local government, such as the District, is a "person" for section 1983 purposes. *See Monell*, 436 U.S. at 692, 98 S.Ct. 2018; *Blue v. District of Columbia*, 811 F.3d 14, 18 (D.C. Cir. 2015). Local governments, however, are not liable for injuries inflicted solely by their employees or agents; the government must be the "moving force" behind the violation. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Therefore, to maintain its section 1983 claim, the Foundation must plausibly allege that the District violated the Constitution and that the violation was the result of an official custom or policy. *Id.*

III.

We begin with the constitutional violation. The Foundation alleges the District selectively enforced its defacement ordinance on the basis of viewpoint in violation of the First and Fifth Amendments. A selective enforcement claim has two elements: a plaintiff must demonstrate (1) he was similarly situated in material respects to other individuals against whom the law was not enforced, and (2) the selective enforcement infringed a constitutional right. In this Part, we set forth the similarly situated requirement and assess whether the Foundation's allegations are plausible.

A.

Selective enforcement claims require courts to separate unlawful discrimination from the ordinary and lawful exercise of prosecutorial discretion. Because the executive cannot address every violation of the laws, the prosecution (and non-prosecution) power is a vital aspect of the executive power. *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (explaining "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *McCleskey v. Kemp*, 481 U.S. 279, 311–12, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) ("[T]he capacity of prosecutorial discretion to provide individualized justice is firmly entrenched in

American law.") (cleaned up). Prosecutorial discretion lies within the "special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.' " *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (quoting U.S. Const. art. II, § 3); *see also Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) (same). It follows from these principles that the "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *See Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

**\*5** Because prosecutorial discretion lies within the executive's sphere, the exercise of such discretion is not generally reviewable by the courts. *See ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) ("[T]he refusal to prosecute cannot be the subject of judicial review."); *Heckler*, 470 U.S. at 831, 105 S.Ct. 1649 (describing "the general unsuitability for judicial review of agency decisions to refuse enforcement"). As we have explained, the "Executive's charging authority embraces decisions about whether to initiate charges, whom to prosecute, which charges to bring," and "[i]t has long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations."[4] *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737 (D.C. Cir. 2016).

Despite the general presumption against judicial review of prosecutorial decisions, courts may review selective enforcement claims to assess whether the executive's choice of prosecution targets infringes on constitutional rights. The executive cannot selectively enforce the law in a way that violates the Constitution. *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints."). And "although prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (cleaned up).

Because selective enforcement claims risk invading the "special province of ... prosecutorial discretion," the Supreme Court has emphasized "that the standard for proving them is particularly demanding." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). To make out a selective enforcement claim, the target of enforcement must displace "the presumption that a prosecutor has acted lawfully." *Id.*

This requires a plaintiff to demonstrate he was singled out for enforcement "from among others similarly situated." *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (cleaned up).

Individuals "are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Id.* at 145 (cleaned up); *see also Att'y Gen. v. Irish People, Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982) ("Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances."). The "similarly situated requirement is necessary" to ensure courts are not " 'interfer[ing] with the course of criminal justice.' " *United States v. Armstrong*, 517 U.S. 456, 466–67, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting *Ah Sin v. Wittman*, 198 U.S. 500, 508, 25 S.Ct. 756, 49 L.Ed. 1142 (1905)).

The similarly situated requirement strikes the proper balance between executive discretion and judicial enforcement of constitutional rights by isolating whether a decision turns on "unlawful favoritism," rather than lawful prosecutorial considerations. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). In practice, courts must assess whether a plaintiff is similarly situated to a person against whom the law was not enforced across the relevant prosecutorial factors. Such factors may include "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte*, 470 U.S. at 607, 105 S.Ct. 1524; *see also Beverly Health & Rehab. Servs. v. Feinstein*, 103 F.3d 151, 153 (D.C. Cir. 1996) (stating executive officials may balance "culpability, evidence, prosecutorial resources, and the public interest" in enforcement decisions).

 **\*6** The factors will vary and cannot be reduced to a singular list. *See Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019). Determining whether a plaintiff is similarly situated to those not prosecuted will be a fact-intensive and case-specific comparative inquiry.

## B.

The Foundation has plausibly alleged its members were similarly situated to the Black Lives Matter advocates. Accepting the Foundation's facts as true, there are salient similarities between the actions of the two groups. To begin with, both groups gathered about matters of public concern and sought to disseminate a political message, in one instance that "Black Lives Matter," and in the other that "Black Pre-Born Lives Matter." The locations of the gatherings were also the same: namely public streets and sidewalks in the District. And the events were proximate in time, held during the summer of 2020 when public attention focused on the problems of racial justice and police violence against black Americans. Many Black Lives Matter protests occurred in May and June, but at least one event occurred as late as August 16. The Foundation held its first rally between these dates, on August 1.

There was also strong evidence that both groups violated the defacement ordinance. Black Lives Matter advocates painted streets, sidewalks, and storefronts with messages such as "Protect Black Youth," "Our Streets," and "Abolish the Police." The complaint includes photographs of the conspicuous defacements. Similarly, the Foundation sought to chalk the "Black Pre-Born Lives Matter" message conspicuously on a public sidewalk. Police officers were present and witnessed defacement by both groups. For example, officers stood by and watched as the "Defund the Police" message was added to the District's Black Lives Matter street painting. Both groups violated the defacement ordinance by "writ[ing], mark[ing], draw[ing], or paint[ing]" on public property without consent, D.C. Code § 22–3312.1, and the District was well aware of the violations.

Finally, the District's differential response fails to correspond with the culpability of the two groups or the general deterrence value of enforcement against them. The Foundation's members managed to write a single, small pro-life message in washable chalk before being arrested for violating the defacement ordinance. By contrast, for weeks, individuals participating in the Black Lives Matter protests painted their messages on public streets and sidewalks, as well as private property. And yet allegedly no arrests were made for defacement that included the "Black Lives Matter" message. This lopsided prosecutorial response—several arrests for small, chalked pro-life messages and no arrests for widespread "Black Lives Matter" messages—does not comport with the deterrence value or culpability associated with the number of protesters and the scope of defacement, suggesting improper selective enforcement.

We find the Foundation has plausibly alleged its members were similarly situated to individuals expressing "Black

Lives Matter" across a range of relevant prosecutorial factors, including the strength of the case, available evidence, culpability, and the resources required to obtain a conviction.

C.

**\*7** The District argues it is not plausible that individuals at the Foundation's small rally were similarly situated to individuals at the Black Lives Matter protests. First, the District maintains the Black Lives Matter protests were much larger, involving tens of thousands of people flooding the streets of downtown Washington. In light of the intensity and scale of the protests, the District was concerned that making arrests for defacement would drain police resources and distract officers from other priorities, such as ensuring public safety and addressing widespread looting and property damage.

We do not doubt these are legitimate prosecutorial factors that will be part of the merits assessment of whether the Foundation has demonstrated its members were similarly situated. Nonetheless, at the motion to dismiss stage, the Foundation's allegations allow us to reasonably infer that its protesters were similarly situated to at least some of the Black Lives Matter protesters.

The comparison is not only between the Foundation's single, small rally and the large Black Lives Matter protests that occurred over weeks. Rather, we consider whether the plaintiffs were similarly situated to any individuals against whom the defacement ordinance was not enforced. The complaint alleges that individuals violated the defacement ordinance during Black Lives Matter protests that varied in size and intensity. Even assuming the District is correct—and distracted by individuals at the largest Black Lives Matter protests presented distinct enforcement challenges—the complaint includes allegations of non-enforcement at smaller and more discrete Black Lives Matter events that are not so easily distinguished. For example, on August 16, a smaller Black Lives Matter event, "Reclaim DC," called for individuals to once again "create art in all forms" on H Street. There was no enforcement of the defacement ordinance even at these smaller events. Given the scope of the Black Lives Matter protests, the extent of graffiti around the city, and the lack of enforcement by District police, we can readily infer that the Foundation's members were at times similarly situated to Black Lives Matter proponents.

Nor can the District rely on the fact that the Foundation gave "advance notice" of its defacement by requesting a permit, unlike the Black Lives Matter advocates. The District does not deny that officers were present at the Black Lives Matter protests, that vandalism and protest art were ubiquitous, and that the protests were long running. "Advance notice" of defacement does not distinguish the speakers. The officers were equally aware and could anticipate that both the Foundation's and the Black Lives Matter events would include defacement of public property with political speech. In fact, one officer allegedly stated that Mayor Bowser had "opened Pandora's Box" with her response to the Black Lives Matter protests and made it legal to paint on the streets. In such circumstances, the request for a permit does not undermine the Foundation's selective enforcement allegations.[5]

**\*8**
* * *

Selective enforcement claims must clear a high hurdle. Because the lawful exercise of prosecutorial discretion does not violate the Constitution, disparate enforcement of a neutral ordinance based on viewpoint is unlawful only when the prosecutorial factors are similar, and "unlawful favoritism" remains the predominant explanation for the government's targets. *See Thomas*, 534 U.S. at 325, 122 S.Ct. 775. The Foundation has plausibly alleged that when chalking the "Black Pre-Born Lives Matter" message, its advocates were similarly situated to advocates who painted and marked the "Black Lives Matter" message.

IV.

The second element of a selective enforcement claim is the infringement of a constitutional right. The Foundation alleges the District's selective enforcement of the defacement ordinance violated the First and Fifth Amendments. We begin with the First Amendment claim.

A.

