ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

Nos. 22-7129 & 22-7130

————————————

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

**Oyoma ASINOR**, *et al.*,
PLAINTIFFS—APPELLANTS,

**v.**

**DISTRICT OF COLUMBIA**, *et al.*,
DEFENDANTS—APELLEES.

————————————

**Alexander CAMERON**, *et al.*,
PLAINTIFFS-APPELLANTS,

**v.**

**DISTRICT OF COLUMBIA**,
DEFENDANT-APPELLEE

————————————

Consolidated Appeals from the UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
(Nos. 1:21-cv-02158-APM and 1:21-cv-02908-APM)

————————————

## BRIEF OF MORGAN CLOUD AND THOMAS K. CLANCY AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS AND REVERSAL

————————————

**Thomas K. Clancy**
Professor of Law Emeritus
University of Mississippi School of Law
34 Dexter Avenue
Sandwich, MA 02563
clancy.thomas.k@gmail.com
(662) 832-5244

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES</u><br><u>AND RULE 26.1 STATEMENT</u>

Under Circuit Rules 26.1 and 28(a)(1), undersigned counsel certifies as follows:

### A.    Parties and *Amici*

All parties, intervenors, and *amici* appearing in this Court to date are listed in the

Brief for Plaintiffs-Appellants.

*Amici* appearing on this brief are: Thomas K. Clancy and Morgan Cloud.

All *amici* appearing on this brief are individuals.

### B.    Rulings Under Review

References to the rulings and order at issue appear in Brief for Plaintiffs-

Appellants.

### C.    Related Cases

To counsel's knowledge, references to all related cases appear in appellants'

opening brief.

/s/ Thomas K. Clancy
Thomas K. Clancy
Counsel for *Amici Curiae*

1

## **TABLE OF CONTENTS**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
AND RULE 26.1 STATEMENT ............................................................ 1

TABLE OF CONTENTS ...................................................................... 2

TABLE OF AUTHORITIES .................................................................. 4

*AMICI CURIAE*'S IDENTITIES, INTERESTS, AND AUTHORITY
TO FILE ............................................................................................ 9

INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 11

ARGUMENT ................................................................................... 13

    The Fourth Amendment Protects Against the Unjustified Prolonged
    Seizures of Personal Property in this Case and Guarantees its Return ........... 13

    A.   Fourth Amendment Reasonableness Regulates both the
        Initial Decision to Seize and the Scope of that Intrusion .................. 13

    B.   The Personal Property and Privacy Rights at Stake in
        Prolonged Detentions of Cell Phones .................................. 16

    C.   The Fourth Amendment Protects Possessory Rights in
        Personal Property as Robustly as it Protects Privacy
        and Liberty Rights ............................................................ 20

    D.   English and American Common Law Confirm a Person's
        Right to the Return of Unjustifiably Retained Personal
        Property, a Right Included in the Fourth Amendment ...................... 22

        1.   The Common Law Foundations of the Fourth Amendment,
            Including the Protection of Personal Property ........................ 22

        2.   *Entick v. Carrington* and the Meaning of the Fourth
            Amendment—from *Boyd* to *Riley* ........................................... 24

        3.   Supreme Court Development of the Fourth Amendment

Right of Return of Property Taken by the Government .......... 27

E.      The Decisions Below are Wrongly Decided ...................................... 31

CONCLUSION....................................................................................... 34

CERTIFICATE OF SERVICE ............................................................... 35

CERTIFICATE OF COMPLIANCE....................................................... 35

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Amos v. United States,*
255 U.S. 313 (1921)................................................................ 28

*Atwater v. City of Lago Vista,*
532 U.S. 318 (2001)................................................................ 22

*Berger v. New York,*
388 U.S. 41 (1967)................................................................ 24

*Boyd v. United States,*
116 U.S. 616 (1886)........................................................ 22, 26, 27

*Burdeau v. McDowell,*
256 U.S. 465 (1921)................................................................ 28

*Carpenter v. United States,*
138 S. Ct. 2206 (2018)............................................................ 22

*Church of Scientology of Cal. v. United States,*
506 U.S. 9 (1992)................................................................ 28

*City of West Covina v. Perkins,*
525 U.S. 234 (1999)................................................................ 28

*Dunaway v. New York,*
442 U.S. 200 (1979)................................................................ 32

*Entick v. Carrington,*
19 How. St. Tr. 1029 (C.P. 1765)........................................ 20, 24, 25, 26

*Florida v. Jardines,*
569 U.S. 1 (2013)................................................................ 20

*Freeman v. Bluet,*
Eastern Term 12 Will. 3, 1403 (1700)............................................. 23

*Gerstein v. Pugh*,
420 U.S. 103 (1975)......................................................................... 22

*Go-Bart Importing Co. v. United States*,
282 U.S. 344 (1931)......................................................................... 28

*Grau v. United States*,
287 U.S. 124 (1932)......................................................................... 28

*Hester v. United States*,
265 U.S. 57 (1924)........................................................................... 22

*Horton v. California*,
496 U.S. 128 (1990)......................................................................... 17

*McDonald v. United States*,
335 U.S. 451 (1948)......................................................................... 28

