ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-7129 & 22-7130

────────────

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

────────────

**Oyoma ASINOR**, *et al.*, *Plaintiffs-Appellants*,

v.

**DISTRICT OF COLUMBIA**, *et al.*, *Defendants-Appellees*.

────────────

**Alexander CAMERON**, *et al.*, *Plaintiffs-Appellants*,

v.

**DISTRICT OF COLUMBIA**, *Defendant-Appellee*.

────────────

Consolidated Appeals from the United States District Court for the District of Columbia (Nos. 1:21-cv-02158-APM and 1:21-cv-02908-APM)

────────────

**BRIEF *AMICUS CURIAE* OF THE PUBLIC DEFENDER SERVICE FOR THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFFS-APPELLANTS**

────────────

Zoé E. Friedland
Hanna Perry
PUBLIC DEFENDER SERVICE FOR THE
DISTRICT OF COLUMBIA
633 Indiana Avenue, NW
Washington, DC  20004
Telephone: (202) 480-0349
zfriedland@pdsdc.org
hperry@pdsdc.org
*Counsel for Amicus Curiae*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES AND RULE 26.1 STATEMENT

Under Circuit Rules 26.1 and 28(a)(1), undersigned counsel certifies as follows:

### (A) PARTIES AND *AMICI*

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants: amicus curiae Public Defender Service for the District of Columbia, which files this amicus curiae brief in support of Appellants.

### (B) RULINGS UNDER REVIEW

References to the order at issue appear in Appellants' opening brief.

### (C) RELATED CASES

These cases have not previously been before this Court, and counsel is unaware of any related cases currently pending in this Court or the district court.

## TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES AND RULE 26.1 STATEMENT ................................................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ABBREVIATIONS ..................................................... iv

AMICUS CURIAE'S IDENTITY, INTERESTS, AND AUTHORITY TO FILE ........................................................................................................ vi

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ..... viii

ARGUMENT ...............................................................................................1

I.  MPD Frequently Seizes Property from Public Defender Service Clients, Even Where Charges are Not Brought Against Them, and Where the Property is Irrelevant to any Investigation............................................2

    A. MPD Frequently Seizes Clients' Cell Phones for Months or Even Years, Regardless of Their Relevance to a Criminal Case, and Even Where No Criminal Charges Are Filed.............................................3

    B. Other Property, Crucial to the Daily Lives of PDS Clients, Is Frequently Seized and Not Returned, Causing Enormous Harm to Clients and Their Families. ......................................................8

II. Though the Burden to Demonstrate the Need for the Continued Deprivation of Property Should Lie with the Government, In Reality, Property Owners Bear the Burden of Obtaining Their Seized Property. ...........12

III. Rule 41(g) Does Not Provide a Meaningful Avenue by Which People Can Seek the Return of Their Seized Property.................................17

CONCLUSION .........................................................................................20

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7) .................22

CERTIFICATE OF SERVICE ................................................................23

# TABLE OF AUTHORITIES

### CASES

*Avila v. Dailey*, 404 F. Supp. 3d 15 (D.D.C. 2019) .................................................15

*Riley v. California*, 573 U.S. 373 (2014) ........................................................ 5, 6, 7

*United States v. Pedro Garcia-Rivera*
   (D.C. Superior Ct. Case No. 2016 CF1 010100) .................................................20

### RULES

D.C. Super. Ct. R. Crim. P. 16 (a)(E) .....................................................................3

D.C. Super. Ct. R. Crim. P. 41(g) .........................................................................21

### OTHER AUTHORITIES

John Creamer & Lewis Warmer., *Unbanked and Impoverished? Exploring
   Banking and Poverty Interactions Over Time* (U.S. Census Bureau, Social,
   Economic, and Housing Statistics Division, Working Paper No. 16, 2022),
   https://www.census.gov/content/dam/Census/library/working-
   papers/2022/demo/sehsd-wp2022-16.pdf ............................................................10

