ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-7129 & 22-7130

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

OYOMA ASINOR, *et al*.,

*Plaintiffs-Appellants,*

v.

DISTRICT OF COLUMBIA, *et al.*,

*Defendants-Appellees.*

---

ALEXANDER CAMERON, *et al*.,

*Plaintiffs-Appellants,*

v.

DISTRICT OF COLUMBIA,

*Defendant-Appellee.*

---

Appeal from the U.S. District Court for the District of Columbia
Case Nos. 1:21-cv-02158 & 1:21-cv-02908
The Honorable Amit Priyavadan Mehta

---

**BRIEF OF *AMICI CURIAE* THE RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER, CATO INSTITUTE, AND
INSTITUTE FOR JUSTICE  IN SUPPORT OF PLAINTIFFS-
APPELLANTS AND REVERSAL**

---

Amir H. Ali
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
202-869-3434
amir.ali@macarthurjustice.org

*Counsel for Amici Curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A. *Parties and amici*.

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Opening Brief for Appellants:

- Amici Curiae Morgan Cloud and Thomas K. Clancy;

- Amicus Curiae Public Defender Service for the District of Columbia;

- Amici Curiae Roderick & Solange MacArthur Justice Center, Institute for Justice, and Cato Institute.

B. *Rulings under review*.

References to the rulings at issue appear in the Opening Brief for Appellants.

C. *Related cases*.

These cases were not previously before this Court or any other court. Counsel is not aware of any related cases pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, *amici curiae* the Roderick & Solange MacArthur Justice Center, the Institute for Justice, and the Cato Institute certify that none of them is a publicly held corporation, none has any parent corporation(s), and that no publicly held corporation owns 10 percent or more of any of their stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............... i

CORPORATE DISCLOSURE STATEMENT ......................................................... ii

TABLE OF AUTHORITIES.................................................................................... iv

STATEMENT OF IDENTITY AND INTEREST IN CASE ....................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT .........................................................................................................5

I.     The Framers Explicitly Safeguarded "Effects" From Unreasonable
       Seizure. Today, No "Effect" Is More Central To Daily Life Than Our
       Cell Phones. .................................................................................................7

II.    Like Any Other Seizure, The Seizure Of Personal Property Has A
       Duration And The Fourth Amendment Requires That The Duration
       Be Reasonable. ..........................................................................................12

CONCLUSION .....................................................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Page(s)**

## Cases

*Brewster v. Beck*,
 859 F.3d 1194 (9th Cir. 2017) ...............................................................5, 7, 13, 17

*Carpenter v. United States*,
 138 S. Ct. 2206 (2018) .......................................................................................11

*Illinois v. McArthur*,
 531 U.S. 326 (2001)........................................................................................4, 15

*Manuel v. City of Joliet*,
 580 U.S. 357 (2017)........................................................................................3, 15

*Mom's Inc. v. Willman*,
 109 F. App'x 629 (4th Cir. 2004) ........................................................................7

*Packingham v. North Carolina*,
 137 S. Ct. 1730 (2017)................................................................................10, 11

*Reno v. Bossier Parish School Bd.*,
 528 U.S. 320 (2000)............................................................................................16

*Riley v. California*,
 573 U.S. 373 (2014)...............................................................................3, 5, 6, 7, 8, 11

*Rodriguez v. United States*,
 575 U.S. 348 (2015)........................................................................................3, 15

*Segura v. United State*s,
 468 U.S. 796 (1984)............................................................................................16

*Shaheed v. City of Wilmington*,
 No. 21-1333, 2022 WL 16948762 (D. Del. Nov. 15, 2022) ...............................2

*Soldal v. Cook Cnty.*,
 506 U.S. 56 (1992)..........................................................................7, 13, 14, 17

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Terry v. Ohio*,
   392 U.S. 1 (1968)................................................................................14

*Thompson v. Clark*,
   142 S. Ct. 1332 (2022)..........................................................................1

*\*United States v. Jacobsen*,
   466 U.S. 109 (1984)................................................................7, 13, 14, 15

