ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-7129 & 22-7130
——————————

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
——————————

**Oyoma ASINOR**, *et al.*, *Plaintiffs-Appellants*,

v.

**DISTRICT OF COLUMBIA**, *et al.*, *Defendants-Appellees*.
——————————

**Alexander CAMERON**, *et al.*, *Plaintiffs-Appellants*,

v.

**DISTRICT OF COLUMBIA**, *Defendant-Appellee*.
——————————

Consolidated Appeals from the U.S. District Court for the District of Columbia
(Nos. 1:21-cv-02158-APM and 1:21-cv-02908-APM)
——————————

**REPLY BRIEF FOR APPELLANTS**

Jacqueline Kutnik-Bauder
Carlos Andino
Jonathan M. Smith
Kristin L. McGough
Washington Lawyers' Committee for
Civil Rights & Urban Affairs
700 14th Street, N.W., Suite 400
Washington, D.C. 20005
(202) 319-1000
jacqueline_kutnik-bauder@washlaw.org

*Counsel for Plaintiffs-Appellants
in Cameron v. District of Columbia,
No. 22-7130*

Scott Michelman
Michael Perloff
Arthur B. Spitzer
Laura K. Follansbee
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 601-4267
smichelman@acludc.org

*Counsel for Plaintiffs-Appellants
in Asinor v. District of Columbia,
No. 22-7120, and Cameron v.
District of Columbia, No. 22-7130*

*(counsel listing continues)*

Tara L. Reinhart
Julia K. York
Joseph M. Sandman
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7630
tara.reinhart@probonolaw.com

Jeffrey L. Light
Law Office of Jeffrey L. Light
1629 K Street, N.W., Suite 300
Washington, DC 20006
202-277-6213
jeffrey@lawofficeofjeffreylight.com

*Further Counsel for Plaintiffs-Appellants
in Cameron v. District of Columbia,
No. 22-7130*

April 27, 2023

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY ......................................................................................... vii

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................3

I.    The Fourth Amendment's Protection Against Unreasonable
      Seizures of Property Extends Beyond the Initial Taking of
      Possession ..................................................................................3

      A.    Defendants' Definition of Seizure Rests on a Misreading
            of Precedent ........................................................................4

      B.    Supreme Court Precedent Rebuts Defendants' Narrow
            Construction of the Fourth Amendment ..............................5

      C.    Cases About Unreasonable Warrant Delays Apply the
            Seizure Clause Once Possession Is Complete....................11

      D.    Cases About Seizures of Persons Further Debunk Defendants'
            Definition of "Seizure." ....................................................15

II.   Defendants' Swiss-Cheese Model of the Fourth Amendment
      Is Inconsistent with Fourth Amendment Principles and History .................17

III.  Plaintiffs Have Plausibly Alleged a Municipal Custom...............21

CONCLUSION ...................................................................................27

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Altman v. City of High Point*,
    330 F.3d 194 (4th Cir. 2003) ...............................................................19

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015)..........................................................25

*Brewster v. Beck*,
    859 F.3d 1194 (9th Cir. 2017) ............................................................23

*Brower v. County of Inyo*,
    489 U.S. 593 (1989)......................................................................26, 27

*California v. Hodari D.*,
    499 U.S. 621 (1991)..............................................................3, 4, 5, 6

*Carter v. District of Columbia*,
    795 F.2d 116 (D.C. Cir. 1986)........................................................22, 24

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988).........................................................................21

*City of West Covina v. Perkins*,
    525 U.S. 234 (1999).........................................................................19

*County of Riverside v. Mclaughlin*,
    500 U.S. 44 (1991)...........................................................................27

*Daskalea v. District of Columbia*,
    227 F.3d 433 (D.C. Cir. 2000).........................................................26

*First Va. Banks, Inc. v. BP Expl. & Oil Inc.*,
    206 F.3d 404 (4th Cir. 2000) ...........................................................14

*Gerstein v. Pugh*,
    420 U.S. 103 (1975).........................................................................16

*Haley v. City of Boston*,
    657 F.3d 39 (1st Cir. 2011)...........................................................22, 26

*Illinois v. Caballes*,
    543 U.S. 405 (2005)........................................................................16

*Kentucky v. King*,
    563 U.S. 452 (2011)........................................................................26

*Lin v. District of Columbia*,
    47 F.4th 828 (D.C. Cir. 2022).......................................................15

*Manuel v. City of Joliet*,
    580 U.S. 357 (2017)..................................................................15, 20

*Mitchum v. Foster*,
    407 U.S. 225 (1972)........................................................................21

*Mom's Inc. v. Willman*,
    109 F. App'x 629 (4th Cir. 2004) ...................................................6

*Owens v. Balt. City State's Attorneys Office*,
    767 F.3d 379 (4th Cir. 2014) ....................................................22, 26

*Parker v. District of Columbia*,
    850 F.2d 708 (D.C. Cir. 1988).......................................................22

*Parrott v. District of Columbia*,
    2023 WL 2162859 (D.D.C Feb. 22, 2023) ......................................1

*Powe v. City of Chicago*,
    664 F.2d 639 (7th Cir. 1981) .........................................................24

*Price v. Sery*,
    513 F.3d 962 (9th Cir. 2008) .........................................................26

*Richard A. Vaughn, DDS, P.C. v. Baldwin*,
    950 F.2d 331 (6th Cir. 1991) .........................................................17

*Robinson v. District of Columbia*,
    130 F. Supp. 3d 180 (D.D.C. 2015)...............................................24

*Rodriguez v. United States*,
    575 U.S. 348 (2015)........................................................................15

*Segura v. United States*,
    468 U.S. 796 (1984)...............................................................7, 8, 11