The Foundation maintains the District engaged in viewpoint discrimination by selectively enforcing the defacement ordinance. The gravamen of the complaint is that District police consistently declined to enforce the defacement ordinance against individuals who expressed "Black Lives

Matter" messages through graffiti, painting, and chalking, while vigorously enforcing the ordinance against individuals chalking the "Black Pre-Born Lives Matter" message. The Foundation recognizes the facial constitutionality of the ordinance as a neutral time, place, or manner restriction, but maintains the selective enforcement of the ordinance based on the content and viewpoint of speech violates the First Amendment. The precise doctrinal label for this type of claim has generated some confusion, which we address below. *See infra* Part C. The legal principles, however, are relatively straightforward.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. While the Amendment refers to Congress, its prohibition against infringements on free speech applies equally to executive actions.[6] As the Supreme Court has recognized, "[t]he pervasive restraint on freedom of discussion by the practice of the authorities under [a] statute is not any less effective than a statute expressly permitting such selective enforcement." *Cox v. Louisiana*, 379 U.S. 536, 557, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). The First Amendment protects against executive infringements on free speech and was directed at the "core abuse" of licensing laws that granted broad discretion to enforce vague legislative schemes. *Thomas*, 534 U.S. at 320, 122 S.Ct. 775; *see also* James Madison, Report of 1799, *in* The Virginia Report of 1799–1800 & Virginia Resolutions of December 21, 1798, at 189, 220 (1850) (discussing freedom of the press under the common law and arguing the First Amendment secures rights "against legislative, as well as against executive ambition"); Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 260 (2017) (explaining the Founders especially prized "the common-law rule against press licensing"). Prosecutorial decisions, like other government actions, cannot turn on the exercise of free speech rights. *Wayte*, 470 U.S. at 608, 105 S.Ct. 1524.

**\*9** Specifically, selective enforcement of a neutral and facially constitutional law may run afoul of the First Amendment if the government's prosecutorial choices turn on the content or viewpoint of speech. It is well established the government "may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Thus, "[c]ontent-based regulations are presumptively invalid." *R. A. V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Restrictions based on viewpoint are especially invidious;

viewpoint discrimination is "poison." *Iancu v. Brunetti*, ––– U.S. ––––, 139 S. Ct. 2294, 2302, 204 L.Ed.2d 714 (2019) (Alito, J., concurring); *see also Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. It is antithetical to a free society for the government to give "one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). "[G]overnment favoritism in public debate is so pernicious to liberty and democratic decisionmaking" that viewpoint discrimination will almost always be "rendered unconstitutional." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 337 (D.C. Cir. 2018) (Wilkins, J., concurring).

The First Amendment also applies with particular force in traditional public fora, which are "used for public assembly and debate." *Frisby v. Schultz*, 487 U.S. 474, 480, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). "Sidewalks, like streets and parks, are places whose title has immemorially been held in trust for the use of the public. As such, they occupy a privileged position in the hierarchy of first amendment jurisprudence." *White House Vigil for the ERA Comm. v. Clark*, 746 F.2d 1518, 1526–27 (D.C. Cir. 1984) (cleaned up). "[M]embers of the public retain strong free speech rights when they venture into public streets and parks." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). In a public forum, content-based regulations receive strict scrutiny, and government regulation on the basis of viewpoint is prohibited. *Minn. Voters All. v. Mansky*, ––– U.S. ––––, 138 S. Ct. 1876, 1885, 201 L.Ed.2d 201 (2018).

It is fundamental to our free speech rights that the government cannot pick and choose between speakers, not when regulating and not when enforcing the laws. As the Supreme Court has stated, "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional." *Thomas*, 534 U.S. at 325, 122 S.Ct. 775. This circuit has recognized, for instance, that a viewpoint discrimination claim may arise when a plaintiff alleges that he was "prevented from speaking ... while someone espousing another viewpoint was ... permitted to do so." *Zukerman*, 961 F.3d at 446 (quoting *McCullen v. Coakley*, 573 U.S. 464, 485 n.4, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014)). In *Zukerman*, an individual sought to make a custom postage stamp with a message about campaign finance laws, but was denied under a postal service policy prohibiting "political" designs. *Id.* at 435, 438. The plaintiff's challenge concerned, in part, selective enforcement

of the policy—other stamps with political messages had been printed. *Id.* at 435. We held such "allegations pass the most basic ... test for viewpoint discrimination," namely that "the government has singled out a subset of messages for disfavor based on the views expressed." *Id.* at 446 (cleaned up).

We have similarly emphasized "the government has no authority to license one side to fight freestyle, while forbidding the other to fight at all." *Mahoney v. Babbitt*, 105 F.3d 1452, 1454 (D.C. Cir. 1997). In *Mahoney*, a small pro-life group sought to picket during President Clinton's second inaugural parade to protest the administration's abortion policies. *Id.* at 1453. The National Park Service revoked the pro-life group's permit to assemble, and the group raised a First Amendment challenge to the unequal enforcement of the permit requirements. *Id.* at 1455. The constitutionality of the facially neutral permitting regulations was not at issue, only the selective enforcement of those regulations against the particular viewpoint of the protesters. *See id.* at 1453, 1455. We emphasized that "the government cannot exclude from a public gathering in a public forum on no other basis those citizens whose views it fears or dislikes or prevent their peaceful expression of those views." *Id.* at 1459.

 **\*10** The government may not enforce the laws in a manner that picks winners and losers in public debates. It would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion. *See Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) (recognizing the importance of free speech selective enforcement claims lest First Amendment guarantees become "an empty formality"). Neutral regulations may reasonably limit the time, place, and manner of speech, but such regulations cannot be enforced based on the content or viewpoint of speech.

## B.

Applying this legal framework, we conclude the Foundation has plausibly alleged the District abridged its members' First Amendment rights by enforcing the defacement ordinance on the basis of the content and viewpoint of their speech. In particular, the District permitted individuals expressing the "Black Lives Matter" message to violate the defacement ordinance, as evidenced by the widespread painting, graffiti, and other defacement on public sidewalks, streets, and buildings, and on private property. By making no arrests, the

police effectively exempted advocates of the "Black Lives Matter" message from the requirements of the ordinance. In contrast, the police showed up in force to the Foundation's small rally and arrested individuals who chalked "Black Pre-Born Lives Matter" on the sidewalk.

The District's unequal enforcement plausibly turned on viewpoint and occurred in a public forum. First, both messages—"Black Lives Matter" and "Black Pre-Born Lives Matter"—are political speech. Allowing the expression of one message while silencing another is quintessential viewpoint discrimination. *See Rosenberger*, 515 U.S. at 831, 115 S.Ct. 2510 ("It is ... objectionable to exclude ... one ... political, economic, or social viewpoint."); *Matal v. Tam*, 582 U.S. 218, 243, 137 S.Ct. 1744, 198 L.Ed.2d 366 (2017) (plurality opinion) ("Our cases use the term 'viewpoint' discrimination in a broad sense."). The District plausibly engaged in viewpoint discrimination by excluding the pro-life perspective from the public square.

Second, it is undisputed that the Foundation's speech took place on a public sidewalk, a traditional public forum. The police arrested the Foundation's members when they chalked their message on the sidewalk, while allowing other speakers to mark their messages on sidewalks and other public places. The District may regulate against defacement of public property; however, it may not enforce its regulation in a manner that discriminates on the basis of viewpoint.

We also emphasize the District has not attempted to support dismissal at this stage by offering an affirmative defense to the Foundation's allegations that the defacement ordinance was selectively enforced in violation of the First Amendment. *See Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011) ("[A] complaint may be subject to dismissal under Rule 12(b) (6) when an affirmative defense ... appears on its face.") (quoting *Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)). We do not question the District's interest in prohibiting defacement of public and private property. The District, however, has suggested no interest, compelling or otherwise, to justify favoring the "Black Lives Matter" message over the "Black Pre-Born Lives Matter" message when enforcing the ordinance.

The government may not play favorites in a public forum—permitting some messages and prohibiting others. We conclude the Foundation has plausibly alleged the District's selective enforcement of the defacement ordinance

constituted viewpoint discrimination in a public forum in violation of the First Amendment.

## C.

**\*11** The District does not substantially contest the First Amendment analysis set forth above. Instead, the District maintains the Foundation's selective enforcement claim must be assessed under the equal protection guarantee of the Fifth Amendment. The District maintains that, in the context of selective enforcement, First Amendment and equal protection standards are essentially the same and that under either framework the Foundation must plausibly allege intentional discrimination. The District's arguments are at odds with Supreme Court and circuit precedent, which recognize that a plaintiff may bring a selective enforcement claim under the First Amendment for a violation of free speech rights. Such claims are distinct from equal protection claims and do not require a plaintiff to demonstrate intentional discrimination.

## 1.

The Supreme Court has recognized that selective enforcement of a content-neutral law may violate the First Amendment.[7] *See, e.g., Wayte*, 470 U.S. at 610, 105 S.Ct. 1524; *Thomas*, 534 U.S. at 325, 122 S.Ct. 775; *cf. Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, ––– U.S. ––––, 138 S. Ct. 1719, 1732, 201 L.Ed.2d 35 (2018) ("The Commission's hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion."). In *Wayte*, when plaintiffs challenged an enforcement policy on both First Amendment and equal protection grounds, the Court addressed the claims separately, on their own terms. 470 U.S. at 610–14, 105 S.Ct. 1524; *see also id.* at 610, 105 S.Ct. 1524 (considering the challenge to the "passive enforcement policy directly on First Amendment grounds"). As already discussed, this circuit has recognized the validity of a First Amendment selective enforcement claim without substantial elaboration. *See, e.g., Zukerman*, 961 F.3d at 435; *Mahoney*, 105 F.3d at 1456. Perhaps little elaboration has been necessary in light of the well-established principles that the First Amendment prohibits viewpoint discrimination by the government and that such prohibition applies to executive action, no less than legislative action.

Several seminal selective enforcement cases have involved racial discrimination and the Fourteenth Amendment's equal protection guarantee. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 366, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (holding enforcement of a California ordinance—governing the use of wooden buildings as laundromats—solely against Chinese owners violated the Equal Protection Clause). Yet not all selective enforcement claims are equal protection challenges. In addition to the cases already cited, numerous decisions of the Supreme Court and our sister circuits have recognized that selective enforcement of the laws may run afoul of various specific constitutional guarantees.[8] The First Amendment prohibits viewpoint discrimination by the government, and we should not shoehorn the Foundation's free speech claim into the equal protection framework.[9] The First Amendment and equal protection standards are conceptually and doctrinally distinct.

**\*12** It follows that to make out a First Amendment selective enforcement claim, the Foundation is not required to allege discriminatory intent. Viewpoint discrimination violates the First Amendment, "regardless of the government's benign motive ... or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 165, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) (cleaned up). "Innocent motives do not eliminate the danger of censorship." *Id.* at 167, 135 S.Ct. 2218. The Supreme Court has "long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment" and "no evidence of an improper censorial motive" is necessary to demonstrate a violation. *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (cleaned up); *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content.").