*Mennie v. Blake*,
(1856) 6 El & Bl. 842 (UK).............................................................. 24

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985)......................................................................... 13

*Oliver v. United States*,
466 U.S. 170 (1984)......................................................................... 22

*One 1958 Plymouth Sedan v. Pennsylvania*,
380 U.S. 693 (1965)......................................................................... 28

*Riley v. California*,
573 U.S. 373 (2014)........................................................... 17, 18, 19, 32

*Shannon v. Shannon*,
(1804) 1 Sch. & Lef. 324 (UK)......................................................... 24

*Silverthorne Lumber Co. v. United States*,
251 U.S. 385 (1920)......................................................................... 28

*Soldal v. Cook Cnty., Ill.*,
506 U.S. 56 (1992)..................................................................... 33

*Terry v. Ohio*,
392 U.S. 1 (1968)....................................................................... 13

*Trupiano v. United States*,
334 U.S. 699 (1948)................................................................... 28

*United States v. Carter*,
985 F.2d 1095 (D.C. Cir. 1993)................................................. 15

*United States v. Howard*,
138 F. Supp. 376 (D. Md. 1956)............................................... 30

*United States. v. Jacobsen*,
466 U.S. 109 (1984)................................................................... 17

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993)..................................................................... 33

*United States v. Jones*,
565 U.S. 400 (2012)................................................. 20, 21, 22, 24

*United States v. Laist*,
702 F.3d 608 (11th Cir. 2012) ................................................... 16

*United States v. Mitchell*,
565 F.3d 1347 (11th Cir. 2009) ................................................ 16

*United States v. Nurse*,
916 F.2d 20 (D.C. Cir. 1990)..................................................... 15

*United States v. Place*,
462 U.S. 696 (1983)....................................................... 14, 15, 31

*United States v. Pratt*,
915 F.3d 266 (4th Cir. 2019)..................................................... 16

*United States v. Sharpe*,
470 U.S. 675 (1985)......................................................................... 14

*Warden v. Hayden*,
387 U.S. 294 (1967)......................................................................... 29

*Weeks v. United States*,
232 U.S. 383 (1914).................................................................. 27, 28

## Constitutional Provisions

U.S. Const. amend. IV ................................................................ 13, 20

## Rules

Fed. R. Crim. Pro. 41 ......................................................................... 30

## Other Authorities

George F. Deiser, <u>The Development of Principle in Trespass</u>,
27 Yale L.J. 220 (1917) ..................................................................... 24

<u>History of the Distinctions Between Trespass, Detinue, and
Trover</u>, 18 Harv. L. Rev. 402 (1905)...................................................... 23

James Barr Ames, <u>Lectures on Legal History and Miscellaneous
Legal Essays</u> (1913)......................................................................... 24

James Barr Ames, <u>The History of Trover</u>, 11 Harv. L. Rev. 374 (1898) ............... 24

Morgan Cloud, <u>Property is Privacy: Locke and Brandeis in the
Twenty-First Century</u>, 55 Am. Crim. L. Rev. 37 (2018)........................................ 22

Morgan Cloud, <u>The Fourth Amendment During the *Lochner* Era: Privacy,
Property, and Liberty in Constitutional Theory</u>,
48 Stan. L. Rev. 555 (1996).................................................................. 25

Thomas K. Clancy, <u>The Fourth Amendment: Its History and
Interpretation</u> 373–411 (3d ed. 2017) ...................................................... 14

Thomas K. Clancy, <u>What Does the Fourth Amendment Protect:</u>
<u>Property, Privacy, or Security?</u>, 33 Wake Forest L. Rev.
307 (1998).................................................................................................. 25

2 William Blackstone, <u>Commentaries on the Laws of England</u>
(William Carey Jones ed., 1916) .............................................................. 23

## *AMICI CURIAE*'S IDENTITIES, INTERESTS,<br>AND AUTHORITY TO FILE[1]

*Amici* are Fourth Amendment scholars who seek to assist in proper understanding of Fourth Amendment principles and believe that this Court would benefit from a detailed explanation of those principles. Pursuant to Circuit Rule 29(d), *amici* certify that a separate brief is necessary because these *amici* have unique expertise regarding Fourth Amendment jurisprudence.

**Morgan Cloud** is the Charles Howard Candler Professor of Law at Emory University. He has published numerous books and articles on constitutional criminal procedure and criminal law. Many of his works examine Fourth Amendment issues relevant to this *amicus* brief, including The Fourth Amendment During The Lochner Era: Privacy, Property, and Liberty, 48 Stan. L. Rev. 555 (1996); Searching Through History, Searching for History, 63 U. Chi. L. Rev. 1707 (1996); Property is Privacy: Locke and Brandeis in the Twenty-First Century, 55 Am. Crim. L. Rev. 37 (2018); and Mapp v. Ohio, the Exclusionary Rule, and Constitutional Judicial Review, Oxford Rsch. Encyclopedia: Am. Hist., (2021). His articles have been cited in

---

[1] In accordance with Federal Rule of Appellate Procedure 29, no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing and submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this *amicus* brief. *See* Fed. R. App. P. 29(a)(2).

opinions published by state and federal courts, including multiple United States Supreme Court opinions.