Kaveh Waddell, *Police Can Use a Legal Gray Area to Rob Anyone of Their
   Belongings*, THE ATLANTIC, Aug. 15, 2016,
   https://www.theatlantic.com/technology/archive/2016/08/how-police-use-a-
   legal-gray-area-to-rob-suspects-of-their-belongings/495740/ ..............................5

MPD, *Handling and Accounting for Seized and Forfeited Property* (General Order
   601.3, 2013), https://go.mpdconline.com/GO/GO_601_03.pdf .........................12

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| MPD | District of Columbia Metropolitan Police Department |
| PDS | Public Defender Service for the District of Columbia |
| CJA | Criminal Justice Act |

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are contained in Appellants' opening brief except D.C. Superior Court Rule of Criminal Procedure 41(g) and D.C. Superior Court Rule of Criminal Procedure 16(a).

## AMICUS CURIAE'S IDENTITY, INTERESTS, AND AUTHORITY TO FILE

The Public Defender Service for the District of Columbia (PDS) is a federally funded, independent organization that provides and promotes quality legal representation to indigent adults and children facing a loss of liberty in the District of Columbia, thereby protecting society's interest in the fair administration of justice.

PDS's Trial Division zealously represents adults in criminal proceedings in the District of Columbia Superior Court and children in delinquency matters. PDS's Civil Legal Services Division provides legal representation to clients in a wide range of civil matters that are collateral or ancillary to the clients' involvement in the delinquency or criminal justice system, or that involve a restraint on liberty. The types of collateral and ancillary civil issues these clients face are complex and almost limitless in number (e.g. adverse immigration consequences, loss of parental rights, loss of housing, seizure of property, loss of employment) and can arise even if the person is acquitted of the criminal charges or has been only arrested and never charged. PDS's Special Litigation Division handles a wide variety of litigation that seeks to vindicate the constitutional and statutory rights of PDS clients and to challenge pervasive, unfair, and racist criminal system practices.

As an organization servicing the population that often experiences the most frequent interactions with the Metropolitan Police Department (MPD) and

experiences serious harms from MPD's prolonged seizure of their property, PDS has important interests in the decision of the Court.

***

All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

***

This separate *amicus* brief is appropriate under Circuit Rule 29(d) because no parties or other *amici* are situated to address the frequency and types of prolonged property seizures by MPD and how those prolonged seizures harm individuals in the District of Columbia.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing and submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

## ARGUMENT

The Public Defender Service (PDS) for the District of Columbia represents indigent individuals in criminal proceedings in Washington, D.C. In that role, PDS witnesses firsthand the Metropolitan Police Department (MPD)'s often unjustified and extended seizure of the property of PDS clients, clients' families, witnesses, and victims. That property is frequently essential to daily life—MPD regularly seizes cell phones, cars, and even winter coats of arrestees, their families, witnesses, and victims. This occurs whether or not charges are ever filed against the individual, and regardless of whether the property seized is relevant to the prosecution of a case. Even where charges are never filed, property is often not returned for months, or even years, if ever. This causes enormous harm to PDS clients, who are by definition indigent, and who are harmed by even brief deprivation of such property, let alone months- or years-long deprivations. Many PDS clients simply do not have enough money to buy a new car, cell phone, or even winter coat, while they await the return of their seized property. Beyond the property's inherent value, much of this property facilitates day-to-day necessities. A car is necessary for meeting employment and family obligations; medication is necessary for maintaining health; and a cell phone with crucial contact information and data is necessary for navigating daily life.