*United States v. James Daniel Good Real Prop.*,
   510 U.S. 43 (1993)................................................................................2

*United States v. Jones*,
   565 U.S. 400 (2012)..........................................................................7, 13

*United States v. Miller*,
   799 F.3d 1097 (D.C. Cir. 2015)........................................................13

*United States v. Mitchell*,
   565 F.3d 1347 (11th Cir. 2009)........................................................12

*United States v. Park*,
   938 F.3d 354 (D.C. Cir. 2019)..........................................................16

*\*United States v. Place*,
   462 U.S. 696 (1983)......................................................................4, 14

*United States v. Smith*,
   967 F.3d 198 (2nd Cir. 2020)..........................................................12

## Constitutional Provisions

U.S. Const. amend. IV ..........................................................................3, 7

## Rules

D.C. Cir. R. 26.1 ..................................................................................... ii

D.C. Cir. R. 29(d)...................................................................................2

Fed. R. App. P. 26.1 ............................................................................... ii

## Other Authorities

Aaron Smith, *Chapter Two: Usage and Attitudes Towards Smartphones*, PEW RSCH. CTR. (Apr. 1, 2015) ................................................ 9, 10

Elisa Shearer, *More than eight-in-ten Americans get news from digital devices*, PEW RSCH. CTR. (Jan. 12, 2021) ............................................................ 10

Emily A. Vogels, *Digital divide persists even as Americans with lower incomes make gains in tech adoption,* PEW RSCH. CTR. (June 22, 2021) ................................................................................................................ 9

Harmony Rhoades et. al, *No digital divide? Technology use among homeless adults*, J. OF SOC. DISTRESS & THE HOMELESS (Mar. 22, 2017) ................................................................................................................. 10

Maria C. Raven et. al, *Mobile Phone, Computer, and Internet Use Among Older Homeless Adults: Results from the HOPE HOME Cohort Study*, 6 JMIR MHEALTH UHEALTH 12 (Dec. 10, 2018) ....................... 10

*Multi-factor Authentication (MFA)*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY ............................................................. 8

*New Study Shows Cell Phone Are Essential Lifeline For Bay Area Homeless,* CBS NEWS (Dec. 5, 2018) ................................................. 10

Rosie Spinks, *Smartphones are a lifeline for homeless people*, THE GUARDIAN (Oct. 1, 2015) ................................................................. 10

Vaibhav Goel et. al, *New trends in US consumer digital payments*, MCKINSEY & CO. (Oct. 26, 2021) ......................................................... 9

## STATEMENT OF IDENTITY AND INTEREST IN CASE[1]

The Roderick and Solange MacArthur Justice Center (MJC) is a not-for-profit organization founded by the family of J. Roderick MacArthur to advocate for civil rights, and for a fair and humane criminal justice system. MJC has five offices, including one in the District of Columbia, and has represented people facing myriad civil rights violations, including arbitrary searches and seizures of persons and property, and other violations of the Fourth Amendment. This includes successfully litigating cases concerning the proper interpretation and application of the Fourth Amendment in the U.S. Supreme Court (*e.g.*, *Thompson v. Clark*, 142 S. Ct. 1332 (2022)), and numerous others in the federal courts of appeals.

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice was founded in 1999, and focuses in particular on the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers.

---

[1] All parties have consented to the filing of this brief. The brief has not been authored, in whole or in part, by counsel to any party in this appeal. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person, other than the *amici*, their members, or their counsel, contributed money that was intended to fund preparation or submission of this brief.

1

The Institute for Justice (IJ) is a nonprofit, public-interest law firm committed to securing the foundations of a free society by defending constitutional rights. A central pillar of IJ's mission is the protection of private property rights, both because the ability to control one's property is an essential component of individual liberty and because property rights are bound up with all other civil rights. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 61 (1993) ("Individual freedom finds tangible expression in property rights."). To that end, IJ challenges warrantless seizures and detentions of people's property. *See, e.g.*, *Shaheed v. City of Wilmington*, No. 21-1333, 2022 WL 16948762 (D. Del. Nov. 15, 2022) (challenging continued detention of seized vehicles). Accordingly, IJ has an institutional interest in courts providing meaningful protection to the right to be secure in one's person and property.