*Smith v. Travelpiece*,
    31 F.4th 878 (4th Cir. 2022) ...............................................14

*Soldal v. Cook Cnty.*,
    506 U.S. 56 (1992)...................................................................6

*Tate v. District of Columbia*,
    627 F.3d 904 (D.C. Cir. 2010).........................................4, 20

*Thompson v. Whitman*,
    85 U.S. 457 (1871)...................................................................5

*Torres v. Madrid*,
    141 S. Ct. 989 (2021)......................................................4, 5, 6, 16

*United States v. Burgard*,
    675 F.3d 1029 (7th Cir. 2012) ......................................8, 12, 13

*United States v. Chadwick*,
    433 U.S. 1 (1977), *abrogated on other grounds by*
    *California v. Acevedo*, 500 U.S. 565 (1991) ................................16, 17

*United States v. Christie*,
    717 F.3d 1156 (10th Cir. 2013) .......................................13

*United States v. Dass*,
    849 F.2d 414 (9th Cir. 1988) ...........................................24

*United States v. Jacobsen*,
    466 U.S. 109 (1984)..................................................6, 7, 8, 9, 10, 15

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993).....................................................................19

*United States v. Martin*,
    157 F.3d 46 (2d Cir. 1998) ...............................................12

*United States v. Martinez*,
    25 F.4th 303 (5th Cir. 2022) ............................................12

iv

*United States v. Miller*,
  799 F.3d 1097 (D.C. Cir. 2015) ............................................................6

*United States v. Mitchell*,
  565 F.3d 1347 (11th Cir. 2009) ...................................................23, 27

*United States v. One 1985 Mercedes*,
  917 F.2d 415 (9th Cir. 1990) ..............................................................20

*United States v. Place*,
  462 U.S. 696 (1983) ........................................................7, 8, 15, 16, 27

*United States v. Pratt*,
  915 F.3d 266 (4th Cir. 2019) ..............................................................12

*United States v. Shrum*,
  908 F.3d 1219 (10th Cir. 2018) ..........................................................13

*United States v. Song Ja Cha*,
  597 F.3d 995 (9th Cir. 2010) ................................................................8

*United States v. Wilson*,
  540 F.2d 1100 (D.C. Cir. 1976) ..........................................................19

*Walter v. United States*,
  447 U.S. 649 (1980) ..............................................................................8

## OTHER AUTHORITIES

Kaveh Wendell, *Police Can Use a Legal Gray Area To Rob Anyone of Their
  Belongings*, The Atlantic (Aug. 15, 2016) .........................................25

Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment:
  Giving Personal Property Due Protection*,
  125 Yale L.J. 946 (2016) ....................................................................19

Noah Webster, An American Dictionary of the English Language (1828) ...............6

Samuel Johnson, A Dictionary of the English Language (1755) .............................6

Seizure, Merriam-Webster's ........................................................................6

William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821 (2016)...........................................................................19

## GLOSSARY

| | |
|---|---|
| JA | Joint Appendix |
| MPD | Metropolitan Police Department of the District of Columbia |

# INTRODUCTION

The government does not defend the district court's reasoning, leaving unanswered why the Fourth Amendment would, as the district court suggests, require that seizures be reasonable in duration when preceding searches or other investigatory conduct, but not otherwise. Forsaking the district court places Defendants in good company. In the one case that has cited the district court's decision, Judge Lamberth rejected its reasoning, stating that "a seizure of property for use as evidence that is valid at its inception may become unreasonable if it outlasts its initial justification." *Parrott v. District of Columbia*, 2023 WL 2162859, at *5 (D.D.C Feb. 22, 2023).

To defend the judgment below, Defendants posit a theory that is both more radical and more flawed than the district court's. Defendants contend that a "seizure of property" means only a "taking of possession," such that the seizure ends when it begins, and has practically no "duration" at all. Multiple Supreme Court cases debunk this view by requiring reasonableness not only in the seizure's inception but also in the manner of executing the seizure after the government has secured possession.

Defendants' misconception stems from their attempt to define the Fourth Amendment's scope based solely on cases concerning a seizure's inception, while brushing aside cases applying the Fourth Amendment's Seizure Clause to events

1

after the dispossession is complete. Both *Torres v. Madrid* and *California v. Hodari D.*, the cases on which Defendants chiefly rely, cite dictionaries defining a seizure of property as a "taking possession," but do so in explaining when a seizure begins, not when it ends. Those decisions had no reason to consider what obligations arise once the government acquires possession. Indeed, the same dictionaries define "seizure" not only as a "taking possession" but also as "possession" or "the state of being seized." The Supreme Court has repeatedly used the word "seizure" in the latter sense as well as the former: *United States v. Place*, *United States v. Jacobsen*, and *Segura v. United States* all teach that a seizure must be reasonable in its inception (a "taking possession") *and* in its manner of execution after possession is secured (i.e. treatment of the item during its "state of being seized"). Defendants' theory thus lops off an entire category of Fourth Amendment requirements.

To reach this result, Defendants contort many cases. After pulling definitions out of context from *Torres* and *Hodari*, Defendants posit implausible distinctions to attempt to divorce the results in *Place*, *Jacobsen*, and *Segura* from their rationales. Defendants then misread the cases about unreasonable delays in obtaining warrants as challenging the constitutionality only of searches, when, in fact, those cases contest searches only as the "fruit" of lawfully initiated but unreasonably prolonged *seizures*. Even after these interpretative gymnastics, Defendants' approach still

2

contains unprincipled exceptions and unmoors the Fourth Amendment from its history. Their construction of the Fourth Amendment is untenable.