Accordingly, we reject the District's argument that discriminatory motive is required for a First Amendment selective enforcement claim. A First Amendment challenge to speech-infringing enforcement, as with speech-infringing regulation, requires no allegation of bad motive. *See NAACP v. Button*, 371 U.S. 415, 439, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("In the domain of ... speech ... abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action.") (cleaned up). A benign purpose does not defeat a claim that the government has selectively enforced the laws in violation of the First Amendment.[10]

While a free speech selective enforcement claim does not require an allegation of invidious purpose, we recognize the District's concerns that selective enforcement claims may impair enforcement efforts in "challenging circumstances" that require "difficult decisions about allocating limited police resources and prioritizing public safety." Such concerns are mitigated, however, by the reality that selective enforcement claims will often be difficult to establish. Selective enforcement claims are cabined by the requirement that a plaintiff demonstrate he is similarly situated to others against whom the law was not enforced. *See supra* Part III. And liability under section 1983 requires identifying an unconstitutional government policy or practice. These requirements allow courts to review unconstitutional selective enforcement claims without second-guessing decisions based on prosecutorial discretion.

2.

Our conclusion that a First Amendment selective enforcement claim is distinct from an equal protection claim is consistent with decisions from our sister circuits, although the doctrinal labels have varied.[11] For instance, the First Circuit recognized a claim rooted in "the idea that the law ... ha[d] been enforced selectively in a viewpoint discriminatory way." *McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004) (citing *Thomas*, 534 U.S. at 325, 122 S.Ct. 775). "The exact claim is that in practice the government has engaged in viewpoint discrimination by failing to enforce the statute against ... pro-abortion/pro-choice views ... while enforcing the statutory prohibitions against those in the same position who express anti-abortion/pro-life views." *Id.* at 62. The First Circuit labeled this an "as-applied" challenge of a special type and explained it was "exactly the same as a claim that discriminatory enforcement of a statute has led to viewpoint discrimination." *Id.* at 61 n.5. The court specifically declined to resolve whether a plaintiff must demonstrate intent to discriminate under the First Amendment. *Id.* at 63 (opining that "some showing of intent ... probably is necessary" but not resolving the issue). Instead, the court concluded that to prevail on a First Amendment selective enforcement challenge a plaintiff "would need to show 'a pattern of unlawful favoritism.'" *Id.* at 64 (quoting *Thomas*, 534 U.S. at 325, 122 S.Ct. 775). *McGuire* does not support the District's argument that a necessary element of a First Amendment selective enforcement claim is proof of "intentional discrimination based on the content" of the Foundation's message.

**\*13** The Ninth Circuit considered a policy of enforcing a buffer zone around an abortion clinic with respect to speech that discouraged clinic access but not enforcing as to speech that facilitated access. *Hoye*, 653 F.3d at 840. The court found the city's "implementation and enforcement of the Ordinance" was "indubitably content-based." *Id.* at 852. And it recognized that plaintiffs may raise "challenges to the content-discriminatory enforcement of content-neutral rules." *Id.* at 854. Although the Ninth Circuit had sometimes classified these claims as equal protection claims based on free speech protections, the court maintained that any distinction between its approach and the "as-applied" approach of the First Circuit was "semantic rather than substantive." *Id.* at 855. For a selective enforcement claim, a plaintiff must demonstrate the content-based discrimination was "the result of an intentional policy or practice," shown "by extrapolating from a series of enforcement actions." *Id.* The court drew this standard from the custom or policy requirement under *Monell*. *See id.* (citing cases applying *Monell*). In the end, the Ninth Circuit declined to choose a "doctrinal category" for the claims because the City had a content-based policy of enforcement, and "[t]hat policy [was] unconstitutional, no matter the analytical approach taken." *Id.* at 856.

The decisions of the First and Ninth Circuits do not support the District's claim that the Foundation must allege invidious discriminatory intent. For the purpose of the Foundation's First Amendment selective enforcement claim, the District's motive for discriminating based on viewpoint is irrelevant.

\* \* \*

Viewpoint discrimination, whether by legislative enactment or executive action, violates the First Amendment. "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). We hold the Foundation has plausibly alleged the elements of a free speech selective enforcement claim. We may reasonably infer from the Foundation's complaint, first, that its members were similarly situated to other protesters who were not arrested and, second, that the District engaged in viewpoint discrimination by enforcing the defacement ordinance against individuals chalking "Black Pre-Born Lives Matter" but not against individuals painting and chalking "Black Lives Matter."

V.

The Foundation, in the alternative, frames its selective enforcement claim in terms of equal protection. To the extent a separate equal protection claim for viewpoint discrimination arises under the Fifth Amendment, the Foundation has failed to allege an essential element—purposeful discrimination.[12] Even taking the facts in the light most favorable to the Foundation, we find it has not put forward plausible evidence of the District's animus.

The Fifth Amendment Due Process Clause has been understood to include an equal protection component that applies to the District of Columbia. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Dixon v. District of Columbia*, 666 F.3d 1337, 1339 (D.C. Cir. 2011). This guarantee of equal protection includes a prohibition on "selective enforcement of the law" based on impermissible considerations "such as race." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The requirements for a selective enforcement claim are the same as those under "ordinary equal protection standards." *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480 (cleaned up). The plaintiff must demonstrate that the decision to enforce "had a discriminatory effect and ... was motivated by a discriminatory purpose." *Id.* (cleaned up).

In the context of an equal protection selective enforcement claim, a plaintiff must show that others similarly situated were not prosecuted and that the prosecution was motivated by invidious discrimination. *See Wayte*, 470 U.S. at 608, 105 S.Ct. 1524; *Juluke v. Hodel*, 811 F.2d 1553, 1561 (D.C. Cir. 1987) (citing *Wayte*). Invidious discrimination means taking an action "because of, not merely in spite of, its adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937 (cleaned up). In other words, for its equal protection claim, the Foundation must plausibly plead the District's enforcement decisions were rooted in "animus" against the Foundation's viewpoint. *See DHS v. Regents of Univ. of Cal.*, ─── U.S. ───, 140 S. Ct. 1891, 1915, 207 L.Ed.2d 353 (2020).

**\*14** The kind of evidence offered by the Foundation does not support an inference of invidious discrimination. First, the complaint points to Mayor Bowser's public support of Planned Parenthood "and its 'pro-choice' agenda." The Foundation maintains these political positions are "consistent

with" an intention to suppress pro-life speech. But "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (cleaned up). Invidious discrimination "requires more than intent as volition or intent as awareness of consequences." *Id.* at 676, 129 S.Ct. 1937 (cleaned up). The Foundation needs evidence the District was motivated by the desire to suppress some views and raise up others. That Mayor Bowser holds a different political or moral position about abortion than the Foundation is insufficient to infer discriminatory motive by the District. Government officials may express a range of political viewpoints without running afoul of the First Amendment. *See Matal*, 582 U.S. at 234, 137 S.Ct. 1744.

Second, the Foundation alleges the District singled out and "targeted the Plaintiffs' ... pro-life beliefs." The complaint, however, states that 22 other arrests were made for violations of the defacement ordinance in the second half of 2020, and the Foundation does not allege these arrests were also, or predominantly, against pro-life speech. In fact, the complaint contains no allegations whatsoever about the specific content of the speech in these other enforcement actions. These allegations are insufficient to show pro-life beliefs were targeted by the District for the purpose of invidious discrimination. *See Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480. If anything, the evidence in the complaint suggests the District continued to enforce the defacement ordinance against a variety of groups.

Third, the Foundation argues there is "direct evidence of discriminatory intent" because the District acted to preserve some Black Lives Matter protest art. The Foundation claims "[t]his bid to take ownership of and share certain speech shows the District's preference for favored viewpoints and is direct evidence of discrimination." But while the First Amendment prevents unlawful favoritism by the government, it "does not limit the government as speaker." *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005). We will not infer favoritism for certain viewpoints from government speech. Choosing to preserve works of art expressing one viewpoint is not, on its own, evidence of purposeful discrimination against other viewpoints.

At bottom, the Foundation alleges the District disagrees with the Foundation's pro-life viewpoint—but government speech does not inevitably give rise to government animus. Assuming there is an independent viewpoint discrimination

claim under the Fifth Amendment's equal protection guarantee, the Foundation has not sufficiently alleged the requisite discriminatory purpose.

## VI.

The Foundation has advanced a predicate First Amendment selective enforcement violation. To establish the District's liability under *Monell*, the Foundation must also plausibly allege the violation was pursuant to an official custom or policy. We hold that it has.

Local governments are responsible only "for their *own* illegal acts." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). They cannot be held vicariously liable for their employees' actions. *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). Therefore, to show a local government has "acted" for the purposes of section 1983, the Foundation must plausibly allege the enforcement at issue was "pursuant to official municipal policy." *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. Official policies include "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350. Plaintiffs may allege an official policy by showing the government has failed to respond to a risk that constitutional rights will be violated "in such a manner as to show 'deliberate indifference' to the risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Determining plausibility is a "context-specific task that requires the reviewing court to draw on ... common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

 **\*15** We may infer that District policymakers were behind the uniform and unexplained policy exempting individuals expressing "Black Lives Matter" from enforcement of the defacement ordinance. The sheer scope of non-enforcement supports the Foundation's claim that policymakers promoted or at least allowed an exemption for a favored viewpoint. The Black Lives Matter protests in the District were part of an ongoing, large-scale, national demonstration. People flooded onto the streets in a protest that included painting and marking of "Black Lives Matter" messages on public and private property. Mayor Bowser commissioned a large street mural proclaiming "Black Lives Matter." It is certainly plausible that policymaking officials in the District were aware of the Black Lives Matter protests and the widespread and ongoing

violations of the defacement ordinance, and were involved in the ubiquitous non-enforcement of the ordinance against the many individuals who expressed their message on sidewalks, streets, and other property. The Foundation also alleges one officer stated Mayor Bowser effectively opened up the streets to protest messages.