**Thomas K. Clancy,** Professor Emeritus at the University of Mississippi School of Law, is a nationally recognized expert on the Fourth Amendment. He has lectured at approximately 150 judicial conferences, has written hundreds of briefs on Fourth Amendment topics, and has written more than twenty articles on the Fourth Amendment. He is the author of two books on the subject: <u>Cyber Crime and Digital Evidence</u> (4th ed. 2023) and <u>The Fourth Amendment: Its History and Interpretation</u> (3d ed. 2017). His publications have been cited by hundreds of authorities, including in three United States Supreme Court opinions.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

The Fourth Amendment guarantees that seizures of property must be reasonable. Reasonableness has two dimensions: it regulates the initial decision to seize and the scope of that seizure. Both must be reasonable. Here we assume that the initial seizures of the cell phones were incident to lawful arrests. The second dimension of reasonableness, however, was violated by the prolonged, arbitrary, and warrantless seizures of this private property. The reasonableness of the scope of a seizure is judged according to multiple components, including the length of, and justification for, extended interference with the citizens' possessory rights over their personal property.

The cell phone seizures continued long after charges were dropped and the citizens released from custody. In some cases, the seizures continued for more than a year, despite numerous attempts by the citizens to obtain the return of their property. The record reveals that the government never sought to justify the prolonged seizures and, to this day, the government offers no Fourth Amendment justification.

The Fourth Amendment protects the right of return of legally seized property that becomes unreasonably prolonged. This principle is clearly stated—repeatedly— in Supreme Court cases, and has deep historical roots in the English common law predating the Constitution.

These two principles—the scope of the reasonableness inquiry and the grounding of the right to return in the Fourth Amendment—demonstrate that the citizens' Fourth Amendment rights remained throughout the time that the District of Columbia held their cell phones and that the lower court opinions in these consolidated cases were in error to rule otherwise.

# ARGUMENT

**The Fourth Amendment Protects Against the Unjustified Prolonged Seizures of Personal Property in this Case and Guarantees its Return.**

### A.     Fourth Amendment Reasonableness Regulates both the Initial Decision to Seize and the Scope of that Intrusion.

The first clause of the Fourth Amendment requires that searches and seizures not be "unreasonable."[2] This is the "fundamental command" of the Amendment. *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985). Reasonableness is the measure of both the permissibility of the initial decisions to search and seize and the permissible scope of those intrusions. *See, e.g.*, *id.* at 341; *Terry v. Ohio*, 392 U.S. 1, 20 (1968). This case is about the scope of the intrusion—the prolonged unjustified detention of the cell phones.

The case law illuminating and applying this fundamental two-dimension principle is legion and without contradiction. For example, cases examining *Terry* stops of persons have recognized that a stop must be justified at its inception and its scope also must be reasonable. The test is whether the intrusion is "reasonably related in scope to the circumstances which justified the interference in the first

---

[2] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

place." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry*, 392 U.S. at 20). Traffic stops routinely examine the justifications for the initial intrusion—the stop itself—and the permissible scope of that stop.[3] Although there is no rigid time limit, stops are temporary in nature. *See, e.g.*, *Sharpe*, 470 U.S. at 683–85; *United States v. Place*, 462 U.S. 696, 709–10 (1983) (refusing to set limit on *Terry* stops but observing that the "brevity of the invasion" is an important factor). At some point, merely because of the duration of a detention, the Court will label it an arrest and find that the scope of the detention has violated the Fourth Amendment in the absence of probable cause. *E.g.*, *Sharpe*, 470 U.S. at 685 ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.").

The present case involves the detention of a person's personal effects. The two-fold analysis does not change. In *Place*, for example, the Court found unreasonable a ninety-minute detention of the suspect's luggage so a drug dog could be brought to the scene and sniff it for the presence of narcotics because the police had failed to "diligently pursue their investigation." 462 U.S. at 698–700, 709–10. The detention occurred after Place arrived at La Guardia Airport in New York on a flight from Miami. *Id.* at 698–99. Prior to boarding that flight, Place had been

---

[3] The many ways in which the scope of stops are regulated are collected in Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation 373–411 (3d ed. 2017).

stopped in the Miami airport by Drug Enforcement Administration authorities, who developed suspicion that he was a drug courier. *Id.* They permitted him to board the plane and then called authorities in New York, who accosted Place and detained his luggage after his arrival. *Id.* The agents took the bags to Kennedy Airport to obtain a "sniff test" by a trained narcotics dog, which alerted to the presence of drugs. *Id.* The Court stated that "the New York agents knew the time of Place's scheduled arrival at La Guardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion." *Id.* at 709. In the Court's words: "The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709. Thus, the extended detention of the luggage violated the Fourth Amendment and the evidence later found inside the luggage was suppressed. *Id.* at 710. This Court has acknowledged that *Place* extended the temporary detention doctrine to personal effects. *E.g.*, *United States v. Nurse*, 916 F.2d 20, 23 (D.C. Cir. 1990) ("In *Place,* the Court extended the *Terry–Royer* reasonable suspicion exception to temporary detentions of personal effects for the purpose of conducting limited investigations."). *See generally United States v. Carter*, 985 F.2d 1095, 1097 (D.C. Cir. 1990) (temporary detention of a paper bag).