Despite the obvious need for the property, there is no practical means by which an individual may seek its return. In fact, even when the government has no

basis to keep the property, the process of ensuring that MPD and the U.S. Attorney's Office complete the required paperwork and communicate with one another is extremely burdensome and complicated. In effect, there is virtually no way for an individual to have their property returned without the assistance of an attorney, even though individuals who are never charged, or those whose cases have been resolved, often do not have and cannot afford legal representation. In light of such an opaque and ineffectual process, it is often impossible for people aggrieved by the extended and unlawful possession of their property to successfully seek its return. Recognizing the Fourth Amendment's application to these unjustifiably prolonged seizures not only comports with precedent, history, and common sense, *see* Appellants' Br., *Asinor v. District of Columbia* (21-cv-02158); *Cameron v. District of Columbia* (21-cv-02908), but would also provide a direct deterrence to MPD's current practice of indefinitely holding property and clarify the government's constitutional obligations.

## I. MPD Frequently Seizes Property from Public Defender Service Clients, Even Where Charges are Not Brought Against Them, and Where the Property is Irrelevant to any Investigation.

MPD routinely seizes property from PDS clients during arrests, and keeps that property for prolonged periods. This is true even when the individual's case is "no papered," meaning that charges are never formally brought, as well as after cases are dismissed. This practice is not limited to individuals who are arrested or suspected

of crimes. Family members of PDS clients, as well as potential witnesses and victims in criminal cases, are subject to these same deprivations.[1] For instance, a victim of carjacking had his car seized by MPD over six months ago, and, despite repeated efforts, has been unable to get it back. MPD also seized the car of one PDS client's mother, and held it for over 14 months, even though the government brought no criminal or civil forfeiture proceedings and never alleged that the car was used in an offense. In another case, MPD seized a potential witness's vehicle, and refused to return the contents of the vehicle including electronic devices belonging to children that were not relevant to the alleged crime. Indeed, MPD seizes property from witnesses who sometimes have no, or only an attenuated connection, to the incident or parties of a case.[2]

### A. MPD Frequently Seizes Clients' Cell Phones for Months or Even Years, Regardless of Their Relevance to a Criminal Case, and Even Where No Criminal Charges Are Filed.

The seizure of cell phones following arrest is an extremely common practice. In PDS attorneys' experience, MPD seizes arrestees' cell phones in almost every

---

[1] MPD retains victim property with no justification even after defense attorneys have released their evidentiary interest in the property. *See* D.C. Super. Ct. R. Crim. P. 16 (a)(E).

[2] The Public Defender Service provided some examples of unjustifiably prolonged seizures for Plaintiffs' complaints. *See Cameron v. District of Columbia*, No. 21-cv-02908 (D.D.C. Nov. 4, 2021), Doc. No. 1; *Asinor v. District of Columbia*, No. 21-cv-2158 (D.D.C. Aug. 28, 2021), Doc. No. 10. Most of the examples in this brief are additional to those included in the complaint and have not been detailed in any filings in this case.

case regardless of whether law enforcement believes the phone will contain evidence of a crime. In drug cases in particular, cell phones are always taken from PDS clients.

In many cases, MPD keeps PDS clients' cell phones for *years*, and often long after a case has been resolved. For example, one client's cell phone was seized in 2015. The charges in the case were dismissed in 2018, three years later. It took an additional year and a half for MPD to return the cell phone—a total of four and a half years after the initial seizure. In another case, an arrestee pled guilty within a month of his arrest, but his cell phone was retained for an additional 15 months despite repeated requests for its return. Yet another arrestee's cell phone was seized in June 2020. MPD kept the cell phone even after trial, where the phone (nor any of its contents) were not introduced as evidence. As of January 2023, the cell phone was still in MPD custody.  Even when a case is "no papered"—and charges are never brought—MPD retains cell phones for prolonged periods. For instance, MPD took over four months to return a cell phone even after the owner was released with no charges. Many PDS clients are still actively pursuing the return of their cellphones, to no avail. These extremely prolonged deprivations are routine.