*Amici* submit that this separate brief is appropriate under Circuit Rule 29(d) because *amici* bring unique perspectives on the Fourth Amendment and questions of government accountability, based on their experience studying and litigating in these areas of law.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's decision in this case injects an untenable and unexplained incongruity into the Fourth Amendment, by which "seizure" means something different when it comes to "effects" than in the case of "persons, houses, or papers." U.S. Const. amend. IV. Under the district court's ruling, an officer who has a legal basis to take someone's cell phone—perhaps the most central "effect" in modern day life—may keep that phone *indefinitely* without any legal basis for the continued seizure. That is because, according to the district court, an effect is only seized at the instant it is taken, and seizures of effects therefore have no duration. This Court should reject that interpretation of the Fourth Amendment, which atextually and superficially limits the Fourth Amendment's protection of personal property, including cell phones. *See Riley v. California*, 573 U.S. 373 (2014) (cell phones are effects protected by the Fourth Amendment).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, *and* effects" and it safeguards each of those things "against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). It is uncontroversial that "seizure" of a person does not describe only the instant in which a person is validly stopped—rather, the person is seized within the meaning of the Fourth Amendment until they are free to leave. *See Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015); *Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017).

Similarly, the "seizure" of a house does not describe only the first instant when officers intrude and prevent entry into a person's home—the home remains seized within the meaning of the Fourth Amendment for as long as officers prevent the resident from reentering. *See, e.g.*, *Illinois v. McArthur*, 531 U.S. 326, 332-33 (2001). This ought to be straightforward: Every "seizure" has a duration—the period for which the Government's possession of the person, house, paper, or effect continues—and the Fourth Amendment says that duration must be reasonable. *See id.*; *United States v. Place*, 462 U.S. 696, 709 (1983).

According to the district court, this isn't so when it comes to personal effects, like the cell phones in this case. Instead, for personal property, "once the act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies." JA131-32 (quoting *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999)) (cleaned up). Consequently, "the prolonged retention of lawfully seized property does not implicate the Fourth Amendment's protection against unreasonable seizures." JA131.

In an effort to reconcile this anomaly with existing precedent, the district court's rule gets even stranger. The district court accepted that the Fourth Amendment *does* require the dispossession of an effect to be reasonable in duration if it was taken as part of an "investigatory detention of property," but *does not* limit

4

the duration if the effect was taken based on another exception to the warrant requirement (such as incident to arrest or during an exigency). JA 134-35.

This is nonsense. The Framers guaranteed that our personal effects, like our persons and our houses, would be free from unreasonable seizures. That includes seizures that are unreasonable because they have outlasted their justification. As one circuit crisply put it: "The Fourth Amendment doesn't become irrelevant once an initial seizure has run its course. A seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force. Thereafter, the government must cease the seizure or secure a new justification." *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017) (citations omitted). Cell phones are no exception to that rule—much to the contrary, the Supreme Court has in other contexts offered *greater* protection to cell phones than other property. *See Riley*, 573 U.S. 373. When the Government continues to dispossess someone of their effect without justification, it has unreasonably seized the effect in violation of the Fourth Amendment.

## ARGUMENT

The parties in this case, as well as the district court, all agree that the District seized plaintiffs' cell phones. JA126; JA153. And they agree that the seizures of those phones were justified at their inception under the "seizure incident to arrest" doctrine. *Cameron* ECF 19 (Mot. to Dismiss) at 1; *Cameron* ECF 22 (Mot. to

5

Dismiss Opp.) at 37. And everyone accepts, as they must at this stage, that the District continued to hold the devices when it had no legitimate interest in doing so. JA14, JA36. Indeed, it is well established that the District could not have searched the phones without a warrant, *see Riley*, 573 U.S. at 385-86, and the police never obtained a warrant to search the plaintiffs' phones in the over two-and-a-half years they held them despite an MPD requirement that the police obtain a warrant within 48 hours of taking a phone, JA20-21.