As for municipal liability, Defendants misconstrue Plaintiffs' Complaints and defend a pleading-stage dismissal by citing cases about burdens at summary judgment. Construed in the light most favorable to Plaintiffs, as required on a motion to dismiss, the Complaints' discussion of more than 200 incidents of unreasonably prolonged seizures easily states plausible allegations of a custom.

## ARGUMENT

### I.    The Fourth Amendment's Protection Against Unreasonable Seizures of Property Extends Beyond the Initial Taking of Possession.

Defendants stake their defense of the judgments below on the proposition that a "seizure" of property means only the act of "taking possession" and that therefore the Fourth Amendment generally has no bearing on what the government does with the property afterward. Although it is true that a seizure of property does not begin until the government takes possession of the item, *California v. Hodari D.*, 499 U.S. 621, 624 (1991), Defendants err in insisting that the seizure generally ends at this moment too. *See* Resp. Br. 16. Understanding "seizure" to mean *solely* a "taking possession" leaves no room for most seizures to have a "manner of execution" after the seizure's inception: a seizure is initiated, executed, and completed all at once.

3

The Supreme Court and appellate courts have repeatedly applied the Fourth Amendment to events occurring after the initial "taking possession"—thus disproving Defendants' fundamental premise.

## A.      Defendants' Definition of Seizure Rests on a Misreading of Precedent.

Defendants define the full scope of the Fourth Amendment's Seizure Clause based on cases discussing the Clause's application only in limited contexts. Defendants primarily rely on *Torres v. Madrid*, 141 S. Ct. 989 (2021), and *Hodari*, which both address only questions about what government conduct suffices to *initiate* a seizure. *Torres* explained: "The question in this case is whether a seizure occurs when an officer shoots someone who temporarily eludes capture after the shooting." 141 S. Ct. at 993-94. And in *Hodari*, "the only issue presented [was] whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment." 499 U.S. at 623. Neither case purports (or had reason) to define the full range of the Seizure Clause's applicability.

Defendants likewise misunderstand *Tate v. District of Columbia*, 627 F.3d 904 (D.C. Cir. 2010), which held that the government's sale of a car it had previously seized did not constitute a Fourth Amendment seizure. While the Court cites *Hodari*, *id*. at 912, its statement that the car "was already in the District's lawful possession and control," *id*., did not refer merely to an earlier Fourth Amendment seizure but to the District's having obtained title to the car through its "progressive forfeiture

4

regime" under which the car was "declared abandoned" and the District effected a "lawful taking," *id*. at 909. Thus, when it was sold at auction it was simply no longer Ms. Tate's car. It is telling that no court has cited *Tate* for the proposition Defendants ascribe to it—indeed, no court has cited the part of *Tate* that Defendants cite at all.

Defendants also emphasize the Supreme Court's statement, "a seizure is a single act, and not a continuous fact," but read that language out of context too. *Thompson v. Whitman*, 85 U.S. 457, 458, 470 (1873), in which the phrase originated, did not involve the Fourth Amendment at all, but a New Jersey statute permitting the condemnation of certain vessels after a hearing before justices "of the county where such seizure shall have been made." The Court noted that a seizure is a "single act" to explain why Monmouth County justices did not have jurisdiction over a vessel seized outside their county but later moved into it by the sheriff. *Id.* at 471. *Hodari* quoted *Thompson* with a "*cf.*" signal to support its conclusion that, though seizure of a person can begin with a touch, the seizure does not remain ongoing if the person escapes. *See* 499 U.S. at 625. *Torres* cited *Thompson* for the same point. 141 S. Ct. at 1002. Critically, none of these cases purports to announce a comprehensive definition of "seizure" that excludes other meanings of the term.

## B. Supreme Court Precedent Rebuts Defendants' Narrow Construction of the Fourth Amendment.

When the Supreme Court has sought to define the Seizure Clause's scope, it has explained that "A 'seizure' of property occurs when there is some meaningful

interference with an individual's possessory interests in the property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "The Fourth Amendment regulates all such interference, and not merely the initial acquisition of possession." *Mom's Inc. v. Willman*, 109 F. App'x 629, 637 (4th Cir. 2004) (per curiam). Courts have used this definition several times without mentioning the *Torres/Hodari* formulation. *See, e.g.*, *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992); *United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015).

History supports this inclusive approach. The founding-era dictionary (Webster's 1828 edition) cited in both *Hodari*, 499 U.S. at 624, and *Torres*, 141 S. Ct. at 995, defined "seizure" in both the sense in which those cases used it (as a "taking possession") *and* the sense in which the Plaintiffs use it here (as a "possession"). Noah Webster, An American Dictionary of the English Language (1828);[1] *see also* Samuel Johnson, A Dictionary of the English Language (1755) (defining seizure as, among other things, "[t]he act of taking forcible possession" as well as "possession").[2] Likewise, the current edition of Merriam-Webster's Dictionary defines "seizure" to mean both "the act, action, or process of seizing" and "the state of being seized"; both definitions date back to the fifteenth century. Seizure, Merriam-Webster's.[3]

---

[1] https://webstersdictionary1828.com/Dictionary/seizure
[2] https://johnsonsdictionaryonline.com/1755/seizure_ns
[3] https://www.merriam-webster.com/dictionary/seizure

The Supreme Court has repeatedly applied the Seizure Clause to govern not only the "taking possession" of property but also its treatment during the "state of being seized." In *United States v. Place*, 462 U.S. 696 (1983), the Court held that a seizure of a traveler's luggage violated the Fourth Amendment based on "the manner in which the seizure … was conducted," *id.* at 707 (cleaned up)—namely, officers' 90-minute retention of the luggage *after* taking possession of it so a dog could sniff it. *See id.* at 708-10.