It is also plausible District policymakers were involved in the continued enforcement of the ordinance against other groups, including the Foundation. The Foundation sought a permit from the District and spoke with an officer specifically about painting a mural on the street. At the same time, the Foundation sent a letter to Mayor Bowser requesting permission to paint its message. The police department and the Chief of Police were copied on the letter. Although neither Mayor Bowser nor the police department responded to the letter, the District granted the permit, which was signed by the Commander of the police department's Special Operations Division. And on the day of the event six police cars and a number of officers were waiting. The police officers informed the Foundation's members that if they chalked on the sidewalk, they would be arrested. Such a coordinated and immediate police response to the Foundation's rally could certainly have been the work of policymakers.

At a minimum, it is plausible at this stage that the District "knew or should have known of the risk of constitutional violations" and yet deliberately failed to act. *See Baker*, 326 F.3d at 1307. The alleged facts "raise a reasonable expectation that discovery will reveal evidence" either that the Special Operations Commander is a policymaker or that other policymakers like the Mayor were involved in exempting individuals who expressed "Black Lives Matter" messages from the defacement ordinance and continuing to enforce the ordinance against speakers of other messages. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Furthermore, the Foundation has alleged facts suggesting the District's exemption from enforcement for a favored viewpoint was "persistent and widespread." *See Connick*, 563 U.S. at 61, 131 S.Ct. 1350. Officers were present during many of the Black Lives Matter protests. The officers watched as thousands of messages were painted on the streets, sidewalks, and other public and private property. Yet not a single person was arrested for numerous and clear violations of the defacement ordinance. The unvarying non-enforcement, against large and small acts of defacement, over a period

of weeks, was "persistent and widespread" and so plausibly constituted a custom or policy for *Monell* liability. *See id.*

The District argues there is no evidence of a custom or practice of enforcing the ordinance "against disfavored messages" and emphasizes the complaint failed to "allege any other instances where the speech of anti-abortion or other religious groups was targeted for enforcement beyond their own rallies." But that is not what the Foundation must allege. To make out a First Amendment violation, it is sufficient the District had a policy of exempting a favored view while continuing to enforce the ordinance against everyone else. *See Thomas,* 534 U.S. at 325, 122 S.Ct. 775 ("Granting waivers to favored speakers ... would of course be unconstitutional."). Such an exemption—even in a single, protracted instance— may be sufficient to state a claim under *Monell. See Pahls v. Thomas,* 718 F.3d 1210, 1216 (10th Cir. 2013) (holding a First Amendment claim can survive summary judgment even when the government selectively enforced the law on a single day).

**\*16** We therefore disagree with the district court's holding that the Foundation failed to allege a policy of selective enforcement under *Monell.* The Foundation has more than plausibly alleged a "persistent and widespread" District practice of selective non-enforcement against those who marked and painted "Black Lives Matter" messages.

VII.

Finally, we say a brief word to clear up confusion expressed by the district court and the parties about appropriate remedies for a successful selective enforcement claim. The Foundation seeks a declaratory judgment, actual and nominal damages, and injunctive relief. A judgment declaring the District's selective enforcement of the ordinance violated the First Amendment and an award of damages, even nominal damages, might be sufficient to redress the Foundation's injuries. *See Uzuegbunam v. Preczewski,* ––– U.S. –––, 141 S. Ct. 792, 796, 209 L.Ed.2d 94 (2021).

Some type of injunctive relief may also be appropriate to redress selective enforcement. The Foundation suggests the court should grant "permanent injunctive relief against the Defacement Ordinance as applied to Plaintiffs." But we reject the Foundation's characterization of its claim as an "as-applied" First Amendment challenge. The District's defacement ordinance is not unconstitutional "as applied" to the Foundation's pro-life speech because the District may

prohibit the defacement of public and private property with any and all messages. The constitutional violation alleged here is the selective enforcement of the ordinance based on the message of the speakers.

As we have recognized in the selective enforcement context, courts have discretion to fashion injunctive relief. *Zukerman v. USPS,* 64 F.4th 1354, 1365 (D.C. Cir. 2023). Such relief must be tailored to address any *unconstitutional selectivity,* not enforcement altogether. Therefore, the district court's concern that the District will end up "awash in paint" is misplaced. *See Frederick Douglass Found.,* 531 F. Supp. 3d at 345. The District may open up its streets for painting messages of all viewpoints; and the District may later decide to enforce its defacement ordinance against all viewpoints. What the District cannot do consistent with the First Amendment is open its streets for the painting of some messages and not others. The precise contours of any remedy must be left in the first instance to the judgment of the district court.

* * *

The First Amendment prohibits the government from favoring some speakers over others. Access to public fora must be open to everyone and to every message on the same terms. The District may act to prevent the defacement of public property, but it cannot open up its streets and sidewalks to some viewpoints and not others. During the summer of 2020, the District arrested individuals chalking "Black Pre-Born Lives Matter" on the sidewalk, while making no arrests against the many individuals marking "Black Lives Matter" on sidewalks, streets, and other property. The Foundation has plausibly alleged that its members were similarly situated to individuals against whom the defacement ordinance was not enforced, and that the District discriminated on the basis of viewpoint when enforcing the ordinance. Because the Foundation has failed to adequately allege animus on the part of the District, however, its equal protection challenge fails.

**\*17** For the foregoing reasons, we reverse the dismissal of the First Amendment free speech claim, affirm dismissal of the equal protection claim, and remand for further proceedings consistent with this opinion.

*So ordered.*

Wilkins, Circuit Judge, concurring in the judgment:

I concur in the result reached by the majority, but I do so by a slightly different path.

I agree that we should reverse the dismissal of the First Amendment claim. The government is wrong to suggest, *see* Appellee Br. 31-33, that the Foundation cannot properly plead an as-applied First Amendment violation based on viewpoint discrimination. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (acknowledging that even though the case involved a facial challenge to the grant-making regulation, a case could arise involving "an as-applied challenge ... where the denial of a grant may be shown to be the product of invidious viewpoint discrimination"). The government concedes that the complaint alleges the Foundation was denied a permit to write its message in a public forum. *See* Appellee Br. 28. "In a public forum, by definition, all parties have a constitutional right of access and the state must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Here, the Foundation has made specific, non-conclusory allegations that the defacement statute was enforced against it in a public forum, while it was not enforced against others writing competing messages in the same forum during the same set of protests. In my view, even though the Foundation must meet the high bar of pleading purposeful discrimination to prevail on its First Amendment claim, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676–77, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the high standard is met here. It is at least plausible that "[w]hen government officials target speech *because of* 'particular views taken by speakers on a subject,' viewpoint discrimination is afoot." *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013) (emphasis in original) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). *See also Wood v. Moss*, 572 U.S. 744, 756–57, 134 S.Ct. 2056, 188 L.Ed.2d 1039 (2014) ("It is uncontested and uncontestable that government officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express."). Therefore, I believe that alleging viewpoint discrimination

in a public forum is sufficient to state a claim and move forward to discovery and briefing on the compelling interest and narrowly tailored aspects of the analysis. *See Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 446 (D.C. Cir. 2020).

The Fifth Amendment selective prosecution claim is a different matter. "To establish selective prosecution, the [plaintiff] must 'prove that (1) [it] was singled out for prosecution from among others similarly situated and (2) that [the] prosecution was improperly motivated, i.e., based on race, religion or another arbitrary classification.' " *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (first alteration added) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)); *see also United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982); *Att'y Gen. v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C. Cir. 1982). The similarly situated requirement is an exceedingly high bar to meet. The Foundation must plead, in a plausible and non-conclusory fashion, that "their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *See Branch Ministries*, 211 F.3d at 146 (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)). Here, one such distinction appears on the face of the complaint: the Foundation requested permission to deface the public property, while those who were not prosecuted did not apply for permits. J.A. 70–72. The Supreme Court expressly rejected the selective prosecution claim in *Wayte v. United States*, on the basis that persons who reported themselves or who were reported by others as having broken the law were prosecuted, while persons who did not report themselves or who were not reported by others were not prosecuted. 470 U.S. 598, 608–09, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Thus, the fact that the Foundation "self reported" its planned defacement by applying for a permit is a legitimate prosecutorial factor under *Wayte.* Similarly, *Wayte* teaches that the self reporting is also a distinguishing factor that fatally undermines the selective prosecution claim. Therefore, the dismissal of the Fifth Amendment claim is properly affirmed.

### All Citations

--- F.4th ----, 2023 WL 5209556

---

Footnotes

1    "It shall be unlawful for any person or persons willfully and wantonly to disfigure, cut, chip, or cover, rub with, or otherwise place filth or excrement of any kind upon; to write, mark, or print obscene or indecent figures representing obscene or objects upon [sic]; to write, mark, draw, or paint, without the consent of the owner or proprietor thereof, or, in the

case of public property, of the person having charge, custody, or control thereof, any word, sign, or figure upon: (1) any property, public or private, building, statue, monument, office, public passenger vehicle, mass transit equipment or facility, dwelling or structure of any kind including those in the course of erection; or (2) the doors, windows, steps, railing, fencing, balconies, balustrades, stairs, porches, halls, walls, sides of any enclosure thereof, or any movable property." D.C. Code § 22–3312.1.

2    The District's "Black Lives Matter" mural was government speech displayed on government controlled property, and therefore not part of the alleged violations of the defacement ordinance.

3    The defacement ordinance applies specifically to construction sites. *See* D.C. Code § 22–3312.1(1) (prohibiting marking on structures and buildings, "including those in the course of erection").

4    While these principles have been articulated with respect to the Article II executive power vested in the President, the Mayor serves as the chief executive of the District of Columbia and is required to "take care that the laws be faithfully executed." D.C. Code § 1–301.76; *see also id.* ("The Mayor of the District of Columbia may grant pardons.").

5    The Supreme Court's decision in *Wayte* also does not foreclose or render implausible the Foundation's claims. *Wayte* involved a draft dodger who wrote several letters to the government proclaiming his refusal to register for the draft. 470 U.S. at 601, 105 S.Ct. 1524. The Supreme Court upheld the government's passive enforcement policy of prosecuting only those who self-reported their draft-dodger status or were reported by others. *Id.* at 610, 105 S.Ct. 1524. Relying on *Wayte*, the District maintains it properly enforced the defacement ordinance against the Foundation based on self-reporting. But the District's comparison is inapposite. In *Wayte*, locating other draft dodgers was "difficult and costly." *Id.* at 612, 105 S.Ct. 1524. Here, the officers were present and watching the defacement of property with "Black Lives Matter" messages. Unlike in *Wayte*, there was no legitimate prosecutorial reason to treat self-reporting differently in this case. Moreover, in resolving the First Amendment claim in *Wayte*, the Court did not rely on the similarly situated requirement, but instead on the strong national security interest in enforcing the draft. *Id.* at 611, 105 S.Ct. 1524. The District has offered no compelling government interest in selectively enforcing the defacement ordinance against individuals writing small pro-life messages in washable chalk.