     Courts have found that the Fourth Amendment has been violated when the police lawfully seize a cell phone but hold the phone too long before seeking a

warrant. In *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019), government agents lawfully seized Pratt's cellphone after he admitted he had child pornography pictures on it. *Id.* at 270. The agents did not apply for a search warrant until 31 days later. *Id.* at 271. The issue before the court was whether that delay was unreasonable or, as the court put it: "The constitutional question is whether the extended seizure of Pratt's phone was reasonable." *Id.* Applying the two-fold reasonableness inquiry and finding the government's arguments for the delay inadequate in light of the important personal interests that Pratt had in his phone, the court found that the evidence should have been suppressed. *Id.* at 276; *see also United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009) (finding Fourth Amendment violated when agent, who lawfully seized a computer, delayed obtaining search warrant for twenty-one days). Other courts have rejected similar claims when the delays were found to be reasonable. *E.g.*, *United States v. Laist*, 702 F.3d 608 (11th Cir. 2012) (25-day delay in getting a search warrant for a seized computer reasonable). The essential point here is not whether any particular length of time in the decided cases was reasonable or not, but that the inquiry *requires* analysis of how long the device has been held to ascertain whether the Fourth Amendment has been satisfied.

## B.    The Personal Property and Privacy Rights at Stake in Prolonged Detentions of Cell Phones.

The Supreme Court has clearly identified the individual's protected interests in his or her effects, including the individual's rightful possessory interest in an

object. *See Horton v. California*, 496 U.S. 128, 134 (1990) (seizure of article in plain view does not involve invasion of privacy but does invade owner's possessory interest). This has occurred in the context of distinguishing between searches and seizures: although a search typically implicates privacy concerns, a seizure implicates the person's interest in retaining possession of his or her property. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("'[S]earch' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed," whereas "'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."). The scope of the seizures of the cell phones in these cases implicates correlative privacy rights that help explain why the government's violations of the Fourth Amendment are so serious.

*Riley v. California*, 573 U.S. 373 (2014), addressed warrantless searches of cell phones incident to arrest. *Id.* at 378–81. Riley was arrested for driving with expired registration tags. *Id.* at 378. He was searched incident to that arrest and the police seized his cell phone from one of his pockets. *Id.* at 378–79. Officers searched Riley's phone, hoping to find evidence linking Riley to gang related crimes. *Id.* In the consolidated case, police officers arrested a man after seeing him apparently selling drugs and seized two cell phones from his person. *Id.* at 380. They searched

his "flip" phone and discovered evidence used to secure a warrant to search his home, where they found drugs and other evidence. *Id.* at 381.

Chief Justice Roberts' opinion for the Court held that the search incident to arrest rule did not authorize warrantless searches of data on cell phones seized during *lawful* arrests. *Id.* at 386. The Court held that law enforcers generally must first obtain search warrants for cell phones and that that the policy justifications for the traditional rule did not apply "to digital content on cell phones." *Id.* at 384–87. The Court explained that "cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 393. One fundamental difference was the vast quantity of data stored on these devices. A phone with storage capacity of "[s]ixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos." *Id.* at 394.

A second difference was the very nature of the devices, making them more, not less, deserving of the full panoply of Fourth Amendment protections. "Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" *Id.* at 403 (citing *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The Chief Justice cataloged the vast amount of information in cell phones, ranging from addresses, bank statements, medical and prescription information, to photographs. *Id.* at 394. He

noted the prevalence of "apps," which "offer a range of tools for managing detailed information about all aspects of a person's life." *Id.* at 396.

*Riley* demonstrates that the unjustified, prolonged seizures of the cell phones in the present cases are more egregious than the taking of other property. The fact that a cell phone permits a person to carry an expansive picture of their lives in a pocket "does not make the information any less worthy of the protection for which the Founders fought." *Id.* at 403. The allegations contained in the Cameron Complaint provide concrete examples of the concerns expressed by the Court in *Riley*. The Complaint lists the length of the police seizures of the Plaintiff's phones: Cameron 280 days, Tan 310 days, Robinson, Angeles, and Oster more than 14 months. Cameron Compl. pars. 37–41. The negative effects of the prolonged seizures on the lives of the Plaintiffs and other arrestees were significant. The Cameron Complaint alleges that all of the people who failed to regain possession of their phones soon after their release were forced to purchase new phones. Some of these individuals lost photographs, documents, passwords, and text message histories; others had to continue to pay contract fees for the seized cell phones despite not having access; one was unable to access his primary email account. Cameron Compl. pars. 43–49. To this day, the District of Columbia has offered no justification for its retention of the phones.