Often the cell phones have no relevance to the charged conduct. Regardless of the allegations in any given case, "phones are nearly always categorized as

evidence in D.C."[3] In one case, MPD seized two cell phones from a theft suspect and retained them for approximately eight months, despite requests for their return, even though they were unrelated to the theft charge. In another case where a phone was seized, it was not returned for three years despite its irrelevance to the charged conduct: unauthorized use of a vehicle. Even when the prosecutor agrees that the cell phone should be released, MPD often refuses to do so. For example, in another case where a suspect was charged with unauthorized use of a vehicle, the prosecutor agreed that the cell phone should be returned. MPD nevertheless refused to return it for *over a year*.

These prolonged seizures of PDS clients' cell phones have severe consequences for their lives, as well as their ability to defend against charges brought against them. Cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 385 (2014). As the Supreme Court observed, the term "cell phone" is "misleading shorthand" because "many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players,

---

[3] Kaveh Waddell, *Police Can Use a Legal Gray Area to Rob Anyone of Their Belongings*, THE ATLANTIC, Aug. 15, 2016, https://www.theatlantic.com/technology/archive/2016/08/how-police-use-a-legal-gray-area-to-rob-suspects-of-their-belongings/495740/.

rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Id*. at 393.

Cell phones are thus necessary to navigate daily life. Immediately following release from custody, phone numbers contained in cell phones, which are rarely memorized, are necessary for contacting family and friends to ensure a safe return home. Indeed, cell phones often contain metro cards and credit cards, and without them individuals cannot use public transportation or summon a rideshare once they are released from custody.

Later, cell phones are necessary for crucial daily tasks, ranging from securing child care to meeting other family needs and maintaining employment. For instance, many daycares and schools require phone apps to check a child in and out of school or to communicate with a child's teachers. Many workplaces ask employees to put apps on their phones to clock in and out or to sign into company computers, which means people who lose their phones may be unable to work.

Beyond the fact that PDS clients often lack the resources to purchase replacement phones, these seized phones contain "vast quantities of personal information" not easily replicated. *Id.* at 386. For instance, people keep calendars on their phones with important dates and appointments, contact information for their doctors, medical monitoring apps for conditions like diabetes or high blood pressure, and bank account apps that let them know how much money they have. This

information is often not accessible in other ways and can leave individuals rudderless and unable to safely navigate daily life.

Additionally, the prolonged seizure of cell phones obstructs PDS clients' legal defense. Witness contact information, including that of potential mitigation witnesses, is often contained in client cell phones. Relevant photographs and location data may also be stored in cellphones, and are inaccessible without the physical phone. In addition to having a serious impact on PDS clients' lives and cases, the prolonged seizure of phones creates information asymmetry between the government and the defense. This information asymmetry facilitates *Brady* violations because the government possesses potentially exculpatory information that the defense has no way to access. Indeed, in such circumstances, the defense loses access to a repository of witness contact information with evidentiary and mitigation value.

Beyond obstructing a legal defense, the prolonged seizure of cell phones can also pose enormous obstacles to filing affirmative civil lawsuits. For example, where MPD officers stop and arrest an individual unlawfully or use excessive force against an individual, the evidence of such unlawful conduct, including recordings or photographs, is often found on cellphones. Thus, when these cellphones are seized for extended periods by MPD officers without lawful basis, MPD can effectively obstruct individuals from filing lawsuits against them. In light of applicable statutes

of limitations, such obstruction can preclude an individual from filing a lawsuit altogether.

Meanwhile, it is not clear what benefit the government gains from keeping the physical cellphones, given their access to Cellebrite and GrayKey technology. This technology allows the government to extract data from cellphones.[4] Additionally, where fingerprints on cell phones are relevant to the government's investigation, they can, and should, be taken and preserved promptly before degrading. Once the data and the fingerprints are preserved, it is unclear what value the physical phone has to the government. By contrast, the cost to the phone's owner of continued deprivation is clear.

### B. Other Property, Crucial to the Daily Lives of PDS Clients, Is Frequently Seized and Not Returned, Causing Enormous Harm to Clients and Their Families.