The district court held that the Fourth Amendment was not implicated by this continued dispossession of the plaintiffs' property on the theory that any "seizure" of effects—here, plaintiffs' cell phones—not only begins, but simultaneously ends, the instant they are taken. *See* JA130-33. On that theory, the Fourth Amendment allows law enforcement officers who have a valid basis to take someone's property to then refuse to return it, even knowing they have no justification for keeping it. In other words, the routine inventory of the property in someone's pockets during an arrest that results in the temporary seizure of a cell phone can lawfully become an indefinite deprivation of that phone—and substantial interference with one's daily life—without reason. This Court should reject that sapping of the Fourth Amendment, and interpret "seizure" to mean the same thing when it modifies "effects" as it does when it modifies "persons" and "houses."

6

**I.  The Framers Explicitly Safeguarded "Effects" From Unreasonable Seizure. Today, No "Effect" Is More Central To Daily Life Than Our Cell Phones.**

It is well established that a seizure occurs any time the Government engages in "some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992); *see also United States v. Jones*, 565 U.S. 400, 405 (2012) ("The text of the Fourth Amendment reflects its close connection to property."). The Fourth Amendment protects all "effects" from such government interference, regardless of the perceived importance of the property at issue. U.S. Const. amend IV. In *Brewster*, for instance, the court concluded that the Fourth Amendment was "implicated by a delay in returning" the plaintiff's car. *Brewster*, 859 F.3d at 1197; *see also Mom's Inc. v. Willman*, 109 F. App'x 629, 637 (4th Cir. 2004) (concluding that the Fourth Amendment was implicated by an officer's continued interference with plaintiff's possessory interest in his watch).

But in modern-day society, it is difficult to imagine a greater interference with daily life than dispossession of one's cell phone. Nearly a decade ago, the Supreme Court recognized that cell phones had already become so integral to daily life that "the proverbial visitor from Mars might conclude that they were an important feature of human anatomy." *Riley*, 573 U.S. at 385. Since then, cell phones have only become more capable and more integral to our personal and professional lives.

7

Mobile devices continue to have "immense storage capacity," *id*. at 393, and are used to store "the privacies of life." *Id.* at 403. As the Supreme Court predicted, the capacity of cell phones has "only continue[d] to widen." *Id*. at 394. In *Riley*, the Court recognized that Americans had come to rely upon the standard smartphone's 16-gigabyte storage to store "millions of pages of text, thousands of pictures, or hundreds of videos." *Id*. Today, the standard cell phone has five or six times that storage capacity[2] and the use of cloud storage has become far more ubiquitous, such that Americans rely on their phone to access potentially terabytes of personal or business data that is stored on other servers. *Riley*, 573 U.S. at 397.

On top of that, mobile devices have become the security gateway to accessing other immensely important and private information, including personal and business email, social media, and bank accounts. Many people rely on their mobile devices as the recipient of multi-factor authentication—codes sent to a cell phone to verify a person's identity when they wish to access an online account.[3] Seizing one's cell phone therefore inhibits access not only to the data stored on the physical phone and to data stored in the cloud, but may prevent the owner from accessing business and personal accounts associated with the phone.

---

[2] https://www.androidauthority.com/average-smartphone-storage-1213428/.
[3] *Multi-factor Authentication (MFA)*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY, https://www.cisa.gov/publication/multi-factor-authentication-mfa.