*United States v. Jacobsen*, 466 U.S. 109, 124 (1984), cited *Place* as holding that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable seizures." The Court applied this rule to assess the reasonableness of a field test of powder, treating it as part of the seizure's "manner of execution" even though it occurred *after* and separately from the government's acquisition of the package containing the powder. *Id.* at 124-25.

And in *Segura v. United States*, six justices agreed that "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons." 468 U.S. 796, 812 (1984) (opinion of Burger, C.J., joined by O'Connor, J.); *id.* at 823 (Stevens, J., dissenting, joined by Brennan, Marshall, and Blackmun, JJ.) ("Even a seizure reasonable at its inception

can become unreasonable because of its duration."). These justices understood that the Fourth Amendment's seizure clause governed not only the initial entry into an apartment, but also the 19-hour period in which officers occupied it. *See id.* at 812-13 (opinion of Burger, C.J.) and 823-24 (Stevens, J., dissenting).[4] If, as Defendants contend, "seizure" means taking possession and the Seizure Clause shuts off when possession is secured, these cases would make no sense.

Defendants characterize (at 12 and 16) *Place* and *Jacobsen* as "exceptions" to its general rule, but even so construed those cases do not fit with Defendants' rule in a principled way. In *Place*, an agent "made a 'seizure' of Place's luggage for purposes of the Fourth Amendment when … the agent told Place that he was going to take the luggage to a federal judge to secure issuance of a warrant." 462 U.S. at 707. The Court did not hold the seizure complete and the Fourth Amendment inoperative after that moment; rather, it concluded that the seizure lasted at least 90 minutes more and that this length of time made the seizure unreasonable. *Id.* at 710. Defendants argue (at 25) that *Place* is an exception to its general rule because the

---

[4] Contrary to Defendants' assertions (at 27), the fact that this conclusion did not appear in a majority opinion does not sap its significance. The Supreme Court has adhered to rules that "a majority did agree on" even though "there was no single opinion of the Court." *See Jacobsen*, 466 U.S. at 116 (abiding by framework from *Walter v. United States*, 447 U.S. 649 (1980), in such circumstances). Accordingly, appellate courts have granted significant weight to the proposition from *Segura* cited above. *See United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012); *United States v. Song Ja Cha*, 597 F.3d 995, 1000 (9th Cir. 2010).

seizure was initiated on "reasonable suspicion, not probable cause." Yet if the Fourth Amendment's text constrains the word "seizure" to mean only a "taking possession," that meaning should remain consistent regardless of the quantum of suspicion used to justify the seizure.

Moreover, *Place* is not limited to reasonable-suspicion seizures. Nor is it limited (as Defendants also suggest, at 25) to seizures that are akin to *Terry* stops because they effectively limit a person's freedom of movement. Rather, *Jacobsen* applied *Place* to a seizure initiated on probable cause, *see* 466 U.S. at 121 n.20, 124, and stated *Place*'s holding in terms extending far beyond the *Terry*-adjacent context: "as *Place* also holds, a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes *possessory* interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Id.* at 124 (emphasis added). The Court thus made clear that *Place* is not limited in the ways Defendants posit.

With respect to *Jacobsen* itself, Defendants argue (at 26-27) that because the "execution" of the seizure there infringed the defendants' possessory interests by permanently destroying their property, the case does not address executions of seizures that, like the ones here, involve the prolonged retention of items. But *Jacobsen* rooted its analysis in *Place*, where the seizure's execution infringed the owner's interests based on its duration, not any destruction. Indeed, in a footnote to

9

its conclusion that seizures must be reasonable in inception and manner of execution, *Jacobsen* states: "In *Place*, the Court held that while the initial seizure of luggage for the purpose of subjecting it to a 'dog sniff' test was reasonable, the seizure became unreasonable because its length unduly intruded upon constitutionally protected interests." 466 U.S. at 124 n.25. This understanding of *Place* makes clear that, contrary to Defendants' assertions, a lawfully-initiated but unreasonably prolonged seizure is the paradigmatic example of a seizure reasonable at its inception but not in its execution.

Moreover, even Defendants' own account of *Jacobsen*, as about only property destruction, does not harmonize that decision with their Fourth Amendment theory. If, as Defendants contend (at 11), a Fourth Amendment seizure is "defined as a 'taking possession,'" the Amendment could not speak to the government's destruction of property after dispossession is complete. Defendants do not explain how, even on their view, *Jacobsen* fits within the textual confines it applies to the Fourth Amendment.

Defendants' revisionist account of Supreme Court caselaw thus fails. *Place*, *Jacobsen*, and *Segura* show that the Fourth Amendment governs a property seizure's inception and its manner of execution after possession is complete, including its duration.

### C.    Cases About Unreasonable Warrant Delays Apply the Seizure Clause Once Possession Is Complete.

Defendants attempt to rewrite *Segura* and appellate cases like it. First, they assert (at 31) that *Segura* applied special protections because it involved the prolonged seizure of a home. However, no Justice advanced that distinction and two said the opposite, reasoning that the "heightened protection[s]" accorded to homes solely protect privacy and are "simply not implicated where a seizure of premises, not a search, is at issue." *See Segura*, 468 U.S. at 810 (opinion of Burger, C.J.).