6    *See, e.g., Nieves v. Bartlett*, ––– U.S. ––––, 139 S. Ct. 1715, 1720, 204 L.Ed.2d 1 (2019) (First Amendment retaliation claim against two police officers who arrested petitioner for disorderly conduct and resisting arrest); *Hartman v. Moore*, 547 U.S. 250, 254, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) (*Bivens* action against postal inspectors for inducing a prosecution in retaliation for speech); *cf. Shrum v. City of Coweta*, 449 F.3d 1132, 1140 (10th Cir. 2006) (McConnell, J.) (holding "the First Amendment applies to exercises of executive authority no less than it does to the passage of legislation," a principle that the Supreme Court has "assumed on countless occasions").

7    We appreciate that our cases have not always clearly delineated the elements of a free speech selective enforcement claim. For instance, the district court relied on a passing comment that "[s]elective enforcement is not, of course, a First Amendment cause of action; rather, ... it lies in a murky domain of equal protection law." *Sanjour v. EPA*, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995) (en banc) (cleaned up); *accord Frederick Douglass Found.*, 531 F. Supp. 3d at 327. The observation in *Sanjour* was dicta, however, as we did not decide the plaintiffs' selective enforcement claim. We also explained that a selective enforcement claim "may involve determining whether [the] plaintiff was in fact attempting to exercise constitutionally protected rights, including First Amendment rights." *Sanjour*, 56 F.3d at 92 n.9.

8    *See, e.g., Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 n.4, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (explaining a "speech suppressive motivation or policy on the part of the District Attorney" could lead to "a claim of selective prosecution"); *McCullen*, 573 U.S. at 484, 134 S.Ct. 2518 (recognizing "selective enforcement" of an ordinance "might state a claim of official viewpoint discrimination"); *Spence v. Washington*, 418 U.S. 405, 414 n.9, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam) (stating the possibility of "selective enforcement" of a state statute prohibiting altered U.S. flags); *Cameron v. Johnson*, 390 U.S. 611, 622, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) (addressing and rejecting on the merits an argument that an anti-picketing statute was selectively enforced); *Juluke v. Hodel*, 811 F.2d 1553, 1561 (D.C. Cir. 1987) (entertaining a selective enforcement claim under the First Amendment); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 151, 168 (3d Cir. 2002) (holding plaintiffs were likely to succeed on their Free Exercise claim for selective

enforcement of a facially neutral ordinance); *Fla. Transp. Servs. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1234–35 (11th Cir. 2012) (finding a dormant Commerce Clause violation for discriminatory enforcement of a facially constitutional ordinance).

9    "[L]aws that classify persons in terms of their abilities to exercise rights that have specific recognition in the first eight Amendments do not generally arise as equal protection issues. In these instances the denial of the right to one class of persons is likely to be held a violation of the specific guarantee without any need to resort to equal protection analysis." Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.39 (5th ed. 2013).

10   The District relies on *American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*, where we required the plaintiff to show, as evidence of viewpoint discrimination, that "the Government acted in order to suppress a disfavored view." 901 F.3d 356, 365 (D.C. Cir. 2018). That case is readily distinguishable because it involved a particular kind of First Amendment challenge. The transit authority banned all issue-oriented advertising soon after the plaintiff sought to run advertisements depicting the Prophet Muhammad in Metrorail stations and on Metrobus exteriors. *Id.* at 360. When a ban is facially neutral and enforced neutrally, a showing of intentional discrimination is required to demonstrate pretext.

11   The district court found "other Courts of Appeals are divided over how to categorize claims in which law enforcement is alleged to have selectively enforced restrictions on speech-related activities based on viewpoint." Likewise, the parties contest the proper categorization of the claims on appeal, relying on out-of-circuit cases.

12   As explained in the foregoing Part, we recognize a separate First Amendment selective enforcement claim that requires no showing of animus.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment 2

75 F.4th 638
United States Court of Appeals, Sixth Circuit.

Janice BROWN, Plaintiff-Appellee,

v.

Andrew KNAPP; Ken Shingleton;
Bryce Willoughby; Thomas
Dhooghe, Defendants-Appellants.

No. 22-1973
|
Argued: June 13, 2023
|
Decided and Filed: July 28, 2023

**Synopsis**

**Background:** Arrestee brought § 1983 action against police officers, alleging violations of Fourth Amendment arising from arrest without warrant and failure to hold probable cause hearing. The United States District Court for the Eastern District of Michigan, Shalina D. Kumar, J., 2022 WL 4541621, denied officers' motion for summary judgment based on qualified immunity. Officers appealed.

**Holdings:** The Court of Appeals, Jane B. Stranch, Circuit Judge, held that:

officers had probable cause for warrantless arrest for witness intimidation in violation of Michigan law;

fact that particular officer did not physically perform the arrest at issue did not preclude officer from having obligation, under Michigan law, to ensure arrestee received probable cause hearing within 48 hours;

fact that multiple police officers were involved in arrest did not constitute extraordinary circumstances that could merit detention of arrestee past 48 hours without probable cause hearing; and

arrestee's right to probable cause determination within 48 hours was clearly established.

Affirmed in part, reversed in part, and remanded.

**\*642** Appeal from the United States District Court for the Eastern District of Michigan at Flint. No. 4:20-cv-12441—Shalina D. Kumar, District Judge.

**Attorneys and Law Firms**

ARGUED: Adam R. de Bear, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Austin Porter, Jr., PORTER LAW FIRM, Little Rock, Arkansas, for Appellee. ON BRIEF: Adam R. de Bear, John G. Fedynsky, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Austin Porter, Jr., PORTER LAW FIRM, Little Rock, Arkansas, for Appellee.

Before: KETHLEDGE, STRANCH, and MATHIS, Circuit Judges.

# OPINION

JANE B. STRANCH, Circuit Judge.

**\*643** In September 2018, Michigan State Police officers arrested Janice Brown without a warrant for alleged witness intimidation. She was jailed for approximately 96 hours and was not brought before a judge for a probable cause hearing during that time. None of the officers involved in her arrest requested a warrant or took any other action relating to her detention. Brown sued the officers for unreasonably seizing her without probable cause and detaining her without due process of law, in violation of the Fourth Amendment. The officers moved for summary judgment based on qualified immunity. The district court denied their motion, and they appealed. We **AFFIRM** in part and **REVERSE** in part.

# I. BACKGROUND

## A. Factual Background

In 2017, Michigan State Police (MSP) detectives Kenneth Shingleton and Thomas Dhooghe were assigned to investigate a cold case, the 2011 killing of LeAnn Bates. The two learned that, the night of her murder, Bates was in her home with a woman named Sheneen Jones, along with both of their boyfriends. At the time, Bates was dating Jones's cousin, who was best friends with Jones's boyfriend, Dale Reed Jr. Jones told the detectives that she and Bates had argued, then Bates grabbed a gun. Jones ran out of the house to get away and heard gunshots behind her. She did not see

who had fired, but Reed rushed outside and told her to get in the car. Jones said that, in the following days, she received a threat that she would be killed by Reed's family. Jones's cousin identified Reed as Bates's shooter, and in July 2018, Reed was arrested and charged with homicide and related weapons charges. Reed and Jones have a daughter together.

Plaintiff Janice Brown is Reed's mother. In September 2018, she traveled from her home in Arkansas to Michigan to attend a court hearing in Reed's pending homicide case, which was scheduled for September 11, 2018. Brown and the two MSP detectives who had been assigned to the case, Shingleton and Dhooghe, all attended the hearing. Jones had been named as a witness in the state's case against Reed and received a subpoena but did not appear to testify, and her cousin also recanted his identification of Reed as the shooter. The court continued the hearing until September 14, 2018. After the hearing ended, Dhooghe overheard Reed's defense attorney tell Brown that "someone needs to talk to her." Dhooghe and Shingleton interpreted the statement as the attorney directing Brown to speak with Jones; Brown says that the attorney was explaining that someone needed to tell Jones she needed to retain an attorney after failing to appear at the hearing.

Later that same day, Shingleton and Dhooghe visited Jones's home to serve a **\*644** subpoena on her for the September 14 hearing. When they arrived, Brown was there. The MSP detectives asked Brown why she was at Jones's house, and Brown said she was visiting her granddaughter. Brown left, and the detectives asked Jones whether Brown was bothering her or had offered her money not to testify. Jones denied both but said she did not want to testify, and she continued to express fear that "they" would kill her if she did, although she did not identify who "they" were. Brown remained in Michigan for the next few days, spending more time with Jones and her granddaughter.

On September 14, Brown, Jones, and Jones's daughter arrived at the courthouse. Brown took her granddaughter into the courtroom while Jones went into the prosecutor's office, where she said she would not provide testimony implicating Reed. As Jones left the prosecutor's office and Brown exited the courtroom, Brown followed behind Jones. The assistant prosecutor assigned to Reed's case, Karen Hanson, testified that, at this time, she saw Brown following closely behind Jones as Jones cried. According to Hanson, Brown was yelling at Jones that she "couldn't go testify and she better not go in there." Hanson claims it was the most aggressive attempt to get someone not to testify that she had ever seen.

Hanson yelled that Brown was bothering Jones, and Brown went back into the courtroom.

Hanson called over the officer in charge, described what she had seen, and said that there was probable cause to arrest Brown. She does not remember whether she instructed an officer to arrest Brown, but Dhooghe testified that she told him to do so. The district court found it unclear whether Dhooghe and Shingleton were both involved at this point, or only Dhooghe. Brown says Hanson discussed the alleged intimidation with Dhooghe and Shingleton; the MSP Defendants say Hanson spoke with Dhooghe only; and Hanson testified that she did not remember who she spoke to.