**C.    The Fourth Amendment Protects Possessory Rights in Personal Property as Robustly as it Protects Privacy and Liberty Rights.**

Fundamental principles established by the Supreme Court long before the *Riley* decision also confirm that the prolonged cell phone seizures in these cases violated the Fourth Amendment. The Fourth Amendment right to be secure from unreasonable searches and seizures of personal property is as robust as the other rights protected by it. The text defines a single right, protecting "persons, houses, papers, and effects" equally, a conclusion confirmed by the Court's recent opinions. U.S. Const. amend IV. *See generally United States v. Jones*, 565 U.S. 400 (2012); *Florida v. Jardines*, 569 U.S. 1 (2013). The government's arguments here ignore the equal dignity afforded the property, privacy, and liberty rights protected by the Fourth Amendment, and diminish property rights to a second-class level of protection unjustified by the Amendment's text and history or the Supreme Court decisions interpreting it.

In *Jones*, for example, the Court affirmed that the Fourth Amendment protects not only liberty and privacy rights, but also the property rights expressly described in the constitutional text—rights that originated in the common law. 565 U.S. at 404–05. In particular, the Court relied on *Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765),

> a "case . . . described as a 'monument of English freedom' 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted, and considered to be 'the true and ultimate expression of

constitutional law'" with regard to search and seizure. . . . In that case, Lord Camden expressed in plain terms the significance of property rights in search-and-seizure analysis.

*Id.* at 405.

The *Jones* opinion emphasized that "[t]he text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to 'the right of the people to be secure against unreasonable searches and seizures'; the phrase 'in their persons, houses, papers, and effects' would have been superfluous." *Id.* Ultimately, the Court explained that property and privacy doctrines complement one another in enforcing Fourth Amendment rights.

The opinion in *Jones* emphasized the Fourth Amendment's roots in common law writ and warrant practice existing before our Revolution, and before ratification of the Constitution: "What we apply is an 18th-century guarantee against unreasonable searches, which we believe must provide *at a minimum* the degree of protection it afforded when it was adopted." *Id.* at 411.

*Jones* also confirmed that Fourth Amendment property rights control government seizures of property like the ones at issue in these cases, whether the dispute involved civil or criminal searches and seizures:

> More recently, in *Soldal v. Cook County*, . . . the Court unanimously rejected the argument that although a "seizure" had occurred "in a 'technical' sense" when a trailer home was forcibly removed, . . . no Fourth Amendment violation occurred because law enforcement had not "invade[d] the [individuals'] privacy[.]" . . . *Katz*, the Court explained, established that "property rights are not the sole measure of

Fourth Amendment violations," but [*Katz*] did not "snuf[f] out the previously recognized protection for property."

*Id.* at 407 (internal citations omitted).

One need not be an "originalist" in constitutional interpretation to recognize the importance of property rights in the creation of the Fourth Amendment. At the Founding, "liberty and privacy rights were understood largely in terms of property rights." *Carpenter v. United States*, 138 S. Ct. 2206, 2239 (2018) (Thomas, J., dissenting) (quoting Morgan Cloud, Property is Privacy: Locke and Brandeis in the Twenty-First Century, 55 Am. Crim. L. Rev. 37, 42 (2018)).

### D.    English and American Common Law Confirm a Person's Right to the Return of Unjustifiably Retained Personal Property, a Right Included in the Fourth Amendment.

#### 1.    The Common Law Foundations of the Fourth Amendment, Including the Protection of Personal Property.

It is undisputed that the Fourth Amendment's roots are in the English Common Law. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). A small sample of the opinions issued from the 19th century to the present day in which the Supreme Court has turned to the common law for guidance in interpreting the Fourth Amendment include *Boyd v. United States*, 116 U.S. 616 (1886); *Hester v. United States*, 265 U.S. 57 (1924); *Oliver v. United States*, 466 U.S. 170 (1984); *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001); *United States v. Jones*, 565 U.S. 400 (2012).

Beginning no later than the 13th century, and probably much earlier, the common law established the right to the return of wrongfully detained personal

property. To paraphrase Blackstone, the right to obtain the return of personal property wrongfully detained "is as old as the common law." *See generally* 2 William Blackstone, Commentaries on the Laws of England, 1732–38 (William Carey Jones ed., 1916). This legal principle governed regardless of whether the chattel had been unlawfully taken, *id.* at 1697–98, or the goods were unjustly detained, "though the original *taking* was lawful." *Id.* at 1704; *see also id.* at 1699.

Legal authorities establishing this right in traditional English and American writ practice can be traced from the thirteenth to the twentieth centuries. Lawyers, judges, and commentators sometimes struggled to decide which specific writ was proper, given the facts of a particular case—choosing trespass, replevin, detinue, or trover in different settings and at different times. Depending on the facts and the appropriate writ, a property-holder was entitled to the return of property, payment of damages, or both. *See* History of the Distinctions Between Trespass, Detinue, and Trover, 18 Harv. L. Rev. 402, 402 (1905).

This was true even if the taking and detention of property were done by officers of the law. For example, in *Freeman v. Bluet*, Eastern Term 12 Will. 3, 1403 (1700), the court stated that "[i]f an officer take[s] the goods of an outlawed person, and make[s] no return, the party, upon reversal of the outlawry, shall have trespass against him for his goods . . . . And . . . the plaintiff ought to have the advantage of the return, which the defendant deprives him of by making none." *Id.*; *see also*

George F. Deiser, <u>The Development of Principle in Trespass</u>, 27 Yale L.J. 220, 232–33 (1917); James Barr Ames, <u>Lectures on Legal History and Miscellaneous Legal Essays</u> 70 (1913); J.B. Ames, <u>The History of Trover</u>, 11 Harv. L. Rev. 374, 377, 378 (1898); *Mennie v. Blake*, (1856) 6 El. & Bl. 842, 1079 (UK); *Shannon v. Shannon*, (1804) 1 Sch. & Lef. 324 (UK).