MPD's property seizure practices extend beyond cell phones. Cars, for instance, are commonly taken from PDS clients and maintained in MPD custody for months and sometimes even years. In one example, a client's car was taken even though he was never arrested or charged with a criminal offense. This client lost his job because of his inability to get to work without his vehicle. He remained liable for car payments and insurance despite not possessing the car. Five months after the

---

[4] PDS opposes the use of this technology without a warrant; nonetheless, the government routinely uses it without a warrant.

seizure, and despite repeated inquiries with MPD, MPD still had not returned the vehicle.

Another PDS client whose car was seized was not provided with any documentation at the time MPD seized his vehicle, or the reason for the seizure. This client was very involved in the care of his children, and for months was unable to drive them to school and necessary medical appointments. He also needed his car for a job that involved a substantial commute and which was not accessible by public transportation. After his car was seized, he could not continue with this employment, and was forced to search for a job in another field.

Yet another PDS client, who was not charged in a criminal case, and who was the victim of domestic violence and had been homeless, had her car seized by MPD. The prolonged duration of this seizure upended her life. She needed the car in order to get to her three separate jobs. Further, most of this client's worldly belongings were in the vehicle, including her and her children's clothing and important documents like her Medicaid card and Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) documents. MPD did not provide her with any information as to why they were seizing her car or how she could get it and its contents back.

MPD also seizes property from victims of crimes who similarly struggle to obtain its return. One individual, who was the victim of a carjacking in the summer

of 2022, had his car seized by MPD. He has attempted to call MPD on multiple occasions seeking the return of this car with no success. For the last six months, he has been paying his monthly car loan and insurance without access to his vehicle.

MPD also routinely seizes cash from PDS clients, even where it has no evidentiary value. The cash is typically not civilly forfeited, and MPD does not prove any nexus to the crime; instead, it takes whatever cash is in the pockets of an arrestee or complainant. Prolonged seizure of cash is debilitating for PDS clients who are by definition indigent, and who are more likely to rely on cash. In fact, over 20 percent of households in poverty in the United States are unbanked and must rely on cash to take care of their finances.[5] When MPD confiscates PDS clients' cash for prolonged periods, the clients struggle to meet their daily needs.

MPD even seizes and retains crucial medications that PDS clients rely upon. In one case, for example, MPD seized a PDS client's Suboxone, which is used to treat opioid addiction. The client legally possessed the Suboxone pursuant to a prescription in his name. Nevertheless, MPD refused to return the Suboxone, even after the case was no-papered and the government agreed that the Suboxone could be released to the client. Suboxone and other prescription medications are controlled

---

[5] John Creamer & Lewis Warmer, *Unbanked and Impoverished? Exploring Banking and Poverty Interactions Over Time* (U.S. Census Bureau, Social, Economic, and Housing Statistics Division, Working Paper No. 16, 2022), https://www.census.gov/content/dam/Census/library/working-papers/2022/demo/sehsd-wp2022-16.pdf.

substances that cannot be easily replaced. And clients who are left without them may relapse into drug addiction despite their best efforts to remain drug free. Indeed, this client spent over a month without a crucial medication he had been using to effectively treat a drug addiction.

MPD also routinely seizes and indefinitely keeps personal items unrelated to any criminal proceedings when arrestees are taken into custody. When the individual is released, these personal items are frequently not returned. In the middle of winter, for instance, MPD seized a client's winter coat. When that individual was released from custody, the coat was not returned, and he was forced to leave D.C. Superior Court in 15-degree weather wearing only a t-shirt. Many PDS clients have had similar experiences, where their winter coats were taken by MPD and not returned once they were released from custody. Given the financial constraints on PDS clients and the prolonged nature of these seizures, PDS clients arrested in the winter frequently spend those months without a winter coat. Seizure of clothing items is not limited to coats, and MPD frequently seizes sneakers when it takes children into custody. In another example, MPD seized a client's glasses. The client was released from custody barely able to see his surroundings and navigate his way home, let alone the bureaucratic and legal obstacles to getting his glasses back. Finally, MPD frequently seizes house keys—often the only means through which an individual and their family can access their home.