Mobile phones have also become a focal point when it comes to health and safety, and to everyday economic transactions.[4] A 2015 Pew Research study found that over half of smartphone owners used their phones to get help in an emergency.[5] And for many, mobile devices now act as our wallets and credit cards. Many Americans use a cell phone to complete everyday purchases, even leaving their homes without physical wallets or cards and depending instead on their phones.[6]

For low-income and homeless people, cell phones have become lifelines. The percentage of Americans making less than $30,000 a year who rely only on cell phones to access the Internet—meaning they do not have broadband internet at home—has more than doubled in the past decade.[7] These low-income Americans rely heavily on their cell phones for tasks that others may complete on larger screens,

---

[4] *See* Aaron Smith, *Chapter Two: Usage and Attitudes Towards Smartphones*, PEW RSCH. CTR. (Apr. 1, 2015), https://www.pewresearch.org/internet/2015/04/01/chapter-two-usage-and-attitudes-toward-smartphones/#job%20seeking (finding that over half of smartphone owners used their phone to look up a health condition; do online banking; access turn-by-turn navigation while driving; follow along with breaking news events; share pictures, videos, or commentary about events happening in their community; and learn about community events or activities).

[5] *Id.*

[6] Vaibhav Goel et. al, *New trends in US consumer digital payments*, MCKINSEY & CO. (Oct. 26, 2021), https://www.mckinsey.com/industries/financial-services/our-insights/banking-matters/new-trends-in-us-consumer-digital-payments.

[7] Emily A. Vogels, *Digital divide persists even as Americans with lower incomes make gains in tech adoption,* PEW RSCH. CTR. (June 22, 2021), https://www.pewresearch.org/fact-tank/2021/06/22/digital-divide-persists-even-as-americans-with-lower-incomes-make-gains-in-tech-adoption/.

9

such as seeking and applying for jobs.[8] Meanwhile, people who are homeless rely on cell phones to search for housing and jobs, to stay in contact with social services, to communicate with medical personnel, and to contact their families.[9] For the homeless population, cell phones have become a crucial resource for safety, for opportunity, and for combatting social isolation and exclusion.[10]

Depriving someone of their phone can also inhibit their political participation. Today, approximately 86% of Americans get their news through their digital devices.[11] Without their cell phone, a person might be unable to access social media, even though the Supreme Court has recognized that "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737

---

[8] *Supra* note 4.

[9] Maria C. Raven et. al, *Mobile Phone, Computer, and Internet Use Among Older Homeless Adults: Results from the HOPE HOME Cohort Study*, 6 JMIR MHEALTH UHEALTH 12 (Dec. 10, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC6305882/; Harmony Rhoades et. al, *No digital divide? Technology use among homeless adults*, J. OF SOC. DISTRESS & THE HOMELESS (Mar. 22, 2017), https://socialinnovation.usc.edu/wp-content/uploads/2018/02/Rhoades-et-al-2017-final.pdf.

[10] Rosie Spinks, *Smartphones are a lifeline for homeless people*, THE GUARDIAN (Oct. 1, 2015), https://www.theguardian.com/sustainable-business/ 2015/oct/01/smartphones-are-lifeline-for-homeless-people; *New Study Shows Cell Phone Are Essential Lifeline For Bay Area Homeless,* CBS NEWS (Dec. 5, 2018), https://www.cbsnews.com/sanfrancisco/news/new-study-shows-cell-phone-are-essential-lifeline-for-bay-area-homeless/.

[11] Elisa Shearer, *More than eight-in-ten Americans get news from digital devices*, PEW RSCH. CTR. (Jan. 12, 2021) https://www.pewresearch.org/fact-tank/2021/01/ 12/more-than-eight-in-ten-americans-get-news-from-digital-devices/.

(2017). The Court recognized that, for many, social media sites "are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id*.

For many of the above reasons, the Supreme Court has understood the Fourth Amendment to offer increased protection to cell phones compared to other personal property. *See, e.g.*, *Riley*, 573 U.S. at 386 (carving out cell phones from the "search incident to arrest" doctrine because while the rule "strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones"); *Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018) (holding that collecting information about the physical location of a cell phone from a third party is a Fourth Amendment search because people "compulsively carry cell phones with them all the time" so collecting location data constitutes "near perfect surveillance."). But here, no special rule is required. The Fourth Amendment prohibits the Government from unreasonably interfering with one's possession of any "effect," full stop. And, as described below, this case can be resolved by merely interpreting the word "seizure" to apply the same to cell phones and other effects as it does to the other things mentioned in the Fourth Amendment—

11

namely, that the seizure of a phone, like a seizure of anything else, has a duration and the Fourth Amendment requires that duration to be reasonable.[12]

It should also not be lost on this Court that the prolonged deprivation here occurred in response to political protest. The district court's decision sends the message that people who come to the nation's capital to protest, and the journalists who come to cover protests, like the plaintiffs here, are at risk of having their cell phones indefinitely confiscated, even if they are never charged with a crime and no legitimate justification remains for the seizure. The decision has the potential to chill would-be protestors, who cannot afford to lose access to their devices, along with their private correspondence and accounts.