Second, Defendants' attempt to characterize *Segura* as a case challenging the legality of a search rather than a seizure. Resp. Br. 31. But Defendants' interpretation is scuttled by the majority's framing of the case as involving "two separate questions: first, whether the entry and internal securing of the premises constituted an impermissible *seizure* of all the contents of the apartment, seen and unseen; [and] second, whether the evidence first discovered during the search of the apartment pursuant to a valid warrant issued the day after the entry should have been suppressed as 'fruit' of the illegal entry." *Segura*, 468 U.S. at 798 (emphasis added).[5]

The *Segura* defendants clearly rested their bid to suppress evidence from the search entirely on their argument that the *seizure* was unconstitutional. Thus, the

---

[5] Chief Justice Burger wrote for the Court in all but one section. *See* 468 U.S. at 797 n.†.

11

legal question at issue was the constitutionality of the seizure, including its duration, not the search.

Like the six justices in *Segura*, appellate courts have recognized that delaying a warrant application can infect a seizure; however, Defendants again improperly treat these cases as assessing searches. For example, in *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019), the defendant moved to suppress illicit photographs that officers found on his phone not by attacking the search directly but by arguing that the search was the fruit of a *seizure* lawful at its inception but unreasonable in duration. The Fourth Circuit did not analyze the legality of the search; rather, "the constitutional question [was] whether the extended seizure of Pratt's phone was reasonable." *Id.* Eleven federal circuits and the D.C. Court of Appeals have similarly concluded that a lawfully-initiated seizure can *become* unlawful if unreasonably *extended* for the acquisition of a warrant. *See* Opening Br. 24-26; *see also United States v. Martinez*, 25 F.4th 303, 307 (5th Cir. 2022); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998).

Though characterizing *all* unreasonable-delay cases as implicating searches alone, Defendants analyze only two of them. In one, *United States v. Burgard*, 675 F.3d 1029, 1031-32 (7th Cir. 2012), police extended the seizure of a cellphone so they could acquire a warrant to search and seize its contents. Defendants contend *Burgard* recognized that a delay in obtaining the warrant could impugn the "new

search and seizure" of the cellphone's contents, not the extended retention of the phone itself. Resp. Br. 30 (quoting *Burgard*, 675 F.3d at 1032). But notwithstanding the quoted phrase, the court's reasoning centered on the phone, not its contents, and on the phone's seizure, not the subsequent search. The court stated that the case presented "one narrow question: did the six-day delay in securing a warrant render the *seizure of Burgard's phone* unreasonable for purposes of the Fourth Amendment?" 675 F.3d at 1031 (emphasis added). Likewise, the court justified its rule in terms that apply to the seized object, not just its contents: "The longer the police take to seek a warrant, the greater the infringement on the person's possessory interest will be, for the obvious reason that a longer seizure is a greater infringement on possession than a shorter one." *Id.* at 1033.

Defendants also discuss *United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013), which they correctly state was framed as an attack on the search warrant, not the seizure. Nonetheless, then-Judge Gorsuch's condemnation of holding onto property for no good reason left open the possibility that the unreasonable retention could create a problem with the seizure as well, *see id.* at 1162—a position the Tenth Circuit subsequently adopted. *See United States v. Shrum*, 908 F.3d 1219, 1232 (10th Cir. 2018) ("[T]he time taken to procure a warrant bears upon the *continuing reasonableness of a seizure* reasonable at its inception") (emphasis added)).

Ultimately, Defendants cannot brush aside the entire line of unreasonable-delay cases as being about searches not seizures. Rather, those cases implement the lesson of *Place*, *Jacobsen*, and *Segura*: that a seizure extends beyond the initial "taking possession" and that an initially lawful seizure can violate the Fourth Amendment by lasting longer than reasonably necessary for the government to achieve its legitimate objectives.

As Plaintiffs have shown, courts have applied that rule not only to scrutinize seizures extended by a tardy warrant application, but also to seizures extended for other reasons. *See* Opening Br. 18-20. Defendants are flat wrong to say (at 13) that one such decision, *Mom's Inc.*, was "called into doubt" by *Smith v. Travelpiece*, 31 F.4th 878, 888 (4th Cir. 2022), a Fourth Circuit decision that did not mention it and held only that the statute of limitations for challenging a misleading warrant application accrued when the seizure based on the warrant occurred. A statute of limitations accrues when an injury begins, but that says nothing about when the injury ends. *See First Va. Banks, Inc. v. BP Expl. & Oil Inc.*, 206 F.3d 404, 406 (4th Cir. 2000) (holding trespass statue accrued when property was breached, despite the harm persisting). *Mom's Inc.*'s rule is the correct one because it is the rule consistent with Supreme Court precedent.

14

**D.    Cases About Seizures of Persons Further Debunk Defendants' Definition of "Seizure."**

With respect to people, as with property, the Seizure Clause governs "the state of being seized," and not merely a seizure's initiation. Officers violate the Fourth Amendment by extending a lawfully-initiated traffic stop beyond the time needed to complete their traffic-related mission. *Rodriguez v. United States*, 575 U.S. 348, 355-57 (2015). They also do so by prolonging a seizure of a person, lawfully initiated on probable cause, after probable cause has dissipated. *Lin v. District of Columbia*, 47 F.4th 828, 839-40 (D.C. Cir. 2022). The Fourth Amendment further "provides standards and procedures for the detention of suspects pending trial." *Manuel v. City of Joliet*, 580 U.S. 357, 369 n.8 (2017) (cleaned up). If a seizure were solely a "single act," it could not possibly cover this range of events occurring after a person is in custody.