The parties similarly disagree as to which detective was present in the courtroom that day: Brown claims that Shingleton approached her, whereas the MSP Defendants claim Dhooghe was present and Shingleton was not. Brown remembered Shingleton from her earlier interaction with him at Jones's house on September 11 because he had been "hostile" towards her, and she believed him to be the person who approached her in the courtroom on September 14. Brown noted that Shingleton had authored a supplemental incident report about her arrest, dated September 19, 2018, "as if he was there" when she was arrested. Brown also testified that, on September 14, she saw only one of the two detectives who she had met on September 11, and that she would not be able to tell Shingleton and Dhooghe apart if they were sitting next to each other. For his part, Dhooghe testified that he was the detective present at Brown's arrest, which MSP officers Bryce Willoughby and Andrew Knapp confirmed, and Shingleton similarly testified he was not present in court on September 14.

The district court did not resolve this question. It found that one or both of the two MSP detectives confronted Brown in the courtroom and told her they thought she had not been visiting her granddaughter the day they saw her at Jones's home because the granddaughter had been at school. Dhooghe (who was scheduled to testify that morning) was in civilian clothes and lacked handcuffs, so he called his supervisor, Detective Willoughby, for help. Approximately five minutes later, Willoughby and Knapp entered the courtroom and arrested Brown for witness intimidation.

**\*645** Willoughby and Knapp transported Brown to the Flint Police Department and filled out booking paperwork. Brown was booked into the Flint City jail, then transferred to the Genesee County jail. At the time, the State of Michigan

had an agreement to house people arrested by MSP at that jail because MSP does not itself maintain any jail or other institution to incarcerate people pre-trial. After her arrest, Dhooghe (and potentially Shingleton) returned to Jones's home and asked if Brown had been intimidating her, but Jones did not wish to speak to them.

Brown was in jail for approximately 96 hours; during that time, she was not brought before a judge for a probable cause hearing, and the MSP Defendants never requested a warrant for her arrest or took any other action relating to her detention. Hanson testified that her prosecutor's office typically waits for the arresting officers to submit a prosecutor's packet, and without that packet, the prosecutor will not prepare a warrant or proposed complaint needed for the probable cause hearing. While Brown was incarcerated, the Genesee County jail sent reports to MSP employees indicating that Brown had remained in custody without a warrant or probable cause hearing for over 48 hours. Brown claims that Shingleton received those reports; the MSP Defendants claim they went only to commanding officers, not the arresting officers. Shingleton was not personally listed as an addressee of the report that was emailed on September 15, 2018, though other MSP recipients were. Brown was released on September 18, 2018, "pending further investigation" under Shingleton's orders.

As relevant to this appeal, Brown sued the MSP detectives and troopers (collectively, the MSP Defendants) for violating her Fourth Amendment rights by unreasonably seizing her without probable cause and detaining her without due process of law.[1] The MSP Defendants moved for summary judgment on the basis of qualified immunity; Brown moved for partial summary judgment on the issue of whether her Fourth Amendment rights were violated by being held for over 48 hours without a probable cause hearing. The district court denied both motions, finding that the MSP Defendants were not entitled to qualified immunity because they had collectively violated Brown's clearly established right to a prompt probable cause determination within 48 hours of her arrest. But because of the "complicated factual scenario" surrounding Brown's arrest, the court could not determine at the summary judgment stage which MSP Defendant or Defendants bore legal responsibility for violating her rights. The MSP Defendants appealed.

## II. JURISDICTION

A district court's denial of qualified immunity is immediately appealable under the collateral order doctrine. See *Rafferty v. Trumbull County*, 915 F.3d 1087, 1092 (6th Cir. 2019). But circuit courts can generally review a denial of qualified immunity "only 'to the extent that it turns on an issue of law'—the appeal cannot be from a district court's determination that there is a genuine dispute of material fact." *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (quoting **\*646** *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Put another way, "a determination that a given set of facts violates clearly established law is reviewable, while a determination that an issue of fact is 'genuine' is unreviewable." *See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007) (quoting *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)).

We can "ignore the defendant's attempts to dispute the facts," *Est. of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005), as long as the issues on appeal are purely legal and the defendant is "willing to concede the most favorable view of the facts to the plaintiff," *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018) (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)). "The upshot is that, in most appeals of denials of qualified immunity, we must defer to the district court's determinations of fact" and any inferences drawn therefrom. *Barry*, 895 F.3d at 443. We are not, however, categorically "limited to only the facts, evidence, or inferences that the district court has stated expressly"; if the district court denies a summary judgment motion without indicating its rationale for doing so, we may undertake a "review of the record" to determine the facts assumed. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015); *Johnson*, 515 U.S. at 319, 115 S.Ct. 2151. We may review a district court's factual determination only if it is "blatantly and demonstrably false," *Barry*, 895 F.3d at 443 (quoting *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)), for example, if a videotape of the events at issue so contradicts the nonmoving party's version of the record that "no reasonable jury could believe" the nonmovant, *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

The MSP Defendants explicitly concede the facts in the light most favorable to Brown and claim to raise only purely legal issues. They argue that: (1) they did not violate Brown's right to be free from an arrest without probable cause; (2) they did not violate Brown's right to a prompt probable cause determination; and (3) there was no clearly established law governing their conduct with respect to Brown's detention.

Broadly speaking, these appear to be legal questions properly raised on appeal.

One last note before proceeding to the appeal's merits. The MSP Defendants would have us disregard the district court's conclusion as to one factual issue and resolve it instead, namely, that it was disputed whether Shingleton was present at the hearing or arrest on September 14, 2018. The MSP Defendants argue, as they did below, that Shingleton did not witness Brown allegedly intimidating Jones, was not physically present at the time of her arrest, and became aware of her arrest only on September 18, 2018, when the jail contacted him and he ordered Brown's release. The MSP Defendants describe Brown's position that Shingleton was present for and involved in her arrest as supported only by "groundless belief."

To be sure, the record on this question is mixed at best. Brown says Shingleton was there on September 14, Shingleton and the other MSP Defendants say he was not, and Hanson does not remember whether she spoke with him that day. It is unsurprising that the parties' recollections differ. But such differences do not render the record so one-sided as to make the district court's conclusion "demonstrably false," as is required for review on appeal. *Barry*, 895 F.3d at 440. There is no videotape or other evidence "blatantly" contradicting either party's version of events. *See Scott*, 550 U.S. at 378-81, 127 S.Ct. 1769; **\*647** *Austin*, 690 F.3d at 496-97 (where videotapes were inconclusive as to events, district court properly concluded that factual dispute existed). At bottom, the MSP Defendants' argument is about the sufficiency of the evidence: they "challenge directly the plaintiff's allegations (and the district court's acceptance) of 'what actually occurred ...,' who did it, or 'nothing more than whether the evidence could support a jury's finding that particular conduct occurred,' " *DiLuzio*, 796 F.3d at 609 (brackets omitted) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 190, 131 S.Ct. 884, 178 L.Ed.2d 703 (2011); then quoting *Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). It is not within our jurisdiction to resolve this dispute. We proceed with deference to the district court's determination of facts.

## III. ANALYSIS

We review a district court's denial of qualified immunity de novo, *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022), and a district court's refusal to address the merits of a defendant's motion asserting qualified immunity is equivalent to a denial for purposes of appellate review, *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004). "When, as here, a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to immunity." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). And when more than one officer is involved, "the court must consider each officer's entitlement to qualified immunity separately." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam). We address each of Brown's claims below.

### A. Brown's Arrest

The district court did not address the MSP Defendants' qualified immunity arguments as to Brown's claim that they violated her Fourth Amendment right to be free from arrest without probable cause. It noted only that Brown "contest[ed]" the existence of probable cause to arrest her. Nevertheless, the district court denied the MSP Defendants' motion for summary judgment in its entirety, implicitly addressing the issue of whether the MSP Defendants were entitled to qualified immunity on Brown's probable cause claim and making it reviewable on appeal. *See Freed v. Thomas*, 976 F.3d 729, 741 (6th Cir. 2020).

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). The existence of probable cause depends upon "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* When there is "reasonably trustworthy information ... sufficient to warrant a prudent man in believing" that an offense had been or was being committed, there is generally probable cause. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)) (alteration in *Gardenhire*). An officer must "consider the totality of the circumstances," and "cannot look only at the evidence of guilt while ignoring all exculpatory evidence when assessing probable cause." *Id.* (quoting *Gardenhire*, 205 F.3d at 318). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Gardenhire*, 205 F.3d at 315.

It is clearly established that "[a]n eyewitness identification will constitute sufficient probable cause unless, at **\*648** the time of the arrest, there is an apparent reason for the officer

to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks and citation omitted). A person does have a right to be free from arrest "based solely on an eyewitness account that is in some way untruthful or unreliable." *Ouza*, 969 F.3d at 282. "At most," an "unreliable and uncorroborated" eyewitness account alone "gives an officer reasonable suspicion of criminal activity such that the officer would be justified in investigating further pursuant to *Terry v. Ohio*." *Id.* But where such an account is corroborated by other evidence, the officer may properly conclude that there is probable cause for a warrantless arrest. *Cf. id.*

Brown was arrested for violating Michigan law, which provides in relevant part that a person shall not, by threat or intimidation, "[d]iscourage or attempt to discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding."[2] Mich. Comp. Laws § 750.122(3)(a). The following facts are undisputed: Jones had told Dhooghe and Shingleton that she received threats from Reed's family; at the September 11 hearing, Dhooghe overheard Reed's lawyer telling Brown that "someone needs to talk to her"; Dhooghe and Shingleton saw Brown at Jones's home just after they saw her at the September 11 hearing; and Hanson told the officer in charge on September 14 that she had witnessed Brown intimidating Jones and telling her not to testify, and that there was probable cause to arrest Brown. Brown's retort is that Dhooghe and Shingleton blamed her for the case against Reed "falling apart," that they wanted to "punish her" for interfering, and that Hanson was lying. Brown offers no evidence to support her claim. Given the events and behavior Dhooghe and/or Shingleton knew about, there was no reason for them to believe that Hanson was lying or mistaken when she told the officer in charge what she had seen and said that there was probable cause for Brown's arrest. Under the totality of the circumstances, the officers therefore had probable cause to arrest Brown for witness intimidation.