> **2.** ***Entick v. Carrington* and the Meaning of the Fourth Amendment—from *Boyd* to *Riley*.**

Anyone familiar with the Fourth Amendment, and the Supreme Court's opinions interpreting it, likely is familiar with *Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765). *Entick* has been a consistent source of the Supreme Court's interpretation of the Fourth Amendment. *E.g.*, *United States v. Jones*, 565 U.S. 400, 405 (2012) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)); *see also* *Berger v. New York*, 388 U.S. 41, 49 (1967).

The *Entick* case arose from a warrant issued by the secretary of state to arrest Entick and to seize *all* of his books and papers, based on the charge that he was "the author, or one concerned in the writing of several weekly very seditious papers." *Entick*, 19 How. St. Tr. at 1030–31. Entick was arrested, and all of his papers were seized from his home. *Id.* After his release, he sued the messengers in trespass. *Id.* at 1031. The jury returned a verdict for Entick, awarding damages, and the case was heard by Lord Camden, who condemned the "warrant [as] wholly illegal and void." *Id.* at 1063–64.

Lord Camden discussed the fundamental role that property rights played in society and outlined a hierarchy of property rights: "The great end, for which men entered into society, was to secure their property." *Id.* at 1035. Papers were, in his view, a person's "dearest property."

Lord Camden condemned the scope of the warrant, because if such a warrant were legal, then "the secret cabinets and bureaus of every subject in this kingdom will be thrown open to the search and inspection of a messenger, whenever the secretary of state shall think fit to charge, or even suspect, a person to be the author, printer, or publisher of a seditious libel." *Id.* at 1063–64. Camden rejected the right of the government to seize or inspect private papers because to pronounce that practice legal, "would be subversive of all the comforts of society." *Id.* at 1066.

Camden distinguished the right to search for and seize stolen goods based on the property rights involved: in the case of stolen goods, the owner is permitted to recapture his own goods; the seizure of private papers, however, involved taking the owner's property by the government.[4]

*Entick* was foundational in the Supreme Court's first opinion defining the

---

[4] Applying *Boyd* and *Entick*, the United States Supreme Court similarly distinguished for many years between private papers and other property. *See, e.g.*, Morgan Cloud, The Fourth Amendment During the *Lochner* Era: Privacy, Property, and Liberty in Constitutional Theory, 48 Stan. L. Rev. 555 (1996); Thomas K. Clancy, What Does the Fourth Amendment Protect: Property, Privacy, or Security?, 33 Wake Forest L. Rev. 307, 309–27 (1998).

fundamental nature of the Fourth Amendment: *Boyd v. United States*, 116 U.S. 616 (1886). In *Boyd*, the government sought civil forfeiture of thirty-five cases of French plate glass, claiming the Boyds had not paid the required import duties. The government served the Boyds with a subpoena commanding them to produce an invoice for an earlier shipment of imported glass. *Id.* at 617–18. The Boyds complied with the subpoena but argued that the compelled production of documents to be used as evidence against them violated both the Fourth Amendment and the Fifth Amendment privilege against self-incrimination. *Id.* The Court decided for the Boyds under both Amendments. *Id.* at 617–18, 634–35.

*Boyd* confirmed that Fourth Amendment rights were directly related to private property rights. The opinion offered special protections for private papers, relying directly on *Entick*, declaring that *Entick* defined "the very essence of constitutional liberty." *Boyd*, 116 U.S. at 630. The *Boyd* Court embraced *Entick* as a statement of fundamental law that was essential to the Revolutionary generations, and the Framers of the Fourth Amendment:

> [T]he law, as expounded by [Lord Camden], has been regarded as settled from that time to this, and his great judgment on that occasion is considered as on[e] of the landmarks of English liberty. . . .
>
> As every American statesmen, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the fourth amendment to the

constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures.

*Id.* at 626–27.

### 3. Supreme Court Development of the Fourth Amendment Right of Return of Property Taken by the Government.

The Supreme Court's seminal *Boyd* opinion provided the foundation for its later decision in *Weeks v. United States*, 232 U.S. 383 (1914), which established the exclusionary rule as a remedy in criminal cases. But *Weeks* did more; it unequivocally confirmed the Fourth Amendment right of return of property taken by the government.

In *Weeks*, private papers, including lottery tickets and letters, were seized during a warrantless search of Weeks' room in a private house. *Id.* at 387. The Supreme Court concluded that "[i]f letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment . . . might as well be stricken from the Constitution." *Id.* at 393. The Court specified that Weeks was entitled to have his private property returned pretrial. *Id.* at 398. By "holding them and permitting their use upon the trial, we think prejudicial error was committed." *Id.* The Court reasoned:

> That papers wrongfully seized should be turned over to the accused has been frequently recognized in the early as well as later decisions of the courts. . . . We therefore reach the conclusion that the letters in question were taken from the house of the accused by an official of the United States, acting under color of his office, in direct violation of the constitutional rights of the defendant; that having made a seasonable application for their return, which was heard and passed upon by the

27

court, there was involved in the order refusing the application a denial
of the constitutional rights of the accused, and that the court should have
restored these letters to the accused.