**II.    Though the Burden to Demonstrate the Need for the Continued Deprivation of Property Should Lie with the Government, In Reality, Property Owners Bear the Burden of Obtaining Their Seized Property.**

According to MPD policy, MPD is required to log all property taken from someone upon arrest in a PD 81 form.[6] MPD fills out a section of this form, called the PD 81-C, and sends it to the U.S. Attorney's Office at the same time it submits the relevant case to the prosecutor. After the case is resolved, the prosecution is supposed to indicate on the PD 81-C form that the property can be released. It is the prosecutor's duty to send this form back to MPD for property to be released. The prosecutor should also inform the property owner or his or her attorney when the property can be released, *see* MPD General Order 601.1, although in practice this almost never happens. Once MPD receives the PD 81-C form indicating property can be returned, the property owner should be able to pick up their property from MPD.

As an initial matter, this process is not available to individuals who are on pre-trial release, as the PD 81-C form only applies where cases have resolved. Although there are many instances where the government does not need seized property in order to investigate or prosecute a case, there is no avenue for these individuals to obtain their seized property. For example, house keys, winter coats, or cell phones

---

[6] MPD, *Handling and Accounting for Seized and Forfeited Property* (General Order 601.3, 2013), at 5-6, https://go.mpdconline.com/GO/GO_601_03.pdf.

that are not relevant to a case are frequently kept during the pre-trial period which can last months or even years, and individuals are left without any avenue to have those items returned. Additionally, people whose cases were "no-papered"— meaning charges were never filed—face enormous obstacles attempting to utilize this process. For these individuals, there is no prosecutor assigned to the case and thus no obvious person for MPD to send the PD 81 form to. There is also no person for the individual or their attorney to contact at the prosecutor's office about the return of their property. The same is true for victims or witnesses who have property seized in "no papered" cases. Ironically, the people who are never even charged with a crime are the ones who often face the greatest obstacles in regaining their property.

In addition to practical obstacles, clients whose cases are "no-papered" are often fearful that contacting the prosecutor may put them in danger of having their case charged. Indeed, because "no-papering" a case does not bar prosecutors from bringing charges at a later time, PDS attorneys often advise these clients not to talk to anyone about their case, let alone contact the police directly to discuss their seized property and the circumstances of their arrest. Despite needing their property to facilitate their daily lives, seeking its return through the current process may jeopardize their rights and their liberty.

Even when the PD 81 process applies, in reality, it rarely works as outlined in MPD's General Order. The process requires back-and-forth communication between

13

MPD and the prosecutor's office; yet, neither of these parties have any incentive to facilitate the release of property to individuals once cases are resolved. Indeed, this entire process depends on how fast the government completes paperwork that they have no incentive to complete. In PDS attorneys' experience, this process can be used as leverage, favoring those who are more cooperative with the government despite the fact that "seizure of a person's property only as bait or as a bargaining chip to elicit information violates the Fourth Amendment." *Avila v. Dailey*, 404 F. Supp. 3d 15, 26 n.10 (D.D.C. 2019).

Further, this process requires back and forth communication with no accountability. Where a case is "no papered" and PDS attorneys advocate with the U.S. Attorney's Office and MPD for the return of a client's property, often each office will point to the other as the responsible entity. Specifically, the U.S. Attorney's Office explains that their office does not generate the PD 81-C form, which MPD is responsible for. Then, when speaking with MPD officials, PDS attorneys are told that it is the U.S. Attorney's Office that needs to provide and sign the PD 81-C form.