## II. Like Any Other Seizure, The Seizure Of Personal Property Has A Duration And The Fourth Amendment Requires That The Duration Be Reasonable.

As described above, the Supreme Court has repeatedly defined a seizure of effects as a "meaningful interference with an individual's possessory interests in that

---

[12] Without the need for a special rule, the elevated concerns surrounding electronic devices have caused this Court's sister circuits to carefully scrutinize their seizure. *See, e.g.*, *United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir. 2009) ("[T]he sooner the warrant issues, the sooner the property owner's possessory rights can be restored if the search reveals nothing incriminating. If anything, this consideration applies with even greater force to the hard drive of a computer." (citation omitted)); *United States v. Smith*, 967 F.3d 198, 208 (2nd Cir. 2020) (discussing *Riley* and reasoning that "the search and seizure of personal electronic devices like a modern cell phone or tablet computer implicates different privacy and possessory concerns than the search and seizure of a person's ordinary personal effects"; further finding the distinction "vital to assessing the importance of the seized property to a defendant when the item in question is a tablet computer or other personal electronic device").

property." *Soldal*, 506 U.S. at 61; *see also Jacobsen*, 466 U.S. at 113. This understanding is in keeping with the Fourth Amendment's purpose of protecting one's right to be secure in their person and property, which operates alongside the Fourth Amendment's related purposes of protecting privacy and liberty. *See Jones*, 565 U.S. at 405 ("The text of the Fourth Amendment reflects its close connection to property."); *United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015) ("The Supreme Court has rejected the notion that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty interests are also implicated." (cleaned up)).

Neither the district court nor the District disputes that continued deprivation of a cell phone meaningfully interferes with the owner's possessory interests in that phone. It follows that the ongoing possession of the phones is a seizure, and is unconstitutional unless it is reasonable. If, as must be assumed at this stage, the District had no legitimate basis for continuing to hold on to plaintiffs' phones, then they engaged in an unreasonable seizure in violation of the Fourth Amendment. *See Brewster*, 859 F.3d at 1197 ("A seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force.").[13]

---

[13] The District argued below that "[t]he purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the *privacy* of one's person, house, papers, or effect," *Cameron* ECF 19 (Mot. to Dismiss) at 9 (emphasis added), and that "the allegedly unreasonable retention of their cell phones does not infringe

The district court eschewed that straightforward resolution of this case. It instead concluded that, "once the act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies." JA131-32. But the Supreme Court has *never* held that the prolonged seizure of a person or property is immune from Fourth Amendment scrutiny merely because that seizure was justified at its inception. It has repeatedly said the opposite: "The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation." *Terry v. Ohio*, 392 U.S. 1, 28-29 (1968); *see also Place*, 462 U.S. at 707-08 ("[T]he manner in which the seizure was conducted is, of course, as vital a part of the inquiry as whether it was warranted at all." (cleaned up)).

Indeed, if the district court's understanding of the Fourth Amendment were correct, it would render the Supreme Court's past analysis of property seizures nonsensical. For example, it would have made no sense in *United States v. Jacobsen* for the Court to consider whether officers violated the Fourth Amendment when they "converted what had been only a temporary deprivation of possessory interests into a permanent one" by destroying seized property. 466 U.S. at 125-26. Under the

---

on plaintiffs' *privacy* and, therefore, does not sound in the Fourth Amendment." *Id.* (emphasis added). The Supreme Court has expressly and unanimously rejected that argument, saying that "our cases unmistakably hold that the [Fourth] Amendment protects property as well as privacy." *Soldal*, 506 U.S. at 62.

district court's reading, the words "temporary" or "permanent" have no relevance to the Fourth Amendment because the seizure of property lasts for, and is judged at, only a single moment in time. The district court's understanding also renders nonsensical the Supreme Court's statement that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment.'" *Id.* at 124 (describing the holding of *Place*). Under the district court's interpretation of the Fourth Amendment, there is nothing to consider other than the "inception."