Defendants' view (at 32-37) that principles on person seizures have no bearing on property seizures is not shared by the Supreme Court. In the specific context of determining whether the Seizure Clause applies after the government secures control of a person or an item, the Supreme Court has used cases about persons to define the protections for property and vice versa. *See Place*, 462 U.S. at 701 (quoting *Terry* for the proposition that "the manner in which the seizure … [was] conducted" could make the luggage seizure unreasonable (alterations original)); *Jacobsen*, 466 U.S. at 113 n.5 (using person-seizure cases to define a "'seizure' of property" under the

Fourth Amendment); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (invoking *Jacobsen* for proposition that a lawfully-initiated traffic stop can become unreasonable based on its "manner of execution"); *Gerstein v. Pugh*, 420 U.S. 103, 116 n.17 (1975) (discussing historic procedures for property seizures as support for mandating probable cause hearings for warrantless arrests).

Defendants suggest (at 35) that property differs from people because intrusions on liberty interests persists during a detention, whereas the intrusion on possessory interest "can fairly be said to happen only once." *Place* rejected that very argument, reasoning instead that "[t]he intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent." 462 U.S. at 705.

Certainly, as *Torres* recognized, the rules for when seizures begin may differ as to people versus property, 141 S. Ct. at 1002, and as *Place* recognized, the rules for what makes seizures "reasonable" may differ in those contexts too. 462 U.S. at 708. But differences in how a seizure begins or becomes unreasonable do not mean that the Fourth Amendment accords significant categories of protections—such as those applying after possession or custody is secured—exclusively in one context. As a general matter, the Fourth Amendment "draws no distinctions among 'persons, houses, papers, and effects' in safeguarding against unreasonable searches and seizures." *United States v. Chadwick*, 433 U.S. 1, 8 (1977), *abrogated on other*

16

*grounds by California v. Acevedo*, 500 U.S. 565 (1991). And as a specific matter, cases such as *Place*, *Jacobsen*, *Caballes*, and *Gerstein*, show that the Court views safeguards for property and people as related in the circumstances here.

## II. Defendants' Swiss-Cheese Model of the Fourth Amendment Is Inconsistent with Fourth Amendment Principles and History.

In addition to conflicting with a trove of binding and persuasive authority, Defendants' contention that the Seizure Clause governs only the initial "taking possession" and not what happens afterward is a rule littered with exceptions. On Defendants' own terms, their limit does not apply if the seizure is initiated on reasonable suspicion, involves destruction of a portion of the seized item or some other undefined additional intrusion, or is of a person. Resp. Br. 12, 16, 35. The rule also cannot apply to seizures initiated on consent, for when "the government's right to possession stem[s] from the owner's consent, the government ha[s] no right to possession after consent [is] withdrawn." *Richard A. Vaughn, DDS, P.C. v. Baldwin*, 950 F.2d 331, 333 (6th Cir. 1991). And, read properly, the unreasonable-delay cases mean, at minimum, that a seizure must last beyond the "taking possession" to govern the period preliminary to an application for a search warrant.

All these exceptions to Defendants' general rule share commonalities with the circumstances here. All implicate events occurring after the government has obtained possession of property (or custody of a person) and all the property-based exceptions protect the same possessory interest that Plaintiffs invoke: the interest in

17

regaining property that the government takes. Yet Defendants draw an arbitrary line between Plaintiffs' circumstances and these others—a line for which Defendants provide no principled rationale, other than their obvious need to square their narrow conception of a "seizure" with the many cases, including Supreme Court cases, that don't fit their theory.

That theory, moreover, defies not only case law but also historical practice. The Fourth Amendment's requirement that seizures last no longer than reasonably necessary is rooted in the common-law tradition from which the Fourth Amendment emerged. *See* Opening Br. 34-36. Questioning the significance of the history on which Plaintiffs rely, Defendants ask whether an unreasonable retention of property would have been "regarded as an unlawful … seizure under the common law when the [Fourth] Amendment was framed." Resp. Br. 34 n.6 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 299 (1999)). The answer is yes: as discussed above, founding-era dictionaries defined a seizure as "possession" and founding era common law construed a "possession" that exceeded its lawful duration as illegal, *see* Opening Br. 34-36; Br. of Cloud & Clancy as Amici Curiae 22-24.

Although Defendants (at 34 n.6) cite a 1984 concurring opinion stating that common-law actions relevant to the claim at issue here—trover, detinue and conversion—did not constitute Fourth Amendment claims, modern scholarship has clarified the Fourth Amendment's original meaning and the central role that

18

protecting property rights played in its establishment. *See* William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1841 (2016); Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 Yale L.J. 946, 987-92 (2016). Additionally, more recent decisions have looked to the common-law understanding of trover to ground Fourth Amendment claims. *See Altman v. City of High Point*, 330 F.3d 194, 202 (4th Cir. 2003) (Luttig, J.).

Attempting to restrict Plaintiffs' claims to the realm of due process, Defendants (at 21) identify cases that have recognized process-based challenges to injuries similar to the ones here, but nothing in those decisions addresses, much less forecloses, the availability of Fourth Amendment relief. *See City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999) (stating that "[a]t this stage, no one contests" the legality of a property seizure, leaving the only a due process challenge to notice on procedures for regaining the seized items); *United States v. Wilson*, 540 F.2d 1100, 1103-04 (D.C. Cir. 1976) (holding that courts have equitable jurisdiction to return property seized for a criminal case without commenting on whether Fourth Amendment imposes similar obligations). And, more generally, the Supreme Court has made clear that both the Fourth and Fifth Amendments may apply to the same situation. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 50

(1993) ("The proper question is not which Amendment controls but whether either Amendment is violated.").