Alternatively, the MSP Defendants argue that an officer should generally be entitled to rely on a prosecutor's independent judgment that probable cause exists. In their view, Hanson's conclusion that probable cause existed to arrest Brown was enough on its own. In support, they cite *Steiger v. Hahn*, 718 F. App'x 386, 391 (6th Cir. 2018), and *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d

Cir. 2010). Both these cases are readily distinguishable. In *Steiger*, detectives gathered extensive evidence, conferred repeatedly with the Michigan Attorney General's office to review the evidence, then applied for an arrest warrant for Steiger based on the conclusion of the Attorney General that the evidence was sufficient to establish probable cause. 718 F. App'x at 387-89. We held that, given the thorough and deliberate process of the investigation into Steiger's behavior, which allowed sufficient time for the Attorney General to review the pertinent evidence, the detectives could rely on the Attorney General's **\*649** judgment that probable cause existed to charge Steiger and were entitled to qualified immunity as to Steiger's false arrest claim. *Id.* at 391-92. The circumstances here were quite different; there was no deliberative, collaborative process between the MSP Defendants and the prosecutor's office to review the evidence of Brown's alleged crime, only a conversation between Hanson and the officer in charge.

In *Kelly*, the Third Circuit held that "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." 622 F.3d at 255-56. But the "reliance must be itself objectively reasonable" and "a plaintiff may rebut this presumption by showing that, under all of the ... circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice." *Id.* at 256. The *Kelly* court reversed a district court's finding that it was objectively reasonable for an officer to rely on a prosecutor's advice regarding probable cause where the officer had observed conduct that he thought constituted a crime, then called the prosecutor to verify that the conduct was a crime sufficient to justify probable cause for arrest. *Id.* at 251, 255-59. The court held that additional fact-finding was necessary to assess whether the officer's reliance on the prosecutor's advice was reasonable. *Id.* at 258-59.

*Kelly*, of course, is not binding. *See Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010). Moreover, the *Kelly* court determined that the reasonableness of relying on a prosecutor's advice depends on the circumstances. *Kelly*, 622 F.3d at 258-59. Here too, there may be factual questions about the reasonableness of relying upon Hanson's assessment of probable cause, e.g., whether the officers present could have reasonably questioned her ability to neutrally assess that there was probable cause to arrest Brown. We decline to endorse the MSP Defendants' position as to the dispositive nature of Hanson's legal conclusion. Regardless, under the totality of

the circumstances, there was probable cause to arrest Brown. *See Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004) (situating pre-arrest consultation with a prosecutor in the "totality of the circumstances" and collecting cases from other circuits). The MSP Defendants did not violate her Fourth Amendment right to be free from arrest without probable cause and are entitled to qualified immunity on Brown's false arrest claim.

**B. Brown's Detention**

"Individuals arrested and detained without a warrant are entitled to a 'prompt' judicial determination of probable cause." *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). In the absence of exceptional circumstances, the government must generally provide a probable cause determination within 48 hours for the determination to be considered sufficiently prompt. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). A failure to do so violates the individual's Fourth Amendment rights and is known as a *Riverside* violation.[3] *See id.* Where the arrested person **\*650** does not receive a probable cause determination within 48 hours, the government bears the burden of demonstrating "the existence of a bona fide emergency or other extraordinary circumstance" that would justify the delay. *Id.* at 57, 111 S.Ct. 1661.

There is no dispute that Brown was detained without a probable cause hearing for approximately 96 hours, and that she was entitled to such a hearing absent extraordinary circumstances. But although the MSP Defendants cursorily assert that the circumstances here were extraordinary, they fail to support that assertion or develop that argument. Instead, the MSP Defendants argue that (1) they "personally" did not intentionally violate Brown's right to receive a prompt determination of probable cause; and (2) it was not clearly established at the time that the MSP Defendants' conduct was a violation of Brown's rights given the circumstances.

1. The MSP Defendants' Violation of Brown's Rights

We "look to state law to determine who is responsible for ensuring that a judicial determination of probable cause takes place within 48 hours" of an arrest. *Drogosch*, 557 F.3d at 378-79 (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 644 (6th Cir. 2003)). Michigan state law provides that it is the duty of "[a] peace officer who has arrested a person for an offense without a warrant" to take the person arrested before a magistrate "without unnecessary delay." Mich. Comp. Laws § 764.13. Thus, the officer or officers who arrested Brown had the legal obligation to ensure she received a probable cause hearing within 48 hours. In Michigan, an arrest is "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." *People v. Gonzales*, 356 Mich. 247, 97 N.W.2d 16, 19 (1959) (quoting 4 Am. Jur. Arrest, § 2); *see also Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002).

Under Michigan law, Willoughby and Knapp were arresting officers with a *Riverside* obligation because they arrested Brown by handcuffing her, physically taking her into custody, and transporting her to jail. The MSP Defendants acknowledge as much.[4] *See* Appellants' Br. at 31. The parties disagree vociferously, however, as to Shingleton and Dhooghe's obligations. Taking the facts as found by the district court and in the light most favorable to Brown, Dhooghe was physically present at the courthouse, potentially spoke with Hanson, and directed Knapp and Willoughby to arrest Brown. Although Dhooghe did not physically arrest Brown because he did not have his handcuffs on him, he still took actions that "indicate[d] an intention" to take Brown into custody and subjected Brown to his will by directing other officers to take her into custody. *Gonzales*, 97 N.W.2d at 19. Dhooghe was an arresting officer for purposes of the *Riverside* analysis. As for Shingleton, the **\*651** district court found it was unsettled whether he was physically present when Brown was arrested. Assuming, in the light most favorable to Brown, that he was, Shingleton was one of the detectives in charge of the Reed case that Hanson contacted to report Brown's intimidation and discuss her arrest. Additionally, he authored a report about Brown's arrest and was aware of her incarceration such that he eventually authorized her release. Shingleton was thus part of the decision to arrest Brown and direct Knapp and Willoughby to physically take her into custody. By so doing, he took actions indicating intent to take Brown into custody and was therefore also an arresting officer.

The MSP Defendants contend that they "lacked the power to convene a probable cause hearing on their own," and that it was objectively reasonable for them to assume that Hanson would secure Brown's arrest warrant. Although Michigan law requires the arresting officer to bring a person arrested without

a warrant before a magistrate for their probable cause hearing, other parties must act as well: the prosecutor requests the warrant and a magistrate makes a finding of reasonable cause and ultimately issues the warrant. *See* Mich. Comp. Laws § 764.1a(1), (2)(d), (4). The MSP Defendants claim that not one of them observed the factual allegations supporting Brown's arrest or had the personal knowledge needed to author an affidavit. In their view, only Hanson could have sworn out a complaint and requested a warrant, and they cannot be held liable for any failure to do so.

This position ignores the undisputed fact that the MSP Defendants did not even attempt to ensure that Brown received a probable cause hearing. Hanson herself testified that the prosecutor's office typically waits for the arresting officers to submit a prosecutor's packet before preparing a warrant or proposed complaint. Nothing in the record indicates that the MSP Defendants could not have followed this routine procedure by preparing a prosecutor's packet and contacting Hanson to collect an affidavit from her. This is particularly true if Hanson could not investigate and prosecute the case, given that she was a witness to the alleged crime. The MSP Defendants "essentially contend[ ] that 'someone screwed up, but it wasn't me.' " *Drogosch*, 557 F.3d at 378. Under Michigan law, however, they were responsible for bringing Brown before a magistrate for a prompt probable cause determination. *See id.* at 379. The MSP Defendants cannot skirt this duty by pointing fingers elsewhere. In sum, all four MSP Defendants had a *Riverside* obligation.

The MSP Defendants maintain that they did not intentionally violate that obligation, citing the general requirement for § 1983 liability that a defendant must have acted "knowingly or intentionally to violate [a plaintiff's] constitutional rights such that mere negligence or recklessness is insufficient."[5] *Ahlers*, 188 F.3d at 373. In the context of a *Riverside* claim, we have held that, where the "undisputed record" establishes a violation of the *Riverside* 48-hour rule and the defendant fails to "identify any emergency or other extraordinary **\*652** circumstance" as justification, the plaintiff "can withstand the first prong of the qualified immunity inquiry by virtue of the violation of her Fourth Amendment right to a judicial determination of probable cause within 48 hours of her arrest." *Cherrington*, 344 F.3d at 644. So, the question is whether the MSP Defendants can establish an emergency or extraordinary circumstance to merit Brown's prolonged detention.

The MSP Defendants' only answer is that "the alleged offense happened in the presence of an assistant prosecutor who directed one police officer to arrest Brown and who in turn referred that request to another officer who happened to be in uniform and with handcuffs." Appellants' Br. at 26. This proposed "extraordinary circumstance" does not take Brown's case "outside the usual 48-hour rule." *Cherrington*, 344 F.3d at 643. Regardless of the precise mechanics of Brown's arrest, the bottom line is that multiple officers were involved in her arrest and subsequent transport to custody. The MSP Defendants offer no reason that the involvement of multiple officers—an everyday occurrence in arrests across the country—would prevent or excuse them from complying with their *Riverside* obligations. The presence of a witness to the alleged crime during an arrest is similarly common and of no moment. The MSP Defendants therefore violated Brown's right to receive a prompt determination of probable cause.

#### 2. Whether Brown's Rights Were Clearly Established

A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018) (internal quotation marks and citation omitted). Existing law must put the "constitutionality of the officer's conduct 'beyond debate.' " *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). The Supreme Court has "stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.' " *Id.* at 590, 138 S.Ct. 577 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014)). That said, a "plaintiff need not always put forth 'a case directly on point' " to show that her rights "were indeed clearly established at the time of the conduct." *Shumate v. City of Adrian*, 44 F.4th 427, 449 (6th Cir. 2022) (quoting *Rivas-Villegas v. Cortesluna*, —— U.S. ——, 142 S. Ct. 4, 7, 211 L.Ed.2d 164 (2021) (per curiam)). A "[p]laintiff need not show that 'the very action in question has previously been held unlawful, but ... in light of pre-existing law, the unlawfulness [of the official action] must be apparent.' " *Id.* at 449-50 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (second alteration in *Shumate*).