*Id.* at 398 (internal citations omitted).

The Supreme Court's subsequent cases developed property-based theories

distinguishing contraband, which was nonreturnable because it is illegal to possess,

and other papers and effects that could be returned to the rightful owner or possessor.

Regardless, *all* of the cases grounded the remedy of return of property in the Fourth

Amendment.[5]

---

[5] *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) (seizure of all
books and documents of paper company; rejecting view that the return of the
originals but not copies satisfied the Fourth Amendment); *Amos v. United States*,
255 U.S. 313 (1921) (finding petition for return of property erroneously denied);
*Burdeau v. McDowell*, 256 U.S. 465 (1921) (acknowledging that courts have the
authority to order return of private papers but finding that the search was a private
one to which the Amendment did not apply); *Go-Bart Importing Co. v. United
States*, 282 U.S. 344 (1931) (ordering return of business records based on illegal
seizure); *Grau v. United States*, 287 U.S. 124 (1932) (ordering return of articles
illegally seized); *Trupiano v. United States*, 334 U.S. 699 (1948) (finding that the
search and seizure of still, mash, and alcohol was illegal but denying return of the
items because they were contraband); *McDonald v. United States*, 335 U.S. 451
(1948) (finding papers, money, and adding machines were illegally seized and the
lower court erroneously denied motion to return property); *One 1958 Plymouth
Sedan v. Pennsylvania*, 380 U.S. 693 (1965) (discussing the distinction between
contraband and non-contraband as to the availability of the return of property);
*Church of Scientology of Cal. v. United States*, 506 U. S. 9 (1992) (observing that
the Fourth Amendment protects person's rights to privacy in papers and effects and
that taxpayer could seek return of tape recordings and other "meaningful relief" if
tapes acquired by unlawful summons); *see also City of West Covina v. Perkins*, 525
U.S. 234 (1999) (rejecting requirement under Due Process Clause of providing
detailed notice of procedures for those seeking return of property seized pursuant to
a warrant). *Cf. id.* at 246 (Thomas., J., concurring, joined by Scalia, J.) (stating
available remedies for return of property have been governed exclusively by the

The principle remained, and remains, unaltered: the right to the return of property taken pursuant to a Fourth Amendment search or seizure is embedded in Supreme Court case law as a Fourth Amendment right. The Court discussed this in *Warden v. Hayden*, 387 U.S. 294 (1967). In *Hayden*, the Court noted that, in criminal litigation, the suppression of evidence had replaced *pretrial* petitions to return property. *Id.* at 304–05. But the Court reaffirmed the existence of the Fourth Amendment right to have property returned whether it was wrongfully seized or wrongfully held:

> The remedy of suppression, . . . which made possible protection of privacy from unreasonable searches without regard to proof of a superior property interest, likewise provides the procedural device necessary for allowing otherwise permissible searches and seizures conducted solely to obtain evidence of crime. For just as the suppression of evidence does not entail a declaration of superior property interest in the person aggrieved, thereby enabling him to suppress evidence unlawfully seized despite his inability to demonstrate such an interest (as with fruits, instrumentalities, contraband), the refusal to suppress evidence carries no declaration of superior property interest in the State, and should thereby enable the State to introduce evidence lawfully seized despite its inability to demonstrate such an interest. And, unlike the situation at common law, the owner of property would not be rendered remediless if "mere evidence" could lawfully be seized to prove crime. For just as the suppression of evidence does not in itself necessarily entitle the aggrieved person to its return (as, for example, contraband), the introduction of "mere evidence" does not in itself entitle the State to its retention. Where public officials "unlawfully seize *or hold* a citizen's realty or chattels, recoverable by appropriate action at law or in equity . . . ," the true owner may "bring his possessory action to reclaim that which is wrongfully withheld."

---

Fourth Amendment).

*Id.* at 307–08 (emphasis added) (citing *Land v. Dollar*, 330 U.S. 731, 738 (1947)). The emphasis in the quotation highlights that the right of return extends to situations where the government continues to "hold" a person's personal property.

The adoption of the Federal Rules of Criminal Procedure in 1944 changed none of this. Fed. R. Crim. Pro. 41 provided a procedural mechanism for the return of property in criminal cases. The Committee explicitly said so in its notes: "This rule is a codification of existing law and practice."[6]

The Rules Committee notes of the 1989 amendments to the Federal Rules of Criminal Procedure 41 confirm that a return of property remedy extends to situations where the persons are not suspected of criminal activity and to continued possessions of property that was lawfully seized but have become unreasonable: "As amended, Rule 41(e) provides that an aggrieved person may seek return of property that has been unlawfully seized, and a person whose property has been lawfully seized may seek return of property when aggrieved by the government's continued possession of it." Fed. R. Crim. P. 41(g) advisory committee's note to 1989 amendment.