This Kafkaesque labyrinth results in a lengthy, months-long process even where attorneys diligently advocate with both MPD and the prosecutor's office for the return of property. In fact, this process does not even usually *begin* until attorneys get involved by advocating for the return of their clients' property with MPD and

the U.S. Attorney's Office. Often, repeated requests are ignored and PDS attorneys are forced to contact MPD's General Counsel to initiate the government's engagement in this process. Engagement with MPD's General Counsel requires sophisticated legal representation and knowledge of MPD's internal hierarchy. This again leaves those who have never been charged with crimes, and thus never assigned an attorney, in the most vulnerable position. Even when letters or emails to MPD are successful and property is ultimately returned, there is little to no transparency from MPD about their internal processes or decision-making that could assist attorneys in navigating this process in the future.

Because this system is so complicated and bureaucratic, it is essentially impossible to navigate without a lawyer. Many people do not have or cannot afford a lawyer after the conclusion of their criminal case when they are seeking the return of their property. For instance, when a case is "no papered," and thus the person has no court-appointed attorney representing them, they may not have the funds to hire their own attorney. Often the seized property, while incredibly valuable to the person, is worth less than the price of hiring a lawyer to advocate for the return of that property. For example, if MPD seizes a car worth a few thousand dollars, the cost of hiring an attorney to advocate for the return of that car may exceed the value of the car itself. This problem is even more stark where clothing, such as coats or shoes, are concerned. In other cases, where a person has a Criminal Justice Act (CJA)

lawyer appointed to represent them, the attorney's representation terminates at the conclusion of the criminal case. These individuals are by definition indigent, and do not have the money to hire an attorney to advocate for the release of their property. Finally, many people who do not qualify for PDS or CJA attorneys and must hire their own criminal defense attorneys cannot afford to pay for the additional services required to secure the return of their property. Only people in the unique position of being represented by an attorney able to spend time and resources advocating for the return of property have a realistic chance of getting it back. Indeed, Mr. Asinor, the plaintiff in one of these cases, did not get his camera and cell phone back until the American Civil Liberties Union of the District of Columbia—which takes a limited number of cases, all *pro bono*—got involved.

Even when MPD and the U.S. Attorney's Office are in full communication and complete all of the required paperwork, individuals face additional barriers to regaining their property. Property is often physically kept in the MPD division where the arresting officer works, and knowing that location requires knowing both who the arresting officer was, as well as their assigned location at the time of the arrest. It also involves knowing that property logged simply as property and property logged as evidence are stored in two different locations. Often the U.S. Attorney's Office does not know where the property is, and MPD will typically only provide

that information in person. Indeed, a single person's property can be in multiple locations depending on how it was logged and which officer logged it.

When individuals are able to ascertain where their property is located, and when the PD 81-C form has been signed by the prosecutor and returned to MPD, individuals often arrive at the MPD location and are told that their property is not there. Resolving these issues is burdensome and time-consuming, even where PDS attorneys are involved. In some cases, MPD will refuse to return property listed on the PD 81-C form because it has been stored with additional property not listed on the form. For example, in the case where MPD seized an individual's legally-prescribed Suboxone, MPD refused to return it even after the prosecution had authorized its release via the PD 81-C form because it was held along with another item not on the release form. This individual was forced to go one month without a prescription he was using to treat an opioid addiction.

## III.    Rule 41(g) Does Not Provide a Meaningful Avenue by Which People Can Seek the Return of Their Seized Property.

In theory, D.C. Superior Court Rule of Criminal Procedure 41(g) is a mechanism by which people "aggrieved by . . . the deprivation of property" may seek its return. However, in practice, this rule—which requires an attorney to file a motion in a criminal case or file a freestanding motion that opens a new civil case, takes months to resolve, and provides no clear standard—is of little aid to individuals who are aggrieved by the deprivation of property that they need for daily life.