The district court's understanding of the Fourth Amendment required it to stack anomaly on top of anomaly. First, the court concluded that "seizure" describes only the initial taking when it comes to effects, even though that is not the case for the other categories enumerated in the Fourth Amendment. It is well established, for instance, that when a person is stopped or arrested, the reasonableness of that seizure concerns not just the initial justification for it but the duration of custody. *See, e.g.*, *Rodriguez*, 575 U.S. at 354-55 (holding in the context of a traffic stop that "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. . . . The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop" (cleaned up)); *Manuel*, 580 U.S. at 368 ("[Plaintiff]'s ensuing pretrial detention, no less than his original arrest, violated his Fourth Amendment rights."). So too when it comes to the seizure of a house. *See, e.g.*, *McArthur*, 531 U.S. at 332-33 (holding

that a "brief seizure of the premises was reasonable," in part because lasted "no longer than reasonably necessary" to obtain a search warrant).

This Court should reject the notion that a "seizure" has duration when it comes to persons and houses, but not effects. Rather, as this Court has explained in the context of other constitutional provisions, the word "seizure" should "carry the same meaning throughout the sentence." *See United States v. Park*, 938 F.3d 354, 370 (D.C. Cir. 2019); *see also Reno v. Bossier Parish School Bd.*, 528 U.S. 320 (2000) (refusing "to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying.").

The district court's conclusion also required it to create a second anomaly to reconcile Supreme Court cases indicating that the seizure of property, indeed, has a duration. As the district court noted, the Supreme Court has repeatedly acknowledged that the Fourth Amendment limits the duration of some seizures of effects. *See* JA134. Indeed, in *Segura*, "six justices agreed that a seizure reasonable at its inception can become unreasonable because of its duration." *Id.* (citing *Segura v. United State*s, 468 U.S. 796, 812, 823 (1984)). Rather than follow this where it leads—to the same place it goes in the context of persons and houses—the district court cast these cases as recognizing a duration for the seizure of effects only insofar as the effect was seized during "an initial investigatory detention." *Id*. But why would that be? To be sure, an effect that is seized based on an initial investigatory

16

detention may become unreasonable insofar as law enforcement later fails to take action that continues to justify the detention (such as seeking a warrant). But so too does it become unreasonable if the initial detention is based on some other exception to the warrant requirement, and law enforcement continues to seize the property after that justification loses its force. "The Fourth Amendment 'is implicated by a delay in returning the property, whether the property was seized for a criminal investigation, to protect the public, or to punish the individual.'" *Brewster*, 859 F.3d at 1197. Regardless of the initial justification, if the Government continues its "meaningful interference with an individual's possessory interests in [his] property," *Soldal*, 506 U.S. at 61, then it has continued to seize the property and that seizure must be reasonable.

     It really is that simple.

17

## CONCLUSION

For the foregoing reasons, the Court should reverse the decision below and hold that the continued dispossession of property without legitimate justification is an unreasonable seizure under the Fourth Amendment.

Date: February 28, 2023                    Respectfully submitted,

                                           *s/ Amir H. Ali*
                                           Amir H. Ali
                                           RODERICK & SOLANGE
                                             MACARTHUR JUSTICE CENTER
                                           501 H Street NE, Suite 275
                                           Washington, DC 20002
                                           202-869-3434
                                           amir.ali@macarthurjustice.org

                                           *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,209 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman typeface.


Date: February 28, 2023                    *s/ Amir H. Ali*
                                           Amir H. Ali

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: February 28, 2023                    *s/ Amir H. Ali*
                                           Amir H. Ali