Of course, the Fourth Amendment does not govern property seizures forever. In the person-seizure context, "once a [criminal] trial has occurred, the Fourth Amendment drops out," *Manuel v. City of Joliet*, 580 U.S. 357, 369 n.8 (2017), and further challenges to custody arise under due process, *id.*, or the Eighth Amendment. Where trials assess individuals' guilt, forfeiture proceedings assess the "guilt of property," *United States v. One 1985 Mercedes*, 917 F.2d 415, 419 (9th Cir. 1990), and their commencement similarly terminates Fourth Amendment's applicability to a seizure's duration. (This point bears on *Tate*, 627 F.3d 904, which held the Fourth Amendment inapplicable to the District's sale of a car that occurred after its "progressive forfeiture regime," *id*. at 912, found the car to be abandoned, *id*. at 909. Thus, the Fourth Amendment dropped out before the sale happened.)

Defendants contend (at 23) that ruling for Plaintiffs will "constitutionalize what would otherwise be state-law determinations" under state equivalents to Criminal Rule 41(g), prompting a flood of federal cases. Yet the government cannot point to a deluge of federal challenges to prolonged property retention in the Fourth or Ninth Circuits where the proper rule applies. The likely reason is that most prolonged retentions occur when there are pending criminal charges, so defendants can file a Rule 41(g) motion in their ongoing case and thereby avoid hiring lawyers

to sue in civil court, where the attorneys' fees would often exceed the value of the case.

But even if Rule 41(g) provided an effective mechanism to obtain the return of seized property where no criminal case was pending, that would not mean the improperly prolonged retention of the property wasn't a Fourth Amendment violation redressable under § 1983—for example, in an action for damages. Congress passed § 1983 to "interpose the federal courts between the States and the people, as guardians of the people's federal rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). Defendants' fear that people will use that remedy as intended is not a reason to foreclose it.

## III.    Plaintiffs Have Plausibly Alleged a Municipal Custom.

A municipality can be liable for its employees' constitutional torts when they occur as a matter of "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (cleaned up).

Here, Plaintiffs plausibly allege a D.C. custom of retaining cellphones seized from arrestees for longer than reasonably necessary for any legitimate governmental purpose. The allegations include: over 200 specific examples of past incidents where D.C. unreasonably retained seized cellphones; the existence of a large bin in MPD's

21

Evidence Control Branch for cellphones MPD seized but has not returned; an *Atlantic* article discussing the District's practice of not returning seized cellphones and other items; a D.C. Office of Police Complaints report that MPD officers have failed to comply with written property policies; and the conclusion of "numerous defense attorneys" that "prolonged retentions of the type complained of in this case … occur regularly." JA25-29, JA55-59. These allegations more than suffice to plausibly allege a custom.

In arguing otherwise, Defendants misstate the law and Plaintiffs' allegations. Defendants assert that Plaintiffs must present "concentrated, fully packed, precisely delineated scenarios." Resp. Br. 46-47 (quoting *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988)). But this Court has applied that standard only in *Parker* and *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986)— appeals from unfavorable verdicts where plaintiffs failed to establish municipal liability *during trial*. This Court has never applied that standard to a motion to dismiss. At this stage, "the recitation of facts need not be particularly detailed." *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 403 (4th Cir. 2014) (holding that plaintiff alleged custom of *Brady* violations based on allegations of "reported and unreported cases and numerous successful motions," which the plaintiff did not describe); *Haley v. City of Boston*, 657 F.3d 39, 53 (1st Cir. 2011) (declining to dismiss deliberate-indifference theory based on similar allegations).

Defendants also try to water down Plaintiffs' allegations by misreading the Complaints. Defendants mischaracterize the allegations about the inauguration protests as stating that "many" phones were not timely returned—implying ambiguity regarding the number of unreasonably prolonged seizures. Resp. Br. at 46. In fact, Plaintiffs alleged that D.C. seized phones from "*all or nearly all* of the individuals, numbering more than 200, arrested in downtown Washington during the January 20, 2017 protests" and "did not return the phones for at least eight months and in some cases much longer." JA25-26, JA56-57 (emphasis added).

Defendants also complain (at 46) that Plaintiffs fail to specify when inauguration protestors' charges were dropped or when they requested their phones back. But neither of those moments establishes the government's deadline to return seized property; instead, that point is calculated from when the "government's justification [no longer] holds force." *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017); *see also United States v. Mitchell*, 565 F.3d 1347, 1348-50, 1353 (11th Cir. 2009) (holding a seizure's duration violated the Fourth Amendment without referencing whether the owner requested the property's return). Plaintiffs alleged sufficient facts to show that the government's justification for retaining the property had expired: as Plaintiffs explain, "any material relevant to the criminal charges arising out of th[e] protest … could have been downloaded by the government expeditiously" because the District has the capacity to obtain search warrants for cell

23

phones in days (based on a policy requiring officers to do so) and the technology to extract any relevant data from the phones within minutes. JA20-21, JA25, JA54, JA57. Granting Plaintiffs the reasonable inferences to which they are entitled, the government could have obtained any evidence it needed in far less than eight months, even for a "large-scale incident," *id.* 46; *see United States v. Dass*, 849 F.2d 414, 415, 416 (9th Cir. 1988) (O'Scannlain, J.) (holding lawfully-initiated "seizures [of packages] violate[d] the Fourth Amendment" when the government waited 7-23 days after acquiring probable cause to obtain search warrants, even though, as the dissent noted, the seizures were part of a significant operation involving 441 packages).

Defendants do not contest that Plaintiffs' remaining examples of seven additional prolonged seizures occurring separately from the inauguration protests contain sufficient detail. Defendants instead charge (at 47) that they are too few in number to establish a custom. But "no numerical standard" is required for a custom, *Carter*, 795 F.2d at 116, and courts have found even small numbers of past incidents sufficient. *See, e.g., Powe v. City of Chicago*, 664 F.2d 639, 651 (7th Cir. 1981) (refusing to dismiss custom claim based on four arrests on a single invalid warrant because the constitutional violations involved "various employees"); *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 196-97 (D.D.C. 2015) (custom claim based on 22 examples survived summary judgment). In any event, when the

24

Complaints are properly construed, Plaintiffs have alleged over 200 examples, not just seven—as well as several other sets of facts demonstrating custom.