The parties focus their attention on four relevant cases: *Cherrington v. Skeeter*, 344 F.3d 631 (6th Cir. 2003) (denied qualified immunity); *Drogosch v. Metcalf*, 557 F.3d 372 (6th Cir. 2009) (same); *Rayfield v. City of Grand Rapids*, 768 F. App'x 495 (6th Cir. 2019) (granted qualified immunity); and *Roberson v. Wynkoop*, No. 21-1240, 2021 WL 5190902 (6th Cir. 2021) (per curiam) (same). We summarize each.

Cherrington was arrested in Ohio early on a Saturday morning in the late summer of 1996 and was not arraigned until the following Tuesday. 344 F.3d at 635. She **\*653** was arrested without a warrant and was not provided with a probable cause hearing for over 72 hours while detained. *Id.* at 642-43. The defendant officers argued that their failure to present Cherrington for a probable cause determination should be excused because her arrest occurred over the Labor Day holiday weekend and because she was cooperating in an undercover investigation in the days following her arrest, which would have been jeopardized by a probable cause hearing. *Id.* at 643. We held that the officers were not entitled to qualified immunity given *Riverside*, which put officers on notice of defendants' Fourth Amendment right to a probable-cause hearing within 48 hours, and which "expressly caution[ed]" that intervening weekends and holidays did not qualify as "extraordinary circumstances" "permit[ting] relief" from that requirement. *Id.* at 643-44.

Next, in 2004, officers randomly searched Drogosch's Michigan home, recovering a firearm. 557 F.3d at 375. He was on probation at the time but was not disqualified from owning a firearm under the terms of his probation order. *Id.* Drogosch tried to explain the situation to the officers, but they arrested him anyway. *Id.* at 376. When Drogosch was brought to jail, the arresting officer completed a *parole* detainer form, not a probation detainer form, even though he was aware that detained parolees were not entitled to an immediate hearing, while detained probationers were. *Id.* Drogosch was then imprisoned for more than 48 hours (in fact, for over a week) without a probable cause hearing. *Id.* at 376-77. The arresting officer argued that he "had no legal obligation to physically bring Drogosch before a judge for a probation-violation hearing," and that he had done what was required of him by bringing Drogosch to jail, filling out the paperwork, and contacting Drogosch's probation officer. *Id.* Here, too, we held that the officer was not entitled to qualified immunity. *Id.* at 380. Under Michigan law, he failed to fulfill his duty to ensure Drogosch received a probable cause hearing—and even if he was not "technically" responsible for bringing Drogosch before a judge, it was his decision to use

an inapplicable detainer form that was "the root cause" of the constitutional violation. *Id.* at 378-79. Furthermore, *Riverside* preceded Drogosch's arrest by over a decade and "would have alerted a reasonable official" to his Fourth Amendment right to a prompt probable hearing.[6] *Id.* at 379.

Then, in 2014, Rayfield was arrested in Michigan after a domestic dispute with his neighbor. 768 F. App'x at 499. At some point after his arrest, Rayfield was transferred from the City of Grand Rapids Police Department to the County of Kent pursuant to an agreement between the City and the County that the County would house people arrested by the Grand Rapids Police Department. *Id.* In total, Rayfield was detained for more than 48 hours without a probable cause hearing; it is unclear how much time he spent in the City's custody as opposed to the County's. *Id.*; *see id.* at 508-09. We found that it was "admittedly arguable that when [the Grand Rapids defendants] transferred custody of Rayfield to the County facility, they should have alerted the County officials **\*654** regarding the length of time that they had previously detained Rayfield, to ensure that Rayfield was not detained for a *total* of more than 48 hours before a hearing." *Id.* at 508-09. We nevertheless affirmed the district court's decision to grant the arresting officers' motions to dismiss on the grounds of qualified immunity. *Id.* at 508-10. We reasoned that, even if the officers had violated Rayfield's constitutional rights by detaining him for more than 48 hours without a probable cause hearing, *Cherrington* had not addressed "the factually and legally distinct situation presented by Rayfield's case, namely when two municipalities, both of which have authority to process a detainee, jointly manage the custody of a pre-hearing detainee." *Id.* at 509-10. Although we could "plausibly conceive of a situation in which City and County officials would violate a detainee's rights under *County of Riverside* by failing adequately to inform the other municipal authority regarding the status of the individual's detention," it was not clearly established that any failure by the officers to do so had violated Rayfield's constitutional rights. *Id.* at 510.

Finally, in 2016, Roberson was arrested at his Michigan residence by MSP troopers after a domestic dispute. 2021 WL 5190902, at \*1. The arresting officer completed the incident report and paperwork requesting an arrest warrant over 24 hours after Roberson was arrested; once the report and warrant packet were submitted, the situation was "out of [the officer's] hands." *Id.* The prosecutor processed the paperwork quickly, but the judicial officer did not hold the probable cause determination until the next morning, more than 48 hours after Roberson was arrested. *Id.* We found that the officer was

entitled to qualified immunity because, even if he had violated Roberson's constitutional rights, "*Riverside* and its progeny [did] not clearly establish that an officer in [the trooper's] position [was] liable in particularized circumstances like these." *Id.* at *2. MSP "troopers rely on other agencies and actors in the criminal justice system to ensure that arrestees receive their probable cause determination" because the MSP does not own or operate its own jails, and it was not objectively unreasonable for the arresting officer "to expect the process to occur in a timely manner as it normally does" given that he had completed the requisite paperwork. *Id.* at *3.

The MSP Defendants argue that *Rayfield* and *Roberson* (which both granted qualified immunity) demonstrate that their conduct was lawful, and that neither *Cherrington* nor *Drogosch* (which both denied qualified immunity) is sufficiently particularized to put them on notice that their actions were *un*lawful. We disagree on both points.

*Rayfield* and *Roberson* are distinguishable, as well as non-binding. In *Rayfield*, the issue was a lack of communication between two municipalities jointly managing a person's pretrial detention: Rayfield was in Grand Rapids custody for some time, then transferred to the County of Kent's custody without notification to the County officials of how much time he had spent in City custody. *See* 768 F. App'x at 508-10. Here, the problem is not the MSP Defendants' and Genesee County's communication (and, in fact, it seems that Genesee County *did* flag Brown's ongoing detention to MSP employees). There is no evidence that the MSP Defendants took any steps at all to facilitate a timely probable cause hearing for Brown.[7] *Roberson* is **\*655** distinguishable for that same reason. The arresting officer there completed the necessary paperwork to secure Roberson a probable cause hearing. 2021 WL 5190902, at *1.

*Cherrington* established in 2003 that officers are assumed to be aware of an individual's right to a probable cause determination within 48 hours. *Cherrington*, 344 F.3d at 644. And *Drogosch* confirmed almost a decade before Brown was arrested that, in Michigan, arresting officers have an obligation to try to secure a probable cause hearing for the person they arrest, including by filing appropriate paperwork. *Drogosch*, 557 F.3d at 379-80; *see also Cherrington*, 344 F.3d at 644. It was therefore clearly established at the time of Brown's arrest that her arresting officers had a duty to take her before a magistrate for a probable cause hearing. The MSP Defendants made no efforts to do so, and they are not entitled to qualified immunity on Brown's *Riverside* claim.

### IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment as to Brown's *Riverside* claim and **REVERSE** the district court's judgment as to Brown's false arrest claim. We **REMAND** the case for further proceedings consistent with this opinion.

### All Citations

75 F.4th 638

Footnotes

1    Brown also named Jason Gould, the jail administrator, Mackenzie Rose, a jailer at Genesee County Jail, and Genesee County, Michigan, in her complaint (collectively, the Genesee County Defendants), and alleged a malicious prosecution claim against Shingleton and Dhooghe. The district court granted the Genesee County Defendants' motion for summary judgment and dismissed Brown's malicious prosecution claim. Brown does not appeal either ruling.

2    Brown also cites another potentially relevant subsection: "A person shall not willfully impede, interfere with, prevent, or obstruct or attempt to willfully impede, interfere with, prevent, or obstruct the ability of a witness to attend, testify, or provide information in or for a present or future official proceeding." Mich. Comp. Laws § 750.122(6).

3    Brown also asserted that her detainment without a hearing violated the Fifth Amendment's Due Process Clause as incorporated through the Fourteenth Amendment. "[I]t is the Fourth, rather than the Fourteenth, Amendment that applies to this case because 'the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary ... determination of probable cause,' " whereas "due process regulates the period of confinement after the initial determination of probable cause." *Drogosch*, 557 F.3d at 378 (quoting *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992)).

4    The MSP Defendants suggest that Willoughby and Knapp are not responsible because § 1983 actions are limited to deprivations of federal statutory and constitutional rights and do not encompass violations of state law. This is shadowboxing: Brown does not claim that Knapp and Willoughby violated state law. Rather, she alleges that they violated her Fourth Amendment rights. As the MSP Defendants' own brief notes, we look to state law merely to define those rights.

5    The cases the MSP Defendants cite to support their desired rule both analyzed conceptually distinct Fourth Amendment claims that used their own particularized standards. *See Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019) ("In the context of a Fourth Amendment claim that a police officer lied in a search warrant, we have distilled a specific inquiry."); *Caminata v. County of Wexford*, 664 F. App'x 496, 500 (6th Cir. 2016) (intentional or reckless action is a "necessary element of both" Fourth Amendment claims of "fabrication of evidence and malicious prosecution").

6    We also discussed the objective reasonableness of the officer's actions, finding that his "act of imprisoning Drogosch involved nothing like split-second decisionmaking" and that he had "plenty of time to ponder the decision of whether to lodge Drogosch in the jail using the incorrect detainer form." *Id.* at 379-80. The officer "would have known that Drogosch was not in violation of his probation and was not even a felon if he had bothered to look at the probation paperwork that Drogosch tried to show him before the arrest." *Id.* at 380.

7    The MSP Defendants' reliance on *Rayfield* is troubling for another reason: the MSP does not own or operate its own jails, so it must coordinate with municipalities to house detainees on its behalf. Under the MSP Defendants' theory, the agency could *always* be entitled to qualified immunity for *Riverside* claims because MSP arrests and pretrial detentions necessarily involve multiple municipalities and agencies.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.