---

[6] Fed. R. Crim. P. 41(g) advisory committee's note. The subsection of Rule 41 governing the return of property has been modified over time. The original version of the rule, adopted in 1944, listed several justifications for the return of property, essentially paralleling suppression rules of the time. *See United States v. Howard*, 138 F. Supp. 376 (D. Md. 1956). That version proved inadequate. The current version of the rule, 41(g), provides in part: "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g).

### E.    The Decisions Below are Wrongly Decided.

The decisions of the District Court in the consolidated cases found the Fourth Amendment inapplicable. Frankly, that conclusion cannot withstand scrutiny. When did the Fourth Amendment disappear in this case? It is a given that it was implicated when the phones were taken from the possession of the citizens, whose rights to possession were denied for long periods of time. Did the Fourth Amendment disappear when the police took custody of the phones? Did it disappear when the phones were stored at the police station? Did it disappear when the cases were "no-papered"? Or sometime later? Where is the line drawn? The Fourth Amendment would not offer much protection if so limited, and would be a very peculiar Amendment if that were the law. For example, it would apply to some prolonged detentions, such as in *Place*, but not to a situation such as the present case; why? There is simply—and categorically—no support in Supreme Court case law for such a disappearing act, regardless of where the line is drawn.

Supreme Court case law applies the two-dimension reasonableness standard to seizures, regardless of the property seized or the alleged justification for the scope of the intrusion. This is true in cases like *United States v. Place*, *supra*, where seizures of personal property are based on reasonable suspicion. It is equally true in cases like those before this Court, where the initial arrests of persons are "no papered," and no criminal charges are prosecuted. In these cases, the government

must establish an independent Fourth Amendment justification for prolonged detentions of personal property seized incident to those arrests.

Here, even if the original seizures of the phones were justified as searches incident to the arrests of the owners, any probable cause attached to the owners but not to the phones. After charges were dropped, the arrests no-papered, and the owners released from custody, no Fourth Amendment justification existed for the continued seizures of the telephones. They should have been returned and, as the Amendment promises, their rightful possession restored.

The arbitrary and suspicion-less seizures in these cases exemplify the core abuses that the Fourth Amendment was designed to combat. *See Dunaway v. New York*, 442 U.S. 200, 213 (1979) ("Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment."). Whatever concerns a person might have about the seizure of most physical personal property, those concerns pale in comparison to the extended deprivation of the plaintiffs' cell phones, which contain many of the tools needed to manage their lives. As the *Riley* Court emphasized, "[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life'" and "offer a range of tools for managing detailed information about all aspects of a person's life." *Riley*, 573 U.S. at 396, 403 (citing *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

Fourth Amendment guarantees are triggered by searches and seizures without regard to whether civil or criminal litigation results. Searches and seizures are "independent of, rather than ancillary to, arrest and arraignment." *Zurcher v. Stanford Daily*, 436 U.S. 547, 558–59 (1978); *see also Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 67 n.11 (1992) ("Fourth Amendment guarantees are triggered by governmental searches and seizures 'without regard to the use to which [houses, papers, and effects] are applied.'" (alteration in original) (citing *Warden v. Hayden*, 387 U.S. 294, 301 (1967))). "What matters is the intrusion on the people's security from governmental interference." *Soldal*, 506 U.S. at 69.

The Fourth Amendment did not somehow disappear with the dismissal of the cases. To the contrary, after no-papering the cases, the government had no continuing justification for continuing to seize the cell phones. Throughout these prolonged and unjustified seizures, the citizens retained their Fourth Amendment rights to their property and the Amendment is the proper vehicle to litigate the government's failure to return the phones.[7]

---

[7] The legitimacy of Plaintiffs' Fourth Amendment claims for relief are not affected by arguments that relief should be sought pursuant to the Due Process Clause. The Supreme Court has "rejected the view that the applicability of one constitutional amendment preempts the guarantees of another." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 51 (1993) (holding that both the Fourth and Fifth Amendments were implicated by the government's seizure and forfeiture action against Good's real property). "The proper question is not which Amendment controls but whether either Amendment is violated." *Id.* at 50.

## <u>CONCLUSION</u>

Based on the foregoing, *amici curiae* respectfully request that the decisions in these consolidated cases be reversed and the cases remanded to the District Court for further proceedings.

February 22, 2023                          Respectfully submitted,

/s/ Thomas K. Clancy
Thomas K. Clancy
Professor of Law Emeritus
University of Mississippi School of Law
34 Dexter Avenue
Sandwich, MA 02563
clancy.thomas.k@gmail.com
(662) 832-5244

Counsel for *Amici Curiae*

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2023, I caused a copy of the foregoing brief to be filed with the Clerk of this Court and to be served upon counsel via this Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: February 22, 2023

/s/ Thomas K. Clancy
Thomas K. Clancy
Counsel for *Amici Curiae*


## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume word limitation of Fed. R. App. P. 29(a)(5), 32(a)(7)(B), and 32(g)(1) because this brief contains 6,310 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Thomas K. Clancy
Thomas K. Clancy
Counsel for *Amici Curiae*