17

Litigating a 41(g) motion effectively requires an attorney. Although PDS attorneys sometimes assist clients who are not charged, this is not always the case, and occasionally individuals with "no papered" cases are never assigned an attorney. CJA attorneys who were appointed to a person who was arrested do not continue to represent the person once the government decides not to file charges. Indeed, CJA attorneys would not receive payment for work on behalf of an individual who is not charged with a crime in Superior Court. Further, for individuals who must hire a private criminal defense attorney, filing a Rule 41(g) motion requires them to spend additional resources to litigate the return of their property. In sum, even where the government seizes an individual's property and maintains it without any valid basis and without a warrant, an enormous, sometimes insurmountable burden is placed on individuals who seek their property's return.

When an individual does have an attorney to file a Rule 41(g) motion, and a case in which to litigate the motion, the process takes months to play out in court. In practice, the government has weeks to respond to the motion, then the court sets a hearing, and then the parties must wait an unspecified period of time for a decision. This is true even where cases have been dismissed or otherwise resolved, and where the property is unrelated to the case or seized without a warrant. These months-long delays are harmful to PDS clients who are by definition indigent, and who require their seized property—such as cars, clothing, and cash—to make ends meet.

18

Moreover, beyond the length of time it takes to litigate these motions, the burden placed on individuals who are seeking the return of their property is high, amorphous, and difficult to meet. This is in part because the rule itself provides no guidance for when property should be returned to its owner and imposes no requirement that the government justify the continued seizure of property. As a result, these motions are routinely opposed by the government, which often provides only an amorphous statement about needing to continue holding the property without any details or basis for doing so.[7] This is true even after criminal proceedings have terminated. *See, e.g.*, *United States v. Pedro Garcia-Rivera* (D.C. Superior Ct. Case No. 2016 CF1 010100) (government representing that it needed to retain a cell phone that it had possessed for over 14 months for general "evidentiary purposes," without providing any specific information about what those purposes could possibly be, given that criminal proceedings had terminated five months prior). The Court in that case denied the Rule 41(g) motion without an evidentiary hearing, even though the rule requires that the "court must receive evidence on any factual issue necessary to decide the motion." D.C. Super. Ct. R. Crim. P. 41(g). Typically, in PDS's experience, conclusory government representations are enough for courts to deny

---

[7] Sometimes the D.C. Office of the Attorney General, which represents MPD, will intervene in these motions to prevent officers from testifying about mishandling property.

41(g) motions, even when the litigation of the motion reveals no justification for the government's prolonged and continued seizure.

## CONCLUSION

MPD routinely seizes property from PDS clients and keeps it long beyond any justifiable timeframe. Even when no charges are ever brought and an individual is not appointed an attorney, MPD keeps the property for months, and sometimes even years. It engages in this practice for witnesses and victims too, who are also not appointed attorneys. And without an attorney able to negotiate the bureaucratic Form 81-C and legalistic Rule 41(g) processes, people are typically left with no way to successfully advocate for the return of their property. The prolonged duration of these seizures profoundly harms individuals in the District of Columbia, who rely on their cell phones, winter coats, cars, and other personal items to navigate daily life. These harms are particularly acute for indigent Public Defender Service clients, who are deprived of crucial necessities for prolonged periods with no justification and little recourse. The Court should thus recognize the key role of the Fourth Amendment in protecting people against unreasonably prolonged seizures.

Respectfully submitted,


*/s/ Zoé E. Friedland*

Zoé E. Friedland
Hanna Perry
PUBLIC DEFENDER SERVICE
FOR THE DISTRICT OF COLUMBIA
633 Indiana Avenue, NW
Washington, DC  20004
(202) 480-0349
zfriedland@pdsdc.org

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)

This brief complies with type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains only 5,543 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B) and D.C. Circuit Rule 32(a)(2).  This brief complies with the typeface requirements of Fed. R. App. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced type-face program using Word 2010 in Times New Roman 14 point font.

*/s/ Zoé E. Friedland*
Zoé E. Friedland

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2023, a true and correct copy of this brief was filed via the Court's electronic filing system, which will forward a copy to all counsel of record.

*/s/ Zoé E. Friedland*
Zoé E. Friedland