Defendants' attacks on those additional facts are unpersuasive. They emphasize (at 45) that *The Atlantic* article discusses nongermane topics; however, Plaintiffs rely on the article for its interviews with attorneys about D.C.'s failure to return seized, non-forfeited items, *see* JA28-29, JA58; Kaveh Wendell, *Police Can Use a Legal Gray Area To Rob Anyone of Their Belongings*, The Atlantic (Aug. 15, 2016).[6] Defendants characterize the Office of Police Complaints report as covering different property abuses than the ones at issue here, Resp. Br. 44; however, the report's relevance is in showing that officers repeatedly violate MPD's property policies, *see* JA121. Finally, Defendants contend (at 45-46) that MPD's "large bin" of cellphones may contain phones that were abandoned, rather than seized and retained. But the Complaints allege that MPD referred protestors to the bin to find previously seized phones. JA26, 55-58 (emphasis added). Thus, the inference that the bin was for seized phones is quite plausible. Even if Defendants can concoct another explanation, "[a] complaint survives a motion to dismiss even if there are two alternative explanations … both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). Combined with

---

[6] https://www.theatlantic.com/technology/archive/2016/08/how-police-use-a-legal-gray-area-to-rob-suspects-of-their-belongings/495740/

the 200-plus specific examples, these allegations far exceed what courts generally require to allege a custom. *See Owens*, 767 F.3d at 403; *Haley*, 657 F.3d at 53.

For the first time on appeal, Defendants invoke D.C. policy on property retention as a shield to liability, Resp. Br. 47-48, but "a paper policy cannot insulate a municipality from liability where there is evidence … that the municipality was deliberately indifferent to the policy's violation." *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000). The same principle precludes an "official policy" from defeating a claim, like Plaintiffs', that a "custom of the City might in fact have deprived [a plaintiff] of his constitutional rights." *Price v. Sery*, 513 F.3d 962, 971, 973-74 (9th Cir. 2008).

Finally, Defendants assail Plaintiffs' custom allegations as alleging only negligent conduct, but two arguments independently defeat that point. First, the Fourth Amendment governs the duration of seizures regardless of whether police extend them deliberately. While police must *initiate* a seizure intentionally, *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989), intent is not required for all aspects of a Fourth Amendment violation. Generally, the Supreme Court has concluded "that evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Kentucky v. King*, 563 U.S. 452, 464 (2011) (cleaned up). Accordingly, as Defendants do not contest (at 49 n.11), forgetfulness does not

exculpate officers who hold arrestees longer than 48 hours before providing the probable cause hearing required by *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Likewise, seizures of property violate the Fourth Amendment based on duration when the cause of the delay was negligence. *See Place*, 462 U.S. at 710 (holding detention of luggage unreasonable where delay arose from officers' failure to "diligently pursue their investigation"); *Mitchell*, 565 F.3d at 1353 (finding Fourth Amendment violation where officers extended a seizure because they "simply believed that there was no rush" to secure a warrant).

In any event, this Court need not decide the requisite mental state here, because Defendants' argument fails for a second, independent reason: regarding almost every example of the custom, Plaintiffs allege that MPD either "refused" to return the device or delayed returning it despite the owner's request. *See* JA25-28, JA55-57. Granting Plaintiffs reasonable inferences, retaining property after a request is an intentional or, at minimum, knowing act, not the mere "accidental effect[] of otherwise lawful government conduct." *Brower*, 489 U.S. at 596.

In sum, granting Plaintiffs favorable inferences, the Complaints plausibly allege a custom of extending seizures longer than reasonably necessary for any legitimate governmental goal.

## CONCLUSION

The judgments should be reversed.

27

April 27, 2023                              Respectfully submitted,

                                           */s/ Scott Michelman*
                                           Scott Michelman
                                           Michael Perloff
                                           Arthur B. Spitzer
                                           Laura K. Follansbee
                                           American Civil Liberties Union Foundation
                                           of the District of Columbia
                                           915 15th Street NW, Second Floor
                                           Washington, D.C. 20005
                                           202-601-4267
                                           smichelman@acludc.org

                                           *Counsel for Plaintiffs-Appellants*
                                           *in Asinor v. District of Columbia,*
                                           *No. 22-7129*, and *Cameron v. District of*
                                           *Columbia*, No. 22-7130

                                           Jacqueline Kutnik-Bauder
                                           Carlos Andino
                                           Jonathan M. Smith
                                           Kristin L. McGough
                                           Washington Lawyers' Committee for
                                           Civil Rights & Urban Affairs
                                           700 14th Street, N.W., Suite 400
                                           Washington, D.C. 20005
                                           (202) 319-1000
                                           jacqueline_kutnik-bauder@washlaw.org

                                           Jeffrey L. Light
                                           Law Office of Jeffrey L. Light
                                           1629 K Street, N.W., Suite 300
                                           Washington, DC 20006
                                           202-277-6213
                                           jeffrey@lawofficeofjeffreylight.com

                                           Tara L. Reinhart
                                           Julia K. York
                                           Joseph M. Sandman

28

1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7630
tara.reinhart@probonolaw.com

*Counsel for Plaintiffs-Appellants*
*in Cameron v. District of Columbia,*
*No. 22-7130*

29

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,403 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface (Times New Roman 14-point type) using Microsoft Word.

/s/ *Scott Michelman*
Scott Michelman